E-FILED
Friday, 03 April, 2020  03:23:56 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| **MAVIDEA TECHNOLOGY GROUP, LLC** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.      1:20-CV-1139** |
| | ) | |
| **JAMIE WARMBIR; CHARLOTTE WARMBIR; WARMBIR IT SOLUTIONS, LLC, an Illinois limited liability company;** | ) ) ) ) | **JURY TRIAL REQUESTED** |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

NOW COMES the Plaintiff, MAVIDEA TECHNOLOGY CROUP, LLC, an Illinois limited liability company ("Plaintiff" or "Mavidea"), for its Complaint against JAMIE WARMBIR, individually, CHARLOTTE WARMBIR, individually, and WARMBIR IT SOLUTIONS, LLC, an Illinois limited liability company ("Warmbir IT"), respectfully states to the Court as follows:

## JURISDICTION AND VENUE

1) This Court has subject matter jurisdiction over this action under 28 U.S.C. §§1331 and 1367.  The Court has federal question jurisdiction because Mavidea asserts claims under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §1836, et. seq.

2)  The Court has supplemental jurisdiction over all claims for which the Court lacks original jurisdiction because Mavidea's claims arise out of the same common nucleus of

operative facts, namely, Defendants improper and illegal actions immediately before and after Jamie Warmbir's separation from Mavidea.

3)  This Court has general jurisdiction over Jamie Warmbir and Charlotte Warmbir as they are individuals domiciled in the State of Illinois.

4)  This Court has general personal jurisdiction over Warmbir IT as it is an entity 1) formed under the laws of the State of Illinois, 2) maintains its principal place of business in the State of Illinois, 3) regularly conducts business in the State of Illinois.

5) Venue is proper in this District and Division pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to this action took place in this District and Division, the Defendants are all domiciled in this District and Division, Mavidea's principal place of business is in this District and Division, and the harm is felt in this District and Division.

## THE PARTIES

6)  Mavidea is an Illinois limited liability company with its principal place of business located at 14170 Carole Dr., Bloomington, Illinois.  Mavidea is, and at all times mentioned was, authorized to conduct business in the State of Illinois.

7)  Jamie Warmbir is an individual residing at 22 Pendleton Way, Bloomington, Illinois.

8)  Charlotte Warmbir is an individual residing at 22 Pendleton Way, Bloomington, Illinois and is the spouse of Jamie Warmbir.

9) Warmbir IT is an Illinois limited liability company with its principal place of business located at 22 Pendleton Way, Bloomington, Illinois.

## **FACTS**

10)  Mavidea was formed on April 18, 2007 in the State of Illinois as a domestic manager-managed limited liability company.  Mavidea is engaged in the business of IT Solutions, software development, digital marketing and website design.

11)  Warmbir Technology Incorporated, an entity wholly owned by Jamie Warmbir, was an original member of Mavidea.  Jamie Warmbir was originally named as a manager of Mavidea and served as a manager until February 10, 2020.

12)  From inception until February 10, 2020, Jamie Warmbir served as an officer of Mavidea.

13)  From inception until February 10, 2020, Jamie Warmbir led the Information Technology business at Mavidea.

14)  Jamie Warmbir provided these services on a full-time basis and was the highest paid individual with Mavidea at of February 10, 2020.

### Mavidea's Operating Agreement

15)  In 2018 and 2019, the members and managers of Mavidea undertook a deliberative process to amend their operating agreement, which resulted in a fully executed agreement dated April 17, 2019 (attached hereto as Exhibit "A" and is referred to as "Operating Agreement" herein).

16)  The Operating Agreement under paragraph 1.8 held "The Members shall use the Company's credit and assets solely for the benefit of the Company."

17)  The Operating Agreement holds, in part, under Paragraph 5.3:

> 5.3  Restrictions on Authority of the Managers.  Without the Consent of the Members, the Managers shall not have the authority to:

> (i) do any act in contravention of this Agreement;…

(ii) do any act which would make it impossible to carry on the ordinary business of the Company, except as otherwise provided in this Agreement;…

(iv) possess Property, or assign rights in specific Property, for other than a Company purpose;

18)  The Operating Agreement under Paragraph 5.4 imposed the following obligations on Managers:

5.4   Duties and Obligations of the Managers

(a) The Managers shall take all actions on behalf of the Company which may be necessary or appropriate… (ii) for the accomplishment of the Company's purposes, including the acquisition, development, maintenance, preservation, and operation of Property in accordance with the provisions of this Agreement, the Act, and all other applicable laws and regulations…

(c) The Managers shall conduct the affairs of the Company in the best interests of the Company and of the Members, including the safekeeping and use of all of the Property for the exclusive benefit of the Company.

19)  Paragraph 1.9 of the Operating Agreement defined "Property" to mean: "… all real and personal property acquired by the Company and any improvements thereto, and shall include both tangible and intangible property."

20)  Some of the members/managers were members of other entrepreneurial ventures and wanted the operating agreement to reflect that their participation in such ventures would not be viewed as a breach of their fiduciary duty.  Thus, while the Operating Agreement required any Manager to use any intangible property created or acquired by Mavidea for the "exclusive benefit of the Company," Paragraph 1.7 indicated that a Manager would not be required to offer the stock of any new independent or competing venture back to Mavidea providing the manager/member respected the intangible property interests of Mavidea under Section 5.3.

21)  The Operating Agreement did not further modify the statutory or common law fiduciary duties of the members or managers.  Thus, any fiduciary duty imposed by statute or common law that was not modified by Paragraph 1.7 remained in full effect.

22)  Paragraph 10.9 of the Operating Agreement indicated that each Member irrevocably waives any right to partition any of the company's Property.

Mavidea's Business

23)  Mavidea has provided Information Technology services since its inception, although the business model has changed over time.  At all times relevant herein, Mavidea used a "managed services" business model where Mavidea would serve businesses throughout central Illinois by entering into a contract with them.  The customer would pay a monthly base fee which would include a "scope" of services that Mavidea would provide.  In most cases, Mavidea would undergo a significant amount of upfront labor to understand the customer's existing computer system and implement the software needed to properly service the contract, with the goal being that the monthly fee later in the contract would cover these initial expenses.

24)  Locating customers that are in need of essentially outsourcing their IT department is a difficult task.  Mavidea needs to identify businesses that do not have a full time IT person or department, but have significant enough IT needs to require regular servicing.  Mavidea also requires that the customer's business culture and integrity be consistent with their own.  As a result, Mavidea employs a full-time employee to call small businesses all over Central Illinois just to find prospects that meet Mavidea's selection criteria.

25)  In 2019, Mavidea made 17,516 phone calls to prospective customers, which led to 1,635 conversations and 87 first time meeting appointments being accepted.  Of those 87 meeting appointments, Mavidea further investigated the prospects and completed 57 of those

appointments.  Out of the 57 meetings, 11 of the prospects were added as potential clients that Mavidea would like to do business with.  Of those 11 potential clients, Mavidea actually signed contracts with three in the 2019 fiscal year.  Mavidea maintains a confidential detailed database of the information it has learned through this sales cycle.

26)  As the director of the IT Department, Jamie Warmbir, at all times, relevant herein, had access to this database and would be the individual that would qualify and meet with those in the final stages of the sales cycle.  Jamie Warmbir would also negotiate and sign the contracts with these businesses.  As a result of his role, he had access to critical proprietary information concerning the identity, pricing terms, contract lengths and services included for each customer of Mavidea.  He also had access to and regularly reviewed the proprietary underlying data concerning how much labor and costs had been expended for each contract.  As a result, he understood the profitability of each customer and the cost it would take to service each contract.

Jamie Warmbir's Actions

27)  At various times in 2019, the other managers of Mavidea noticed that Jamie Warmbir appeared to be of general discontent.  In October, 2019, the other managers had a meeting with Jamie Warmbir to discuss the discontentment and to see what improvement could be made.  From these discussions, the other managers indicated to Jamie Wambir that they did not have an interest in selling the IT division of Mavidea to him, but that they would be open to discuss other possibilities of a departure for him if he desired.  Jamie Warmbir's wife, Charlotte Warmbir, discussed with the managers some of the reason for discontentment.  On October 14, 2019, Jamie Warmbir tendered a "Statement of Contentment" to the other managers affirming that he wanted to continue to be on the team.

28)  Shortly thereafter, however, Jamie Warmbir devised a scheme to forcibly take the IT Division from Mavidea by taking Mavidea's clients and employees in the event the managers of Mavidea would not sell it to him for the price he dictated.

29)  Jamie Warmbir concealed these intentions for months from the other Managers which enabled him a) learn additional confidential information from the company and its managers, b) further exploit the confidential information / Property of the Plaintiff, c) obtain an appraisal of Mavidea's IT business, d) meet with his attorney and other advisors to prepare for his new venture, e) put himself in a position with the employees of Mavidea to convert them to his new venture, f) identify and cultivate prospective clients that could be signed up by his new venture, and g) take other actions to prepare for the start of his new venture that are still being investigated.

30)  Additionally, Jamie Warmbir failed to follow the standard practice of Mavidea by either a) failing to procure non-competition agreements or b) destroying existing non-competition agreements with the two employees under his supervision that he most desired to come to his new business.

31)  To the information and belief of the Plaintiff, Jamie Warmbir memorized or otherwise recorded the Plaintiff's customer list, contract term dates, pricing data, and other customer information that was confidential information, trade secrets, and Property of the Plaintiff.

32)  To the information and belief of the Plaintiff, Jamie Warmbir memorized or otherwise recorded the Plaintiff's prospective customer list, proposed pricing data, and other prospective customer information that was the confidential information, trade secrets, and Property of the Plaintiff.

33)  Jamie Warmbir allowed appointments to be set up with prospective or existing customers past his resignation date in which he knew he could take advantage of after leaving. These appointments were confidential information, trade secrets, and Property of the Plaintiff;

34)  To the information and belief of the Plaintiff, Jamie Warmbir recruited his spouse, Charlotte Warmbir, to assist him in making preparations for his new business;

35)  Jamie Warmbir accumulated additional contacts and proprietary company information on the phone that he wrongfully intended to take with him after leaving Mavidea;

36)  Jamie Warmbir delayed the signing of new clients so that he would not be encumbered by a Mavidea contract when starting his new venture,

37)  Jamie Warmbir forwarded the confidential resume and an email dialogue with a prospective employee to his own personal email account so that he could utilize the information for his new company;

38)  Without permission, Jamie Warmbir released Plaintiff's confidential financial information to an appraiser for his own purposes in furtherance of the scheme.

39)  On February 10, 2020 Jamie Warmbir set his plan into action, relinquishing his authority to act as a manager/agent of Mavidea.  He informed the remaining managers that they had the next four business days to either 1) sell the IT Division to him for the price that he demanded, or 2) that he take would take the customers and employees without paying them anything for it.  He informed them that his new competing business was ready to service customers immediately after any denial to sell it to him at his price.

40)  On February 14, 2020, the remaining managers informed Jamie Warmbir that the Company would not be accepting his offer and that he would need to tender any of Mavidea's Property back to the Company on that day.

41)  After learning that the Company wanted his phone and phone number back, he secretly contacted Verizon and posed as an Agent of Mavidea, even though he had already resigned such authority.  He requested that Verizon transfer the telephone number from the account that Mavidea owned to a personal account that only he was in control of.

42)  The telephone number that Jamie Warmbir used as his cell phone number was the point of contact for many customers and prospective customers of the IT Division.  By converting the phone number to his own use, this has enabled Jamie Warmbir to wrongfully receive inquiries from the Company's customers, prospective customers, employees, and other third parties to divert Company Property for his own use in furtherance of his original scheme.

43)  On the next business day, Jamie Warmbir announced that he and his wife were opening a new business called "Warmbir IT Solutions, LLC" and that he welcomed new clients.

44)  Jamie Warmbir immediately undertook an effort to have the employees he supervised at Mavidea terminate their employment and come to his new venture.  He was enable to shortcut his search for employees and enhance any offers to them by using the names, backgrounds, salary history.  By short-cutting the normal search, it is believed his intentions were to quickly dismantle Mavidea's ability to provide service to its customers, enhancing his ability to pitch to Mavidea's customers that they would be better off terminating their contract and signing up with his business;

45)  Within a couple of weeks, Jamie Warmbir had hired the two employees that he had either 1) failed to obtain a non-competition agreement for or 2) destroyed a non-competition agreement while he supervised them.

46)  Jamie Warmbir allowed the services of a third party to reach out and contact some employees so that he could attempt to deny knowledge of the activities.

47)  Shortly thereafter, he encouraged another Mavidea employee to cease employment at

Mavidea and join his competing company.  Said employee gave notice to Mavidea that he was

leaving for this purpose on March 26, 2020.  Jamie Warmbir had prepared and executed the non-

competition agreement on behalf of Mavidea with this employee on September 23, 2019, fully

knowing that said contract contained the following provisions:

> 7(d)  Employee shall not, following the termination of his/her employment with
> Mavidea, either directly or indirectly, or by action in concert with others, either
> for Employee's own benefit or for the benefit of any other person or entity:
>
> > (i)  Make known to any person the names, address or telephone numbers
> > or any of the client candidates, clients, projects, contracts, designs,
> > specifications or plans of Mavidea or any other Trade Secrets and/or
> > Confidential Information pertaining to them;
> >
> > (ii) For a period of twelve (12) months following the termination of
> > Employee's employment with Mavidea Technology Group, LLC, call on,
> > solicit, divert, interfere with or take away, or attempt to call on, solicit,
> > divert, interfere with or take away any of the projects, clients, client
> > candidates, employees, employee candidates, or consultants of Mavidea,
> > including without limitation all those clients, client candidates, employees,
> > employee candidates, consultants and/or projects with whom Employee
> > became acquainted during his/her employment with Mavidea, either for
> > Employee's own benefit or for the benefit of any other person or entity;
> >
> > (iii)  Induce in any way, directly or indirectly, Mavidea's employees
> > and/or persons working with and/or contracting with Mavidea, to disclose
> > Mavidea's Trade Secrets and/or Confidential Information to any person;
> >
> > (iv) For a period of twelve (12) months following the termination of
> > Employee's employment with Mavidea, hire or take away, or attempt to
> > hire or take away, any of Mavidea's employees, and/or independent
> > contractors, and/or persons working with and/or contracting with
> > Mavidea; and
> >
> > (v) For a period of twelve (12) months following the termination of
> > Employee's employment with Mavidea, induce or influence (or seek to
> > induce or influence) any person who is engaged (as an employee, agent,
> > independent contractor, or otherwise) by Mavidea to terminate his or her
> > employment or engagement or to breach their duties or obligations owed
> > to Mavidea

(e)  For the duration of this Agreement, or for a period of twelve (12) months following the termination of Employee's employment with Mavidea, Employee shall not, directly or indirectly, either as an employee, employer, consultant, agent, principal, partner, stockholder, corporate officer, director or in any other individual or representative capacity, engage or participate in any business that is in competition in any manner whatsoever with the business of Mavidea, without the prior written consent of the Management…"

48) Jamie Warmbir immediately upon opening his business undertook an effort, using the customer names, backgrounds, contract terms, pricing data and other customer information, to have Mavidea's customers terminate their contracts with Mavidea and sign new contracts at his new venture;

49)  Within a few short weeks, Jamie Warmbir's efforts had resulted in eight contract terminations with Mavidea.

50)  Jamie Warmbir immediately undertook an effort, using the prospective customer names, backgrounds, prospective pricing data and other customer information to have Mavidea's prospective customers come to sign contracts with him instead of Mavidea;

51)  Within a few short weeks, Jamie Warmbir's efforts had resulted in at least one prospective customer signing with his company instead of Mavidea.

52)  Jamie Warmbir utilized the appointments and engagements set for him while at Mavidea to convert these customers and prospective customers to his own business;

53)  In his attempt to convert clients, Jamie Warmbir used falsehoods about Mavidea, such as "At Mavidea, IT is not a priority compared to other projects."

54) To the information and belief of the Plaintiff, he assisted customers in terminating their contracts with the Plaintiff by providing them with suggested language to use in their termination notice.

55)  On or about March 11, 2020, Mavidea's attorney sent Jamie Warmbir's attorney a cease and desist letter that also demanded they preserve all evidence (said letter is attached hereto as Exhibit "B").

56) On or about March 16, 2020, Jamie Warmbir's attorney tendered a response labeled "For Settlement Purposes Only" which effectively rejected all of the Plaintiff's assertions and did not contain any proposal to settle the matter.  The foregoing wrongful efforts have continued without any pause.

## COUNT I:

## VIOLATION OF THE FEDERAL DEFEND TRADE SECRETS ACT

## AGAINST JAMIE WARMBIR AND WARMBIR IT SOLUTIONS, LLC

57) Mavidea repeats and realleges each and every allegation contained in Paragraphs 1 through 56 of the Complaint as if set forth fully herein.

58)  The Defend Trade Secrets Act (18 U.S.C. §1832) which amended the Economic Espionage Act to add a federal civil cause of action, among other things, defines "trade secret" to include all forms and types of financial, business or economic information, including patterns, plans, compilations, methods, techniques, processes, procedures or programs, if (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public.

59) During the course of his affiliation with Mavidea, Jamie Warmbir was provided access to all of Mavidea's trade secrets, as described herein.

60) Such trade secrets are developed and maintained by Mavidea at great time, cost and expense to Mavidea, and are maintained on password protected networks accessible only by certain Mavidea employees with need to use such information on the Company's behalf.

61) Mavidea's trade secrets are not available to the general public and are closely guarded by Mavidea. Mavidea keeps such information strictly confidential in order to maintain a competitive advantage.

62) Mavidea derives independent economic value from the trade secrets and confidential information that were entrusted to Jamie Warmbir; these secrets are not generally known or readily ascertainable by proper means by other persons who can obtain economic value from their disclosure and use, and the information is the subject of significant efforts to maintain its secrecy.

63) Mavidea's trade secrets, including the information identified herein, are trade secrets under the DTSA, 18 U.S.C. §1832, et. seq., because Mavidea derives independent economic value from this information not being generally known to the public, the information is not readily ascertainable by proper means by persons who could obtain economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy.

64) On information and belief, Jamie Warmbir acquired Mavidea's trade secrets by improper means and without authorization. On information and belief, Jamie Warmbir has failed to return or destroy Mavidea's trade secrets and are using or disclosing such trade secrets in connection with Jamie Warmbir's efforts to start a competitive business, in violation of Mavidea's Operating Agreement regarding the protection of Mavidea's Property.

65) On information and belief, Jamie Warmbir has used or disclosed and is intending to further use and disclose, Mavidea's confidential information and trade secrets for his benefit.

66)  Jamie Warmbir knew or should have known that the information, as described herein, 1) is confidential, 2) was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; 3) was developed or acquired by Mavidea at great expense and effort, 4) was maintained as confidential and is not generally available to the public and Mavidea's competitors, 5) would provide significant benefit to individuals seeking to compete with or harm Mavidea; and 6) is critical to Mavidea's ability to conduct its business successfully.

67)  The information that Jamie Warmbir has misappropriated or threaten to misappropriate relates to Mavidea, which involve services that are utilized throughout interstate commerce.

68)  Jamie Warmbir has been and will further be unjustly enriched by the misappropriation and/or threatened misappropriation of Mavidea's trade secrets and confidential information, and, unless restrained, will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate Mavidea's trade secrets and confidential information.

69)  On information and belief, Jamie Warmbir's actual and/or threatened misappropriation has been willful and malicious.

70)  As a result of the threatended and/or actual misappropriation of Mavidea's trade secrets and confidential information, Mavidea has suffered and will continue to suffer with loss of business expectancies, customers, employees, its trade secrets and goodwill in amounts which may be impossible to determine, unless Jamie Warmbir is enjoined and restrained by order of the Court.

71)  In addition, Mavidea seeks, actual, incidental, compensatory, consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

72)  As an actual and proximate result of Jamie Warmbir's conduct, as alleged in this claim for relief, Mavidea has suffered actual and consequential damages in the amount of at least $2,778,413.00.

73)  As a further proximate result of Jamie Warmbir's wrongful conduct and breach of the Operating Agreement, Mavidea has been injured, irreparably and otherwise, and is threatened with additional and ongoing injuries.

74)  Warmbir IT Solutions, LLC is an alter ego of Jamie Warmbir that was purposefully set up by Jamie Warmbir to facilitate and undertake the wrongful actions described herein

75)  Warmbir IT Solutions, LLC should be liable and enjoined from continuing any of these activities

WHEREFORE, the Plaintiff prays this Court enter judgment in its favor and against the Defendant, Jamie Warmbir and Warmbir IT Solutions, LLC, as follows:

a) an injunction against the Defendants requiring them to abstain from further violations of the Federal Defend Trade Secrets Act;

b) for actual damages suffered by the Plaintiff in an amount not less than $2,778,413.00;

c)  for interest;

d) for attorney's fees and costs of suit;

e) for other relief the Court deems appropriate;

## COUNT II:

## BREACH OF FIDUCIARY DUTY

## AGAINST JAMIE WARMBIR

76)  Mavidea repeats and realleges each and every allegation contained in Paragraphs 1 through 56 of the Complaint as if set forth fully herein.

77)  Jamie Warmbir, as a manager of Mavidea, owed a fiduciary duty to Mavidea and the other Members and Managers of Mavidea.

78)  Such fiduciary duties exist both before and after Jamie Warmbir's departure from the Company.

79)  Jamie Warmbir breached his fiduciary duties to Mavidea prior to his resignation by :

A) After making the decision to leave Mavidea, he concealed his intentions from the other Managers which enabled him to a) learn additional confidential information from the company and its managers, b) further exploit the Property of the Plaintiff, c) obtain an appraisal of Mavidea's IT business, d) meet with his attorney and other advisors to prepare for his new venture, e) put himself in a position with the employees of the company to convert them to his new venture, f) identify and cultivate prospective clients that could be signed up by his new venture, and g) take other actions to prepare for the start of his new venture that are still being investigated.

B) Failing to follow the standard practice of Mavidea by either a) failing to procure non-competition agreements or b) destroying existing non-competition agreements with the two employees under his supervision that he most desired to come to his new business.

C) To the information and belief of the Plaintiff, memorizing or otherwise recording the Plaintiff's customer list, contract term dates, pricing data, and other customer information.

D) To the information and belief of the Plaintiff, memorizing or otherwise recording the Plaintiff's prospective customer list, proposed pricing data, and other prospective customer information;

E) Allowing appointments to be set up with prospective or existing customers past his resignation date in which he knew he could take advantage of after leaving;

F) Recruiting his spouse, Charlotte Warmbir, to assist him in making preparations for his new business;

G) Accumulate additional contacts and proprietary company information on the phone that he wrongfully intended to take with him after starting his competing business;

H) Delay the signing of new clients so that he would not be encumbered by a Mavidea contract when starting his new venture,

I) Forwarded the confidential resume and an email dialogue with a prospective employee to his own personal email account so that he could utilize the information for his new company;

J) Released Mavidea's financial information to third parties without consent;

80) All such actions were intentionally designed so that Jamie Warmbir could immediately have his business up and running after resigning as Manager, as well as give as little warning to Mavidea as possible that might enable to company to enact counter-measures to protect its intangible property.

81) Jamie Warmbir's fiduciary duties did not end at the time he resigned his position as Manager.  Jamie Warmbir's fiduciary duties to Mavidea continue to this day.

82)  Jamie breached his fiduciary duties after leaving Mavidea by using the confidential information and Mavidea Property he obtained while at Mavidea:

A) He immediately undertook an effort to have the employees he supervised at Mavidea terminate their employment and come to his new venture.  He was enable to shortcut his search for employees and enhance any offers to them by using the names, backgrounds, salary history.  By short-cutting the normal search, it is believed his intentions were to quickly dismantle Mavidea's ability to provide service to its customers, enhancing his ability to pitch to Mavidea's customers that they would be better off terminating their contract and signing up with his business ;

B) He immediately undertook an effort, using the customer names, backgrounds, contract terms, pricing data and other customer information, to have Mavidea's customers terminate their contracts with Mavidea and sign new contracts at his new venture;

C)  He immediately undertook an effort, using the prospective customer names, backgrounds, prospective pricing data and other customer information to have Mavidea's prospective customers come to sign contracts with him instead of Mavidea;

D) He utilized the appointments and engagements set for him while at Mavidea to convert customers and prospective customers to his own business;

E) He used falsehoods, such as "At Mavidea, IT is not a priority compared to other things."

F) After resigning his manager position and being requested to turn his phone over to the company by the other managers, he wrongfully posed himself to be an agent of

Mavidea and effectuated a transfer of the Company's telephone number to an account in his own name that Mavidea had no authority over;

G) To the information and belief of the Plaintiff, he assisted customers in terminating their contracts with the Plaintiff by giving them the language to use in their termination notice;

(H) He encouraged and directly caused a Mavidea employee to undertake an action that would knowingly be in violation of his employment agreement;

83) These wrongful actions have caused the following damages to Mavidea:

A) The Defendants have caused at least eight customers to cancel their contracts with the Plaintiff;

B) The Defendants have caused two employees to terminate their employment with the Plaintiff and one employee to give his notice;

C) The Defendants have caused the Plaintiffs to incur additional labor costs both on a short term and long term basis to mitigate the damages caused by Defendants' wrongful actions;

D) The Defendants have caused the Plaintiffs to not receive prospective customer calls due to the theft of Plaintiff's phone number by the Defendant;

E) The Plaintiff and its Managers/Members have lost business other divisions of the Company due to the immediate actions and attention required to mitigate damages caused by the Defendants;

F) The Plaintiff has had to reassign its Managers to tasks related to mitigating damages caused by the Defendants increasing its labor costs;

G) The Plaintiff has lost a significant amount of money in its valuation as a going concern;

H) The Plaintiff has had to institute this legal action to collect damages due to the wrongful refusal of the Defendant to pay the same. As a result, the Plaintiff has suffered a cost related to the time value of money at its applicable borrowing rate;

I) The Plaintiff has been required to hire attorneys to prosecute this claim, as well as incur other costs related to the lawsuit;

J) Additional Damages either unknown or still accumulating;

84) The Defendant's wrongful acts are characterized by wantonness, malice, oppression and other circumstances of aggravation. The pattern of conduct by the defendants were motivated by more than mere ignorance or oversight, but by personal gain.

85) As such, the Defendant should pay punitive damages to the Plaintiff as outlined in *Estate of Wernick*, 127 Ill.2d 61, 525 N.E.2d 876 (1989);

WHEREFORE, the Plaintiff prays this Court enter judgment in its favor and against the Defendant, Jamie Warmbir, as follows:

a) for actual damages suffered by the Plaintiff in an amount not less than $2,778,413.00;

b) for punitive damages in an amount to be determined;

c) for interest;

d) for attorney's fees and costs of suit;

e) for other relief the Court deems appropriate;

## COUNT III:

## BREACH OF OPERATING AGREEMENT

## AGAINST JAMIE WARMBIR

86) Mavidea repeats and realleges each and every allegation contained in Paragraphs 1 through 56 of the Complaint as if set forth fully herein.

87) Jamie Warmbir knowingly and voluntarily entered into the Operating Agreement. The Operating Agreement is a valid and enforceable contract.

88)  The Plaintiff has performed all conditions, covenants, promises and obligations required on its part to be performed in accordance with the Operating Agreement, except for any conditions and covenants for which performance was excused or prevented by the Defendant.

89)  The definition of property in Paragraph 1.9 of the Operating Agreement includes any intangible property.

90) The inclusion of the broad term "intangible property" infers a much more expansive interpretation than the items covered by the Illinois Trade Secret Act or the Federal Defend Trade Secrets Act.

91) Black's Law Dictionary (11th ed. 2019) defines "Intangible Property" as property that lacks a physical existence.  Examples include stock options and business goodwill."

92)  Thus, Property, as defined in the Operating Agreement, include such items as customer relationships, business goodwill, business know-how, employee relationships, customer and prospective customer lists and contracts, established processes, telephone numbers, contract terms, pricing and profitability data, and the other items referenced herein that Jamie Warmbir misappropriated for his own use.

93)  Paragraph 1.7 indicated that a Manager was only permitted to compete with Mavidea in the event the intangible property interests of Mavidea under Section 5.3 were respected.  If that did not occur, Paragraph 1.7 suggests that the offending Manager should tender the stock back to Mavidea of any new independent or competing venture, as well as account for its income and profits.

94)  The pre-separation and post-separation actions of Jamie Warmbir referenced herein are contrary to the terms of 1.8, 5.3 and 5.4 of the Operating Agreement.

95)  As such, Jamie Warmbir is in breach of the operating Agreement.

96)  As a further proximate result of Jamie Warmbir's wrongful conduct and breach of the Operating Agreement, Plaintiff has been injured, irreparably and otherwise, and is threatened with additional and ongoing injuries.

WHEREFORE, the Plaintiff prays this Court enter judgment in its favor and against the Defendant, Jamie Warmbir, as follows:

a)  for an Order requiring Jamie Warmbir to turn over all ownership interest in Warmbir IT Solutions, LLC to the Plaintiff;

b)  for actual damages suffered by the Plaintiff in an amount not less than $2,778,413.00;

c)  for punitive damages in an amount to be determined;

d)  for interest;

e) for attorney's fees and costs of suit;

f) for other relief the Court deems appropriate;

## COUNT IV:

## CIVIL CONSPIRACY

## AGAINST CHARLOTTE WARMBIR

97)  Mavidea repeats and realleges each and every allegation contained in Paragraphs 1 through 56 of the Complaint as if set forth fully herein.

98)  Shortly after the formation of Warmbir IT Solutions, LLC, Jamie Warmbir announced on LinkedIn that "My wife, Charlotte, will be running the business with me… We are going to provide services to clients in the central Illinois marketplace and will be based out of Bloomington, IL."

99)  Charlotte Warmbir knew that Jamie Warmbir owed a fiduciary duty to the Mavidea.

101)  To the knowledge and belief of the Plaintiff, Charlotte Warmbir assisted and is currently assisting Jamie Warmbir with the violations of law outlined in this Complaint.

102)  Charlotte Warmbir acted purposefully when she aided and abetted Jamie Warmbir's wrongful violations referenced herein.

103)  Charlotte Warmbir's wrongful conduct resulted in breaches of Jamie Warmbir's fiduciary duties.

104)  As a direct and proximate result of Charlotte Warmbir's wrongful actions, Mavidea has been damaged by:

105)  These wrongful actions have caused the following damages to Mavidea:

A) The Defendants have caused at least eight customers to cancel their contracts with the Plaintiff;

B) The Defendants have caused two employees to terminate their employment with the Plaintiff and one employee to give his notice;

C) The Defendants have caused the Plaintiffs to incur additional labor costs both on a short term and long term basis to mitigate the damages caused by Defendants' wrongful actions;

D) The Defendants have caused the Plaintiffs to not receive prospective customer calls due to the theft of Plaintiff's phone number by the Defendant;

E) The Plaintiff and its Managers/Members have lost business other divisions of the Company due to the immediate actions and attention required to mitigate damages caused by the Defendants;

F) The Plaintiff has had to reassign its Managers to tasks related to mitigating damages caused by the Defendants increasing its labor costs;

G) The Plaintiff has lost a significant amount of money in its valuation as a going concern;

H) The Plaintiff has had to institute this legal action to collect damages due to the wrongful refusal of the Defendant to pay the same.  As a result, the Plaintiff has suffered a cost related to the time value of money at its applicable borrowing rate;

I)  The Plaintiff has been required to hire attorneys to prosecute this claim, as well as incur other costs related to the lawsuit;

J)  Additional Damages either unknown or still accumulating;

106) The Defendant's wrongful acts are characterized by wantonness, malice, oppression and other circumstances of aggravation.  The pattern of conduct by the defendants were motivated by more than mere ignorance or oversight, but by personal gain.

WHEREFORE, the Plaintiff prays this Court enter judgment in its favor and against the Defendant, Charlotte Warmbir, as follows:

a) for actual damages suffered by the Plaintiff in an amount not less than $2,778,413.00;

b) for punitive damages in an amount to be determined;

c) for interest;

d) for attorney's fees and costs of suit;

e) for other relief the Court deems appropriate;

## COUNT V:

## BREACH OF ILLINOIS TRADE SECRETS ACT

## AGAINST JAMIE WARMBIR AND WARMBIR IT SOLUTIONS, LLC

107) Mavidea repeats and realleges each and every allegation contained in Paragraphs 1 through 56 of the Complaint as if set forth fully herein.

108) Jamie Warmbir acquired the trade secrets by improper means, namely misappropriating by copying/memorizing the trade secrets of Mavidea after his authority was terminated.

109) Warmbir IT Solutions, LLC also acquired the trade secrets referenced herein by improper means, namely by receiving the trade secrets from unauthorized party, Jamie Warmbir.

110) Jamie Warmbir and Warmbir IT Solutions, LLC used the information without the consent of the owner, Mavidea.

111)  By using the information, Jamie Warmbir and Warmbir IT Solutions, LLC have caused injury to the Plaintiff.  These wrongful actions have caused the following damages to Mavidea:

A) The Defendants have caused at least eight customers to cancel their contracts with the Plaintiff;

B) The Defendants have caused two employees to terminate their employment with the Plaintiff and one employee to give his notice;

C) The Defendants have caused the Plaintiffs to incur additional labor costs both on a short term and long term basis to mitigate the damages caused by Defendants' wrongful actions;

D) The Defendants have caused the Plaintiffs to not receive prospective customer calls due to the theft of Plaintiff's phone number by the Defendant;

E) The Plaintiff and its Managers/Members have lost business other divisions of the Company due to the immediate actions and attention required to mitigate damages caused by the Defendants;

F) The Plaintiff has had to reassign its Managers to tasks related to mitigating damages caused by the Defendants increasing its labor costs;

G) The Plaintiff has lost a significant amount of money in its valuation as a going concern;

H) The Plaintiff has had to institute this legal action to collect damages due to the wrongful refusal of the Defendant to pay the same.  As a result, the Plaintiff has suffered a cost related to the time value of money at its applicable borrowing rate;

I)  The Plaintiff has been required to hire attorneys to prosecute this claim, as well as incur other costs related to the lawsuit;

J)  Additional Damages either unknown or still accumulating;

112)  The Defendant's wrongful acts are characterized by wantonness, malice, oppression and other circumstances of aggravation.  The pattern of conduct by the defendants were motivated by more than mere ignorance or oversight, but by personal gain.

WHEREFORE, the Plaintiff prays this Court enter judgment in its favor and against the Defendants, Jamie Warmbir and Warmbir IT Solutions, LLC, as follows:

a) a preliminary and permanent injunction preventing the Defendant from continuing to violate the Illinois Trade Secrets Act;

b)  for actual damages suffered by the Plaintiff in an amount not less than $2,778,413.00;

c)  for punitive damages in an amount to be determined;

d)  for interest;

e) for attorney's fees and costs of suit;

f) for other relief the Court deems appropriate;


## COUNT VI:

## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

## AGAINST JAMIE WARMBIR AND WARMBIR IT SOLUTIONS, LLC

113) Mavidea repeats and realleges each and every allegation contained in Paragraphs 1 through 56 of the Complaint as if set forth fully herein.

114)  Plaintiffs had valid and enforceable contracts with its customers that Jamie Warmbir and Warmbir IT Solutions, LLC have either attempted to appropriate to themselves or have appropriated to themselves.

115)  Prior to any dates of termination, Plaintiff had performed the obligations under the contracts and had a reasonable basis to receive the benefits described therein.

116)  Jamie Warmbir had prepared and executed most of the contracts for the customers of Mavidea while a Manager of Mavidea.  He was aware of all customer contracts.  Warmbir IT Solutions, LLC, through the knowledge of its owner/manager, Jamie Warmbir, also had the same knowledge.

117)  Defendant intentionally and without legal justification induced a breach of the contract, thereby interfering with Plaintiff's rights under the contracts.

118)  The contracts were, in fact, subsequently terminated.

119)  As a result of Defendants' wrongful conduct and the resulting terminations of the contracts, the Plaintiff has suffered damages, and are suffering ongoing damages.

WHEREFORE, the Plaintiff prays this Court enter judgment in its favor and against the Defendant, Jamie Warmbir and Warmbir IT Solutions, LLC, as follows:

a) for actual damages suffered by the Plaintiff in an amount not less than $2,778,413.00;

b)  for punitive damages in an amount to be determined;

c)  for interest;

d) for attorney's fees and costs of suit;

e) for other relief the Court deems appropriate;

## COUNT VII:

## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

## AGAINST JAMIE WARMBIR AND WARMBIR IT SOLUTIONS, LLC

120) Mavidea repeats and realleges each and every allegation contained in Paragraphs 1 through 56 of the Complaint as if set forth fully herein.

121)  Plaintiff reasonably expected to enter into a valid business relationship with the businesses described on its confidential client tracking list.

122)  Defendants, Jamie Warmbir and Warmbir IT Solutions, LLC had knowledge of Plaintiff's expectancy.

123)  Defendants intentionally and unjustifiably interfered with Plaintiff's expectancy by directly and indirectly encouraging them to convert their business to Warmbir IT Solutions, LLC and by the other acts described herein.

124)  As a result of Defendants interference, Plaintiff failed to realize its expectancy on these customers.

125)  Defendants' interference with Plaintiff's expectancy was willful, wanton and knowing.

126)  As a result of Defendants' wrongful interference with Plaintiff's expectancy, Plaintiff has suffered damages in an amount to be determined through discovery and at the time of trial, but in an amount to exceed $2,778,413.00.

WHEREFORE, the Plaintiff prays this Court enter judgment in its favor and against the Defendant, Jamie Warmbir and Warmbir IT Solutions, LLC, as follows:

a) for actual damages suffered by the Plaintiff in an amount not less than $2,778,413.00;

b)  for punitive damages in an amount to be determined;

c)  for interest;

d) for attorney's fees and costs of suit;

e) for other relief the Court deems appropriate;


Respectfully Submitted,

Bartell Powell LLP

/s/ Jason S. Bartell
Jason S. Bartell, a partner of the firm

ATTORNEYS FOR THE PLAINTIFF


Jason Bartell, ARDC# 6255602
Bartell Powell LLP
10 East Main Street
Champaign, IL  61820
(217) 352-5900
Facsimile (217) 352-0182
Email: jbartell@bartellpowell.com

Michael Powell, ARDC# 6257615
Bartell Powell LLP
207 West Jefferson St. Ste. 602
Bloomington, IL  61701
(309)807-5275
Facsimile (309)807-5015
Email: mpowell@bartellpowell.com