BP - 811 001

E-FILED
Thursday, 23 April, 2020  11:20:12 AM
E-FILED
Friday, 03 April, 2020  03:03:56 PM
Clerk, U.S. District Court, ILCD
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

| | | |
|---|---|---|
| **MAVIDEA TECHNOLOGY GROUP, LLC** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | Case No.      1:20-CV-1139 |
| | ) | |
| **JAMIE WARMBIR; CHARLOTTE WARMBIR; WARMBIR IT SOLUTIONS, LLC, an Illinois limited liability company;** | ) ) ) ) | |
| | ) | **JURY TRIAL REQUESTED** |
| **Defendants.** | ) | |

**COMPLAINT**

NOW COMES the Plaintiff, MAVIDEA TECHNOLOGY CROUP, LLC, an Illinois

limited liability company ("Plaintiff" or "Mavidea"), for its Complaint against JAMIE

WARMBIR, individually, CHARLOTTE WARMBIR, individually, and WARMBIR IT

SOLUTIONS, LLC, an Illinois limited liability company ("Warmbir IT"), respectfully states to

the Court as follows:

**JURISDICTION AND VENUE**

1) This Court has subject matter jurisdiction over this action under 28 U.S.C. §§1331 and

1367. The Court has federal question jurisdiction because Mavidea asserts claims under the

Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §1836, et. seq.

2) The Court has supplemental jurisdiction over all claims for which the Court lacks

original jurisdiction because Mavidea's claims arise out of the same common nucleus of



operative facts, namely, Defendants improper and illegal actions immediately before and after

Jamie Warmbir's separation from Mavidea.

    3) This Court has general jurisdiction over Jamie Warmbir and Charlotte Warmbir as

they are individuals domiciled in the State of Illinois.

    4) This Court has general personal jurisdiction over Warmbir IT as it is an entity 1)

formed under the laws of the State of Illinois, 2) maintains its principal place of business in the

State of Illinois, 3) regularly conducts business in the State of Illinois.

    5) Venue is proper in this District and Division pursuant to 28 U.S.C. §1391 because a

substantial part of the events or omissions giving rise to this action took place in this District and

Division, the Defendants are all domiciled in this District and Division, Mavidea's principal

place of business is in this District and Division, and the harm is felt in this District and Division.

## THE PARTIES

    6) Mavidea is an Illinois limited liability company with its principal place of business

located at 14170 Carole Dr., Bloomington, Illinois. Mavidea is, and at all times mentioned was,

authorized to conduct business in the State of Illinois.

    7) Jamie Warmbir is an individual residing at 22 Pendleton Way, Bloomington, Illinois.

    8) Charlotte Warmbir is an individual residing at 22 Pendleton Way, Bloomington,

Illinois and is the spouse of Jamie Warmbir.

    9) Warmbir IT is an Illinois limited liability company with its principal place of business

located at 22 Pendleton Way, Bloomington, Illinois.

## FACTS

10)  Mavidea was formed on April 18, 2007 in the State of Illinois as a domestic manager-managed limited liability company. Mavidea is engaged in the business of IT Solutions, software development, digital marketing and website design.

11)  Warmbir Technology Incorporated, an entity wholly owned by Jamie Warmbir, was an original member of Mavidea. Jamie Warmbir was originally named as a manager of Mavidea and served as a manager until February 10, 2020.

12)  From inception until February 10, 2020, Jamie Warmbir served as an officer of Mavidea.

13)  From inception until February 10, 2020, Jamie Warmbir led the Information Technology business at Mavidea.

14)  Jamie Warmbir provided these services on a full-time basis and was the highest paid individual with Mavidea at of February 10, 2020.

### Mavidea's Operating Agreement

15)  In 2018 and 2019, the members and managers of Mavidea undertook a deliberative process to amend their operating agreement, which resulted in a fully executed agreement dated April 17, 2019 (attached hereto as Exhibit "A" and is referred to as "Operating Agreement" herein).

16)  The Operating Agreement under paragraph 1.8 held "The Members shall use the Company's credit and assets solely for the benefit of the Company."

17)  The Operating Agreement holds, in part, under Paragraph 5.3:

> 5.3  Restrictions on Authority of the Managers. Without the Consent of the Members, the Managers shall not have the authority to:
>
> (i) do any act in contravention of this Agreement;...

(ii) do any act which would make it impossible to carry on the ordinary business of the Company, except as otherwise provided in this Agreement;...

(iv) possess Property, or assign rights in specific Property, for other than a Company purpose;

18)  The Operating Agreement under Paragraph 5.4 imposed the following obligations on Managers:

5.4   Duties and Obligations of the Managers

(a) The Managers shall take all actions on behalf of the Company which may be necessary or appropriate... (ii) for the accomplishment of the Company's purposes, including the acquisition, development, maintenance, preservation, and operation of Property in accordance with the provisions of this Agreement, the Act, and all other applicable laws and regulations...

(c) The Managers shall conduct the affairs of the Company in the best interests of the Company and of the Members, including the safekeeping and use of all of the Property for the exclusive benefit of the Company.

19)  Paragraph 1.9 of the Operating Agreement defined "Property" to mean: "... all real and personal property acquired by the Company and any improvements thereto, and shall include both tangible and intangible property."

20)  Some of the members/managers were members of other entrepreneurial ventures and wanted the operating agreement to reflect that their participation in such ventures would not be viewed as a breach of their fiduciary duty.  Thus, while the Operating Agreement required any Manager to use any intangible property created or acquired by Mavidea for the "exclusive benefit of the Company," Paragraph 1.7 indicated that a Manager would not be required to offer the stock of any new independent or competing venture back to Mavidea providing the manager/member respected the intangible property interests of Mavidea under Section 5.3.

21) The Operating Agreement did not further modify the statutory or common law

fiduciary duties of the members or managers.  Thus, any fiduciary duty imposed by statute or

common law that was not modified by Paragraph 1.7 remained in full effect.

22) Paragraph 10.9 of the Operating Agreement indicated that each Member irrevocably

waives any right to partition any of the company's Property.

Mavidea's Business

23) Mavidea has provided Information Technology services since its inception, although

the business model has changed over time.  At all times relevant herein, Mavidea used a

"managed services" business model where Mavidea would serve businesses throughout central

Illinois by entering into a contract with them.  The customer would pay a monthly base fee which

would include a "scope" of services that Mavidea would provide.  In most cases, Mavidea would

undergo a significant amount of upfront labor to understand the customer's existing computer

system and implement the software needed to properly service the contract, with the goal being

that the monthly fee later in the contract would cover these initial expenses.

24) Locating customers that are in need of essentially outsourcing their IT department is

a difficult task.  Mavidea needs to identify businesses that do not have a full time IT person or

department, but have significant enough IT needs to require regular servicing.  Mavidea also

requires that the customer's business culture and integrity be consistent with their own.  As a

result, Mavidea employs a full-time employee to call small businesses all over Central Illinois

just to find prospects that meet Mavidea's selection criteria.

25) In 2019, Mavidea made 17,516 phone calls to prospective customers, which led to

1,635 conversations and 87 first time meeting appointments being accepted.  Of those 87

meeting appointments, Mavidea further investigated the prospects and completed 57 of those

appointments. Out of the 57 meetings, 11 of the prospects were added as potential clients that

Mavidea would like to do business with. Of those 11 potential clients, Mavidea actually signed

contracts with three in the 2019 fiscal year. Mavidea maintains a confidential detailed database

of the information it has learned through this sales cycle.

26) As the director of the IT Department, Jamie Warmbir, at all times, relevant herein,

had access to this database and would be the individual that would qualify and meet with those in

the final stages of the sales cycle. Jamie Warmbir would also negotiate and sign the contracts

with these businesses. As a result of his role, he had access to critical proprietary information

concerning the identity, pricing terms, contract lengths and services included for each customer

of Mavidea. He also had access to and regularly reviewed the proprietary underlying data

concerning how much labor and costs had been expended for each contract. As a result, he

understood the profitability of each customer and the cost it would take to service each contract.

Jamie Warmbir's Actions

27) At various times in 2019, the other managers of Mavidea noticed that Jamie

Warmbir appeared to be of general discontent. In October, 2019, the other managers had a

meeting with Jamie Warmbir to discuss the discontentment and to see what improvement could

be made. From these discussions, the other managers indicated to Jamie Wambir that they did

not have an interest in selling the IT division of Mavidea to him, but that they would be open to

discuss other possibilities of a departure for him if he desired. Jamie Warmbir's wife, Charlotte

Warmbir, discussed with the managers some of the reason for discontentment. On October 14,

2019, Jamie Warmbir tendered a "Statement of Contentment" to the other managers affirming

that he wanted to continue to be on the team.

28)  Shortly thereafter, however, Jamie Warmbir devised a scheme to forcibly take the IT Division from Mavidea by taking Mavidea's clients and employees in the event the managers of Mavidea would not sell it to him for the price he dictated.

29)  Jamie Warmbir concealed these intentions for months from the other Managers which enabled him a) learn additional confidential information from the company and its managers, b) further exploit the confidential information / Property of the Plaintiff, c) obtain an appraisal of Mavidea's IT business, d) meet with his attorney and other advisors to prepare for his new venture, e) put himself in a position with the employees of Mavidea to convert them to his new venture, f) identify and cultivate prospective clients that could be signed up by his new venture, and g) take other actions to prepare for the start of his new venture that are still being investigated.

30)  Additionally, Jamie Warmbir failed to follow the standard practice of Mavidea by either a) failing to procure non-competition agreements or b) destroying existing non-competition agreements with the two employees under his supervision that he most desired to come to his new business.

31)  To the information and belief of the Plaintiff, Jamie Warmbir memorized or otherwise recorded the Plaintiff's customer list, contract term dates, pricing data, and other customer information that was confidential information, trade secrets, and Property of the Plaintiff.

32)  To the information and belief of the Plaintiff, Jamie Warmbir memorized or otherwise recorded the Plaintiff's prospective customer list, proposed pricing data, and other prospective customer information that was the confidential information, trade secrets, and Property of the Plaintiff.

33) Jamie Warmbir allowed appointments to be set up with prospective or existing customers past his resignation date in which he knew he could take advantage of after leaving. These appointments were confidential information, trade secrets, and Property of the Plaintiff;

34) To the information and belief of the Plaintiff, Jamie Warmbir recruited his spouse, Charlotte Warmbir, to assist him in making preparations for his new business;

35) Jamie Warmbir accumulated additional contacts and proprietary company information on the phone that he wrongfully intended to take with him after leaving Mavidea;

36) Jamie Warmbir delayed the signing of new clients so that he would not be encumbered by a Mavidea contract when starting his new venture,

37) Jamie Warmbir forwarded the confidential resume and an email dialogue with a prospective employee to his own personal email account so that he could utilize the information for his new company;

38) Without permission, Jamie Warmbir released Plaintiff's confidential financial information to an appraiser for his own purposes in furtherance of the scheme.

39) On February 10, 2020 Jamie Warmbir set his plan into action, relinquishing his authority to act as a manager/agent of Mavidea. He informed the remaining managers that they had the next four business days to either 1) sell the IT Division to him for the price that he demanded, or 2) that he take would take the customers and employees without paying them anything for it. He informed them that his new competing business was ready to service customers immediately after any denial to sell it to him at his price.

40) On February 14, 2020, the remaining managers informed Jamie Warmbir that the Company would not be accepting his offer and that he would need to tender any of Mavidea's Property back to the Company on that day.

41) After learning that the Company wanted his phone and phone number back, he secretly contacted Verizon and posed as an Agent of Mavidea, even though he had already resigned such authority. He requested that Verizon transfer the telephone number from the account that Mavidea owned to a personal account that only he was in control of.

42) The telephone number that Jamie Warmbir used as his cell phone number was the point of contact for many customers and prospective customers of the IT Division. By converting the phone number to his own use, this has enabled Jamie Warmbir to wrongfully receive inquiries from the Company's customers, prospective customers, employees, and other third parties to divert Company Property for his own use in furtherance of his original scheme.

43) On the next business day, Jamie Warmbir announced that he and his wife were opening a new business called "Warmbir IT Solutions, LLC" and that he welcomed new clients.

44) Jamie Warmbir immediately undertook an effort to have the employees he supervised at Mavidea terminate their employment and come to his new venture. He was enable to shortcut his search for employees and enhance any offers to them by using the names, backgrounds, salary history. By short-cutting the normal search, it is believed his intentions were to quickly dismantle Mavidea's ability to provide service to its customers, enhancing his ability to pitch to Mavidea's customers that they would be better off terminating their contract and signing up with his business;

45) Within a couple of weeks, Jamie Warmbir had hired the two employees that he had either 1) failed to obtain a non-competition agreement for or 2) destroyed a non-competition agreement while he supervised them.

46) Jamie Warmbir allowed the services of a third party to reach out and contact some employees so that he could attempt to deny knowledge of the activities.

47)  Shortly thereafter, he encouraged another Mavidea employee to cease employment at

Mavidea and join his competing company.  Said employee gave notice to Mavidea that he was

leaving for this purpose on March 26, 2020.  Jamie Warmbir had prepared and executed the non-

competition agreement on behalf of Mavidea with this employee on September 23, 2019, fully

knowing that said contract contained the following provisions:

> 7(d)  Employee shall not, following the termination of his/her employment with Mavidea, either directly or indirectly, or by action in concert with others, either for Employee's own benefit or for the benefit of any other person or entity:
>
>> (i)  Make known to any person the names, address or telephone numbers or any of the client candidates, clients, projects, contracts, designs, specifications or plans of Mavidea or any other Trade Secrets and/or Confidential Information pertaining to them;
>>
>> (ii) For a period of twelve (12) months following the termination of Employee's employment with Mavidea Technology Group, LLC, call on, solicit, divert, interfere with or take away, or attempt to call on, solicit, divert, interfere with or take away any of the projects, clients, client candidates, employees, employee candidates, or consultants of Mavidea, including without limitation all those clients, client candidates, employees, employee candidates, consultants and/or projects with whom Employee became acquainted during his/her employment with Mavidea, either for Employee's own benefit or for the benefit of any other person or entity;
>>
>> (iii)  Induce in any way, directly or indirectly, Mavidea's employees and/or persons working with and/or contracting with Mavidea, to disclose Mavidea's Trade Secrets and/or Confidential Information to any person;
>>
>> (iv) For a period of twelve (12) months following the termination of Employee's employment with Mavidea, hire or take away, or attempt to hire or take away, any of Mavidea's employees, and/or independent contractors, and/or persons working with and/or contracting with Mavidea; and
>>
>> (v) For a period of twelve (12) months following the termination of Employee's employment with Mavidea, induce or influence (or seek to induce or influence) any person who is engaged (as an employee, agent, independent contractor, or otherwise) by Mavidea to terminate his or her employment or engagement or to breach their duties or obligations owed to Mavidea

(e)  For the duration of this Agreement, or for a period of twelve (12) months following the termination of Employee's employment with Mavidea, Employee shall not, directly or indirectly, either as an employee, employer, consultant, agent, principal, partner, stockholder, corporate officer, director or in any other individual or representative capacity, engage or participate in any business that is in competition in any manner whatsoever with the business of Mavidea, without the prior written consent of the Management…"

48) Jamie Warmbir immediately upon opening his business undertook an effort, using the customer names, backgrounds, contract terms, pricing data and other customer information, to have Mavidea's customers terminate their contracts with Mavidea and sign new contracts at his new venture;

49)  Within a few short weeks, Jamie Warmbir's efforts had resulted in eight contract terminations with Mavidea.

50)  Jamie Warmbir immediately undertook an effort, using the prospective customer names, backgrounds, prospective pricing data and other customer information to have Mavidea's prospective customers come to sign contracts with him instead of Mavidea;

51)  Within a few short weeks, Jamie Warmbir's efforts had resulted in at least one prospective customer signing with his company instead of Mavidea.

52)  Jamie Warmbir utilized the appointments and engagements set for him while at Mavidea to convert these customers and prospective customers to his own business;

53)  In his attempt to convert clients, Jamie Warmbir used falsehoods about Mavidea, such as "At Mavidea, IT is not a priority compared to other projects."

54) To the information and belief of the Plaintiff, he assisted customers in terminating their contracts with the Plaintiff by providing them with suggested language to use in their termination notice.

55)  On or about March 11, 2020, Mavidea's attorney sent Jamie Warmbir's attorney a cease and desist letter that also demanded they preserve all evidence (said letter is attached hereto as Exhibit "B").

56) On or about March 16, 2020, Jamie Warmbir's attorney tendered a response labeled "For Settlement Purposes Only" which effectively rejected all of the Plaintiff's assertions and did not contain any proposal to settle the matter.  The foregoing wrongful efforts have continued without any pause.

## COUNT I:

## VIOLATION OF THE FEDERAL DEFEND TRADE SECRETS ACT

## AGAINST JAMIE WARMBIR AND WARMBIR IT SOLUTIONS, LLC

57) Mavidea repeats and realleges each and every allegation contained in Paragraphs 1 through 56 of the Complaint as if set forth fully herein.

58)  The Defend Trade Secrets Act (18 U.S.C. §1832) which amended the Economic Espionage Act to add a federal civil cause of action, among other things, defines "trade secret" to include all forms and types of financial, business or economic information, including patterns, plans, compilations, methods, techniques, processes, procedures or programs, if (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public.

59) During the course of his affiliation with Mavidea, Jamie Warmbir was provided access to all of Mavidea's trade secrets, as described herein.

60) Such trade secrets are developed and maintained by Mavidea at great time, cost and expense to Mavidea, and are maintained on password protected networks accessible only by certain Mavidea employees with need to use such information on the Company's behalf.

61) Mavidea's trade secrets are not available to the general public and are closely guarded by Mavidea. Mavidea keeps such information strictly confidential in order to maintain a competitive advantage.

62) Mavidea derives independent economic value from the trade secrets and confidential information that were entrusted to Jamie Warmbir; these secrets are not generally known or readily ascertainable by proper means by other persons who can obtain economic value from their disclosure and use, and the information is the subject of significant efforts to maintain its secrecy.

63) Mavidea's trade secrets, including the information identified herein, are trade secrets under the DTSA, 18 U.S.C. §1832, et. seq., because Mavidea derives independent economic value from this information not being generally known to the public, the information is not readily ascertainable by proper means by persons who could obtain economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy.

64) On information and belief, Jamie Warmbir acquired Mavidea's trade secrets by improper means and without authorization. On information and belief, Jamie Warmbir has failed to return or destroy Mavidea's trade secrets and are using or disclosing such trade secrets in connection with Jamie Warmbir's efforts to start a competitive business, in violation of Mavidea's Operating Agreement regarding the protection of Mavidea's Property.

65) On information and belief, Jamie Warmbir has used or disclosed and is intending to further use and disclose, Mavidea's confidential information and trade secrets for his benefit.

66) Jamie Warmbir knew or should have known that the information, as described herein, 1) is confidential, 2) was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; 3) was developed or acquired by Mavidea at great expense and effort, 4) was maintained as confidential and is not generally available to the public and Mavidea's competitors, 5) would provide significant benefit to individuals seeking to compete with or harm Mavidea; and 6) is critical to Mavidea's ability to conduct its business successfully.

67) The information that Jamie Warmbir has misappropriated or threaten to misappropriate relates to Mavidea, which involve services that are utilized throughout interstate commerce.

68) Jamie Warmbir has been and will further be unjustly enriched by the misappropriation and/or threatened misappropriation of Mavidea's trade secrets and confidential information, and, unless restrained, will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate Mavidea's trade secrets and confidential information.

69) On information and belief, Jamie Warmbir's actual and/or threatened misappropriation has been willful and malicious.

70) As a result of the threatended and/or actual misappropriation of Mavidea's trade secrets and confidential information, Mavidea has suffered and will continue to suffer with loss of business expectancies, customers, employees, its trade secrets and goodwill in amounts which may be impossible to determine, unless Jamie Warmbir is enjoined and restrained by order of the Court.



71) In addition, Mavidea seeks, actual, incidental, compensatory, consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

72)  As an actual and proximate result of Jamie Warmbir's conduct, as alleged in this claim for relief, Mavidea has suffered actual and consequential damages in the amount of at least $2,778,413.00.

73)  As a further proximate result of Jamie Warmbir's wrongful conduct and breach of the Operating Agreement, Mavidea has been injured, irreparably and otherwise, and is threatened with additional and ongoing injuries.

74)  Warmbir IT Solutions, LLC is an alter ego of Jamie Warmbir that was purposefully set up by Jamie Warmbir to facilitate and undertake the wrongful actions described herein

75)  Warmbir IT Solutions, LLC should be liable and enjoined from continuing any of these activities

WHEREFORE, the Plaintiff prays this Court enter judgment in its favor and against the Defendant, Jamie Warmbir and Warmbir IT Solutions, LLC, as follows:

a) an injunction against the Defendants requiring them to abstain from further violations of the Federal Defend Trade Secrets Act;

b) for actual damages suffered by the Plaintiff in an amount not less than $2,778,413.00;

c)  for interest;

d) for attorney's fees and costs of suit;

e) for other relief the Court deems appropriate;

## COUNT II:

## BREACH OF FIDUCIARY DUTY

## AGAINST JAMIE WARMBIR

76)  Mavidea repeats and realleges each and every allegation contained in Paragraphs 1 through 56 of the Complaint as if set forth fully herein.

77)  Jamie Warmbir, as a manager of Mavidea, owed a fiduciary duty to Mavidea and the other Members and Managers of Mavidea.

78)  Such fiduciary duties exist both before and after Jamie Warmbir's departure from the Company.

79)  Jamie Warmbir breached his fiduciary duties to Mavidea prior to his resignation by :

A) After making the decision to leave Mavidea, he concealed his intentions from the other Managers which enabled him to a) learn additional confidential information from the company and its managers, b) further exploit the Property of the Plaintiff, c) obtain an appraisal of Mavidea's IT business, d) meet with his attorney and other advisors to prepare for his new venture, e) put himself in a position with the employees of the company to convert them to his new venture, f) identify and cultivate prospective clients that could be signed up by his new venture, and g) take other actions to prepare for the start of his new venture that are still being investigated.

B) Failing to follow the standard practice of Mavidea by either a) failing to procure non-competition agreements or b) destroying existing non-competition agreements with the two employees under his supervision that he most desired to come to his new business.

C) To the information and belief of the Plaintiff, memorizing or otherwise recording the Plaintiff's customer list, contract term dates, pricing data, and other customer information.

D) To the information and belief of the Plaintiff, memorizing or otherwise recording the Plaintiff's prospective customer list, proposed pricing data, and other prospective customer information;

E) Allowing appointments to be set up with prospective or existing customers past his resignation date in which he knew he could take advantage of after leaving;

F) Recruiting his spouse, Charlotte Warmbir, to assist him in making preparations for his new business;

G)  Accumulate additional contacts and proprietary company information on the phone that he wrongfully intended to take with him after starting his competing business;

H)  Delay the signing of new clients so that he would not be encumbered by a Mavidea contract when starting his new venture,

I)  Forwarded the confidential resume and an email dialogue with a prospective employee to his own personal email account so that he could utilize the information for his new company;

J) Released Mavidea's financial information to third parties without consent;

80)  All such actions were intentionally designed so that Jamie Warmbir could immediately have his business up and running after resigning as Manager, as well as give as little warning to Mavidea as possible that might enable to company to enact counter-measures to protect its intangible property.

81) Jamie Warmbir's fiduciary duties did not end at the time he resigned his position as Manager.  Jamie Warmbir's fiduciary duties to Mavidea continue to this day.

82)  Jamie breached his fiduciary duties after leaving Mavidea by using the confidential information and Mavidea Property he obtained while at Mavidea:

A) He immediately undertook an effort to have the employees he supervised at Mavidea terminate their employment and come to his new venture.  He was enable to shortcut his search for employees and enhance any offers to them by using the names, backgrounds, salary history.  By short-cutting the normal search, it is believed his intentions were to quickly dismantle Mavidea's ability to provide service to its customers, enhancing his ability to pitch to Mavidea's customers that they would be better off terminating their contract and signing up with his business ;

B) He immediately undertook an effort, using the customer names, backgrounds, contract terms, pricing data and other customer information, to have Mavidea's customers terminate their contracts with Mavidea and sign new contracts at his new venture;

C)  He immediately undertook an effort, using the prospective customer names, backgrounds, prospective pricing data and other customer information to have Mavidea's prospective customers come to sign contracts with him instead of Mavidea;

D) He utilized the appointments and engagements set for him while at Mavidea to convert customers and prospective customers to his own business;

E) He used falsehoods, such as "At Mavidea, IT is not a priority compared to other things."

F) After resigning his manager position and being requested to turn his phone over to the company by the other managers, he wrongfully posed himself to be an agent of

Mavidea and effectuated a transfer of the Company's telephone number to an account in his own name that Mavidea had no authority over;

G) To the information and belief of the Plaintiff, he assisted customers in terminating their contracts with the Plaintiff by giving them the language to use in their termination notice;

(H) He encouraged and directly caused a Mavidea employee to undertake an action that would knowingly be in violation of his employment agreement;

83) These wrongful actions have caused the following damages to Mavidea:

A) The Defendants have caused at least eight customers to cancel their contracts with the Plaintiff;

B) The Defendants have caused two employees to terminate their employment with the Plaintiff and one employee to give his notice;

C) The Defendants have caused the Plaintiffs to incur additional labor costs both on a short term and long term basis to mitigate the damages caused by Defendants' wrongful actions;

D) The Defendants have caused the Plaintiffs to not receive prospective customer calls due to the theft of Plaintiff's phone number by the Defendant;

E) The Plaintiff and its Managers/Members have lost business other divisions of the Company due to the immediate actions and attention required to mitigate damages caused by the Defendants;

F) The Plaintiff has had to reassign its Managers to tasks related to mitigating damages caused by the Defendants increasing its labor costs;

G) The Plaintiff has lost a significant amount of money in its valuation as a going concern;

H) The Plaintiff has had to institute this legal action to collect damages due to the wrongful refusal of the Defendant to pay the same.  As a result, the Plaintiff has suffered a cost related to the time value of money at its applicable borrowing rate;

I)  The Plaintiff has been required to hire attorneys to prosecute this claim, as well as incur other costs related to the lawsuit;

J)  Additional Damages either unknown or still accumulating;

84) The Defendant's wrongful acts are characterized by wantonness, malice, oppression and other circumstances of aggravation.  The pattern of conduct by the defendants were motivated by more than mere ignorance or oversight, but by personal gain.

85)  As such, the Defendant should pay punitive damages to the Plaintiff as outlined in *Estate of Wernick*, 127 Ill.2d 61, 525 N.E.2d 876 (1989);

WHEREFORE, the Plaintiff prays this Court enter judgment in its favor and against the Defendant, Jamie Warmbir, as follows:

a) for actual damages suffered by the Plaintiff in an amount not less than $2,778,413.00;

b)  for punitive damages in an amount to be determined;

c)  for interest;

d) for attorney's fees and costs of suit;

e) for other relief the Court deems appropriate;

## COUNT III:

## BREACH OF OPERATING AGREEMENT

## AGAINST JAMIE WARMBIR

86) Mavidea repeats and realleges each and every allegation contained in Paragraphs 1 through 56 of the Complaint as if set forth fully herein.

87) Jamie Warmbir knowingly and voluntarily entered into the Operating Agreement. The Operating Agreement is a valid and enforceable contract.

88)  The Plaintiff has performed all conditions, covenants, promises and obligations required on its part to be performed in accordance with the Operating Agreement, except for any conditions and covenants for which performance was excused or prevented by the Defendant.

89)  The definition of property in Paragraph 1.9 of the Operating Agreement includes any intangible property.

90) The inclusion of the broad term "intangible property" infers a much more expansive interpretation than the items covered by the Illinois Trade Secret Act or the Federal Defend Trade Secrets Act.

91) Black's Law Dictionary (11th ed. 2019) defines "Intangible Property" as property that lacks a physical existence.  Examples include stock options and business goodwill."

92)  Thus, Property, as defined in the Operating Agreement, include such items as customer relationships, business goodwill, business know-how, employee relationships, customer and prospective customer lists and contracts, established processes, telephone numbers, contract terms, pricing and profitability data, and the other items referenced herein that Jamie Warmbir misappropriated for his own use.

93) Paragraph 1.7 indicated that a Manager was only permitted to compete with Mavidea in the event the intangible property interests of Mavidea under Section 5.3 were respected. If that did not occur, Paragraph 1.7 suggests that the offending Manager should tender the stock back to Mavidea of any new independent or competing venture, as well as account for its income and profits.

94) The pre-separation and post-separation actions of Jamie Warmbir referenced herein are contrary to the terms of 1.8, 5.3 and 5.4 of the Operating Agreement.

95) As such, Jamie Warmbir is in breach of the operating Agreement.

96) As a further proximate result of Jamie Warmbir's wrongful conduct and breach of the Operating Agreement, Plaintiff has been injured, irreparably and otherwise, and is threatened with additional and ongoing injuries.

WHEREFORE, the Plaintiff prays this Court enter judgment in its favor and against the Defendant, Jamie Warmbir, as follows:

a)  for an Order requiring Jamie Warmbir to turn over all ownership interest in Warmbir IT Solutions, LLC to the Plaintiff;

b)  for actual damages suffered by the Plaintiff in an amount not less than $2,778,413.00;

c)  for punitive damages in an amount to be determined;

d)  for interest;

e)  for attorney's fees and costs of suit;

f)  for other relief the Court deems appropriate;

## COUNT IV:

## CIVIL CONSPIRACY

## AGAINST CHARLOTTE WARMBIR

97)  Mavidea repeats and realleges each and every allegation contained in Paragraphs 1 through 56 of the Complaint as if set forth fully herein.

98)  Shortly after the formation of Warmbir IT Solutions, LLC, Jamie Warmbir announced on LinkedIn that "My wife, Charlotte, will be running the business with me… We are going to provide services to clients in the central Illinois marketplace and will be based out of Bloomington, IL."

99)  Charlotte Warmbir knew that Jamie Warmbir owed a fiduciary duty to the Mavidea.

101) To the knowledge and belief of the Plaintiff, Charlotte Warmbir assisted and is currently assisting Jamie Warmbir with the violations of law outlined in this Complaint.

102) Charlotte Warmbir acted purposefully when she aided and abetted Jamie Warmbir's wrongful violations referenced herein.

103) Charlotte Warmbir's wrongful conduct resulted in breaches of Jamie Warmbir's fiduciary duties.

104) As a direct and proximate result of Charlotte Warmbir's wrongful actions, Mavidea has been damaged by:

105)  These wrongful actions have caused the following damages to Mavidea:

A) The Defendants have caused at least eight customers to cancel their contracts with the Plaintiff;

B) The Defendants have caused two employees to terminate their employment with the Plaintiff and one employee to give his notice;

C) The Defendants have caused the Plaintiffs to incur additional labor costs both on a short term and long term basis to mitigate the damages caused by Defendants' wrongful actions;

D) The Defendants have caused the Plaintiffs to not receive prospective customer calls due to the theft of Plaintiff's phone number by the Defendant;

E) The Plaintiff and its Managers/Members have lost business other divisions of the Company due to the immediate actions and attention required to mitigate damages caused by the Defendants;

F) The Plaintiff has had to reassign its Managers to tasks related to mitigating damages caused by the Defendants increasing its labor costs;

G) The Plaintiff has lost a significant amount of money in its valuation as a going concern;

H) The Plaintiff has had to institute this legal action to collect damages due to the wrongful refusal of the Defendant to pay the same.  As a result, the Plaintiff has suffered a cost related to the time value of money at its applicable borrowing rate;

I) The Plaintiff has been required to hire attorneys to prosecute this claim, as well as incur other costs related to the lawsuit;

J) Additional Damages either unknown or still accumulating;

106) The Defendant's wrongful acts are characterized by wantonness, malice, oppression and other circumstances of aggravation.  The pattern of conduct by the defendants were motivated by more than mere ignorance or oversight, but by personal gain.

WHEREFORE, the Plaintiff prays this Court enter judgment in its favor and against the Defendant, Charlotte Warmbir, as follows:

a) for actual damages suffered by the Plaintiff in an amount not less than $2,778,413.00;

b)  for punitive damages in an amount to be determined;

c)  for interest;

d) for attorney's fees and costs of suit;

e) for other relief the Court deems appropriate;

## COUNT V:

## BREACH OF ILLINOIS TRADE SECRETS ACT

## AGAINST JAMIE WARMBIR AND WARMBIR IT SOLUTIONS, LLC

107) Mavidea repeats and realleges each and every allegation contained in Paragraphs 1 through 56 of the Complaint as if set forth fully herein.

108)  Jamie Warmbir acquired the trade secrets by improper means, namely misappropriating by copying/memorizing the trade secrets of Mavidea after his authority was terminated.

109)  Warmbir IT Solutions, LLC also acquired the trade secrets referenced herein by improper means, namely by receiving the trade secrets from unauthorized party, Jamie Warmbir.

110)  Jamie Warmbir and Warmbir IT Solutions, LLC used the information without the consent of the owner, Mavidea.

111) By using the information, Jamie Warmbir and Warmbir IT Solutions, LLC have caused injury to the Plaintiff.  These wrongful actions have caused the following damages to Mavidea:

A) The Defendants have caused at least eight customers to cancel their contracts with the Plaintiff;

B) The Defendants have caused two employees to terminate their employment with the Plaintiff and one employee to give his notice;

C) The Defendants have caused the Plaintiffs to incur additional labor costs both on a short term and long term basis to mitigate the damages caused by Defendants' wrongful actions;

D) The Defendants have caused the Plaintiffs to not receive prospective customer calls due to the theft of Plaintiff's phone number by the Defendant;

E) The Plaintiff and its Managers/Members have lost business other divisions of the Company due to the immediate actions and attention required to mitigate damages caused by the Defendants;

F) The Plaintiff has had to reassign its Managers to tasks related to mitigating damages caused by the Defendants increasing its labor costs;

G) The Plaintiff has lost a significant amount of money in its valuation as a going concern;

H) The Plaintiff has had to institute this legal action to collect damages due to the wrongful refusal of the Defendant to pay the same.  As a result, the Plaintiff has suffered a cost related to the time value of money at its applicable borrowing rate;

I)  The Plaintiff has been required to hire attorneys to prosecute this claim, as well as incur other costs related to the lawsuit;

J)  Additional Damages either unknown or still accumulating;

112) The Defendant's wrongful acts are characterized by wantonness, malice, oppression and other circumstances of aggravation.  The pattern of conduct by the defendants were motivated by more than mere ignorance or oversight, but by personal gain.

WHEREFORE, the Plaintiff prays this Court enter judgment in its favor and against the Defendants, Jamie Warmbir and Warmbir IT Solutions, LLC, as follows:

a) a preliminary and permanent injunction preventing the Defendant from continuing to violate the Illinois Trade Secrets Act;

b)  for actual damages suffered by the Plaintiff in an amount not less than $2,778,413.00;

c)  for punitive damages in an amount to be determined;

d)  for interest;

e) for attorney's fees and costs of suit;

f) for other relief the Court deems appropriate;

### COUNT VI:

### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

### AGAINST JAMIE WARMBIR AND WARMBIR IT SOLUTIONS, LLC

113) Mavidea repeats and realleges each and every allegation contained in Paragraphs 1 through 56 of the Complaint as if set forth fully herein.

114)  Plaintiffs had valid and enforceable contracts with its customers that Jamie
Warmbir and Warmbir IT Solutions, LLC have either attempted to appropriate to themselves or
have appropriated to themselves.

115)  Prior to any dates of termination, Plaintiff had performed the obligations under the
contracts and had a reasonable basis to receive the benefits described therein.

116)  Jamie Warmbir had prepared and executed most of the contracts for the customers
of Mavidea while a Manager of Mavidea.  He was aware of all customer contracts.  Warmbir IT
Solutions, LLC, through the knowledge of its owner/manager, Jamie Warmbir, also had the same
knowledge.

117)  Defendant intentionally and without legal justification induced a breach of the
contract, thereby interfering with Plaintiff's rights under the contracts.

118)  The contracts were, in fact, subsequently terminated.

119)  As a result of Defendants' wrongful conduct and the resulting terminations of the
contracts, the Plaintiff has suffered damages, and are suffering ongoing damages.

WHEREFORE, the Plaintiff prays this Court enter judgment in its favor and against the
Defendant, Jamie Warmbir and Warmbir IT Solutions, LLC, as follows:

a) for actual damages suffered by the Plaintiff in an amount not less than
$2,778,413.00;

b)  for punitive damages in an amount to be determined;

c)  for interest;

d) for attorney's fees and costs of suit;

e) for other relief the Court deems appropriate;

## COUNT VII:

## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

## AGAINST JAMIE WARMBIR AND WARMBIR IT SOLUTIONS, LLC

120) Mavidea repeats and realleges each and every allegation contained in Paragraphs 1 through 56 of the Complaint as if set forth fully herein.

121)  Plaintiff reasonably expected to enter into a valid business relationship with the businesses described on its confidential client tracking list.

122)  Defendants, Jamie Warmbir and Warmbir IT Solutions, LLC had knowledge of Plaintiff's expectancy.

123)  Defendants intentionally and unjustifiably interfered with Plaintiff's expectancy by directly and indirectly encouraging them to convert their business to Warmbir IT Solutions, LLC and by the other acts described herein.

124)  As a result of Defendants interference, Plaintiff failed to realize its expectancy on these customers.

125)  Defendants' interference with Plaintiff's expectancy was willful, wanton and knowing.

126)  As a result of Defendants' wrongful interference with Plaintiff's expectancy, Plaintiff has suffered damages in an amount to be determined through discovery and at the time of trial, but in an amount to exceed $2,778,413.00.

WHEREFORE, the Plaintiff prays this Court enter judgment in its favor and against the Defendant, Jamie Warmbir and Warmbir IT Solutions, LLC, as follows:

a) for actual damages suffered by the Plaintiff in an amount not less than $2,778,413.00;

b)  for punitive damages in an amount to be determined;

c)  for interest;

d) for attorney's fees and costs of suit;

e) for other relief the Court deems appropriate;

Respectfully Submitted,

Bartell Powell LLP

/s/ Jason S. Bartell
Jason S. Bartell, a partner of the firm

ATTORNEYS FOR THE PLAINTIFF

Jason Bartell, ARDC# 6255602
Bartell Powell LLP
10 East Main Street
Champaign, IL  61820
(217) 352-5900
Facsimile (217) 352-0182
Email: jbartell@bartellpowell.com

Michael Powell, ARDC# 6257615
Bartell Powell LLP
207 West Jefferson St. Ste. 602
Bloomington, IL  61701
(309)807-5275
Facsimile (309)807-5015
Email: mpowell@bartellpowell.com

**FIRST AMENDED AND RESTATED OPERATING AGREEMENT**
**OF**
**MAVIDEA TECHNOLOGY GROUP, LLC**

This OPERATING AGREEMENT (the "Agreement") is entered into and shall be effective as of the 17th day of April, 2019, by and among MAVIDEA TECHNOLOGY GROUP, LLC, an Illinois Limited Liability Company (the "Company"), Jamie D. Warmbir, Erik Barnlund, Jacob E. Davis, Arnold Lovin, and Michael Somers (the "Managers"), and the persons whose names are set forth on Exhibit A attached hereto (the "Members").

Article I
THE COMPANY

1.1     Organization.  The Company has been organized as a limited liability company pursuant to the provisions of the Act.  Articles of Organization creating the Company were filed with the Illinois Secretary of State on April 18, 2007 in accordance with and pursuant to the Act.

1.2     Company Name; Property.    The name of the Company shall be MAVIDEA TECHNOLOGY GROUP, LLC, or such other name as the Managers shall hereafter designate with the Consent of the Members, and all business of the Company shall be conducted in such name.  The Company shall hold all of its property in the name of the Company and not in the name of any Member.

1.3     Purpose.  The purpose of the Company is to transact any and all other lawful business for which limited liabilities companies may be organized under the Act.  However, the Company shall not operate in a manner which would cause it to be treated as an investment company under the Investment Company Act of 1940.

1.4     Principal Place of Business.    The principal place of business of the Company shall be 14170 Carole Dr., Bloomington, Illinois, or such other place as the Managers may designate.

1.5     Registered Agent and Office.  The Company shall at all times maintain a registered office and a registered agent as required under the Act which shall be the office and agent as stated in the Articles or as otherwise may be determined from time to time by the Members.  The current registered agent and registered office, respectively are Jamie Warmbir, 14170 Carole Dr., Bloomington, IL 61705.

1.6     Term.  The term of the Company commenced on the date the Articles of Organization were issued by the Illinois Secretary of State and shall continue until the winding up and liquidation of the Company and its business is completed following a Liquidating Event, as provided in Article IX hereof.

1.7     Independent Activities.  Except to the extent specified in Section 15-3 of the Act, each Member and Manager may, directly or indirectly, independently or with others,

engage in or possess any interest in whatever activities he, she or it chooses, whether the same as or competitive with the Company or otherwise, without having or incurring any obligation to offer any interest in such activities to the Company or any Member, or to account in any way to any such Person.

      1.8    <u>No Payments of Individual Obligations</u>.  The Members shall use the Company's credit and assets solely for the benefit of the Company.  No asset of the Company shall be transferred or encumbered for or in payment of any individual obligation of a Member.

      1.9    <u>Definitions</u>.  Capitalized words and phrases used in this Agreement have the following meanings:

      "<u>Act</u>" means the Illinois Limited Liability Company Act, as amended from time to time.

      "<u>Agreement</u>" or "<u>Operating Agreement</u>" means this Operating Agreement, as amended from time to time.

      "<u>Capital Account</u>" means, with respect to any Member, the Capital Account maintained for such Member pursuant to Section 3.1 of this Agreement.

      "<u>Capital Contributions</u>" means, with respect to any Member, any contribution to the capital of the Company in cash or property by a Member whenever made.

      "<u>Code</u>" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

      "<u>Company</u>" means MAVIDEA TECHNOLOGY GROUP, LLC, an Illinois limited liability company.

      "<u>Consent of the Members</u>" means and requires the consent of a Majority in Interest of the Members.

      "<u>Interest</u>" means a Member's ownership interest in the Company, including any and all benefits to which the holder of such an Interest may be entitled as provided in this Agreement, together with all obligations of such Member to comply with the terms and provisions of this Agreement.

      "<u>Majority in Interest of the Members</u>" means Members whose combined Percentage Interests represent more than 50% of the Percentage Interests of all Members.

      "<u>Managers</u>" means the Persons referred to as such in Section 5.2 of this Agreement or who become Managers pursuant to the terms of this Agreement.

      "<u>Member</u>" means any Person (i) whose name is set forth on <u>Exhibit A</u> attached hereto or who has become a Member pursuant to the terms of this Agreement, and (ii) who holds an Interest.  "<u>Members</u>" means all such Persons.

"Percentage Interest" means the fraction, expressed in percentage form, obtained by dividing (i) the number of Units held by a Member by (ii) the total number of Units held by all Members.

"Person" means any individual, partnership, corporation, trust, limited liability company, or other legal entity.

"Property" means all real and personal property acquired by the Company and any improvements thereto, and shall include both tangible and intangible property.

"Regulations" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such Regulations may be amended from time to time.

"Transfer" means  any voluntary or involuntary transfer, sale, pledge, hypothecation, grant of a security interest, or other disposition.

"Unit" means the number of units of membership interest set forth for each Member on Exhibit A, as may be changed from time to time pursuant to the terms of this Agreement.

## Article II
## MEMBERS

2.1    Members.  The names of, Capital Contributions made by, and number of Units held by the Members are set forth on Exhibit A attached hereto, as may be amended from time to time.

2.2    Rights or Powers.  The Members shall have the right to vote on the matters explicitly set forth in this Agreement.  The Members shall otherwise have no right or power to take part in the management or control of the Company or its business affairs or to act for or to bind the Company in any way.

2.3    Member Liability.  Except as otherwise provided by this Agreement, the Act, or other applicable law, no Member shall be liable for the debts, liabilities, contracts or any other obligations of the Company.  A Member shall be liable only to make its Capital Contributions and shall not be required to lend any funds to the Company.  A Member shall not be required to restore a deficit balance in his, her or its Capital Account.

2.4    Members' Capital Contributions.

(a)    Except as otherwise provided in this Agreement, no Member shall demand or receive a return of his, her or its Capital Contributions.  A Member may withdraw from the Company at any time, but the Units held by such Member shall not be liquidated or redeemed without the Consent of the Members.  If a Member's Units are not redeemed by the Company upon withdrawal, the Member shall forfeit all rights as a Member except the rights to allocations and distributions as provided in Articles III and IV as if such Person were still a Member, and such Member's Capital Account shall be distributed upon liquidation of the Company as

3

provided in Article IX hereof. Under circumstances requiring a return of any Capital Contributions, no Member shall have the right to receive Property other than cash except as may be specifically provided herein.

(b)     No Member shall receive any interest, salary or drawing with respect to his, her or its Capital Contributions or such Member's Capital Account or for services rendered on behalf of the Company or otherwise in such person's capacity as a Member, except as otherwise provided in this Agreement.

2.5     <u>Additional Capital Contributions</u>. Except as otherwise unanimously agreed to by the Members, no Member shall be obligated to make any additional Capital Contribution to the Company.

Article III
CAPITAL ACCOUNTS AND ALLOCATIONS

3.1     <u>Capital Accounts</u>. A separate Capital Account will be maintained for each Member in accordance with Section 704(b) of the Code and Regulations Section 1.704-1(b)(2)(iv). Each Member's Capital Account will be increased by: (1) the amount of money contributed by the Member to the Company; (2) the fair market value of property contributed by the Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code); and (3) allocations to the Member of income and gain pursuant to Section 3.2 hereof. Each Member's Capital Account will be decreased by: (1) the amount of money distributed to the Member by the Company; (2) the fair market value of property distributed to the Member by the Company (net of liabilities secured by such distributed property that the Member is considered to assume or take subject to under Section 752 of the Code); (3) allocations to the Member of expenditures described in Section 705(a)(2)(B) of the Code; and (4) allocations to the Member of loss and deduction pursuant to Section 3.2 hereof.

In the event of a permitted sale or exchange of Units held by a Member, the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Units.

The manner in which Capital Accounts are to be maintained pursuant to this Section 3.1 is intended to comply with the requirements of Code Section 704(b) and the Regulations thereunder and shall be interpreted and applied in a manner consistent therewith. If, in the opinion of the Managers, the manner in which Capital Accounts are to be maintained should be modified in order to comply with Code Section 704(b) and the Regulations thereunder, then, notwithstanding anything to the contrary contained in the preceding provisions of this Section 3.1, the Managers may alter the method in which Capital Accounts are maintained; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between the Members.

3.2     <u>Allocations of Profits and Losses</u>. For each fiscal year, each item of the Company's income, gain, loss, deduction or credit shall be allocated to each of the Members in accordance with their respective Percentage Interests; provided, however, that such allocations

4

shall be made in accordance with Section 704 of the Code and applicable Regulations thereunder. Allocations of such items with respect to a Member whose Percentage Interest has changed in such fiscal year shall be made on an interim closing of the books method.

      3.3   Determination of Capital Accounts and Transfers. Except as otherwise provided in this Agreement, whenever it is necessary to determine the balance in the Capital Account of any Member for purposes of this Agreement, such balance shall be determined after first giving effect to all allocations, for transactions effected prior to the time as of which such determination is made, of items of income and loss and other items allocated pursuant to Section 3.2, for the current year; and second, after giving effect to all distributions or deemed distributions for such year in respect of transactions effected prior to the date as of which such determination is to be made; and third, after giving effect to all allocations of the Company's items of income and loss for the transaction in question (that is, prior to giving effect to distributions or deemed distributions as a result of such transaction).

      3.4   Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, any deficit balance in such Member's Capital Account as quickly as possible; provided that an allocation pursuant to this Section 3.4 shall be made only if and to the extent that such Member would have a deficit balance in his, her or its Capital Account after all other allocations provided for in this Article III have been tentatively made as if this Section 3.4 were not in the Agreement.

      3.5   Tax Allocations; Code Section 704(c). In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any Property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such Property to the Company for federal income tax purposes and the fair market value of such Property on the date on which such Property is contributed to the Company.

      In the event the fair market value of any Company asset is adjusted pursuant to the Regulations under Code Section 704(b), subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its fair market value in the same manner as under Code Section 704(c) and the Regulations thereunder.

      Any elections or other decisions relating to such allocations shall be made by the Managers in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 3.5 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of profits, losses, other items, or distributions pursuant to any provision of this Agreement.

Article IV
DISTRIBUTIONS

4.1     Distributions to Pay Taxes.    The Company shall make distributions to each member of the amount necessary, as determined by the Managers, to pay federal, state and local income tax on income or gain of the Company allocated to the Members pursuant to Article III hereof, based on the Members' respective Percentage Interests.

4.2     Other Distributions.   The Managers shall have the sole discretion to cause the Company to make any other distributions of cash or property to the Members.   Such distributions shall be made in accordance with the Members' Percentage Interests.

4.3     Restriction on Distributions.  Notwithstanding anything to the contrary in Sections 4.1 and 4.2 above, no distribution shall be made if, after giving effect to the distribution: (i) the Company would not be able to pay its debts as they become due in the ordinary course of business; or (ii) the Company's total assets would be less than the sum of its total liabilities.

Article V
MANAGEMENT

5.1     Authority of the Managers.   Except to the extent otherwise provided herein, the Managers shall have the sole and exclusive right to manage the business of the Company including, without limitation, the right and power to:

(a)     acquire by purchase, lease, or otherwise any real or personal property which may be necessary, convenient, or incidental to the accomplishment of the purposes of the Company;

(b)     operate, maintain, finance, improve, construct, own, grant options with respect to, sell, convey, assign, mortgage, and lease any real estate and any personal property necessary, convenient, or incidental to the accomplishment of the purposes of the Company;

(c)     execute any and all agreements, contracts, documents, certifications and instruments necessary or convenient in connection with the management, maintenance, and operation of Property, or in connection with managing the affairs of the Company;

(d)     borrow money and issue evidences of indebtedness necessary, convenient, or incidental to the accomplishment of the purposes of the Company, and secure the same by mortgage, pledge, or other lien on any Property;

(e)     execute, in furtherance of any or all of the purposes of the Company, any deed, lease, mortgage, deed of trust, mortgage note, promissory note, bill of sale, contract, or other instrument purporting to convey or encumber any or all of the Property;

(f)     prepay in whole or in part, refinance, increase, modify, or extend any liabilities affecting the Property and in connection therewith execute any extensions or renewals of encumbrances on any or all of the Property;

(g)     maintain and distribute funds to the Members by way of cash, income, return of capital, or otherwise in accordance with the provisions of this Agreement;

(h)     contract on behalf of the Company for the employment and services of employees and/or independent contractors, such as lawyers and accountants, and delegate to such Persons the duty to manage or supervise any of the assets or operations of the Company;

(i)     engage in any kind of activity and perform and carry out contracts of any kind (including contracts of insurance covering risks to Property and the Managers' liability) necessary or incidental to, or in connection with, the accomplishment of the purposes of the Company under the laws of each state in which the Company is then formed or qualified;

(j)     make any and all elections for federal, state, and local tax purposes, and act as the "Tax Matters Member" under the Code and in any similar capacity under state or local law.

(k)     institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought on or in behalf of, or against, the Company or the Members in connection with activities arising out of, connected with, or incidental to this Agreement, and to engage counsel or others in connection therewith.

5.2     Number/Actions of Managers. The Company shall have five Managers. The Managers must approve of any action by a majority vote before the Company can proceed with such act.  The weighted value of each Manager's vote shall be the same percentage as the Manager's, or an entity owned or controlled by said Manager, Percentage Interest owned in the Company.  For example, if a Manager, or an entity owned or controlled by said Manager, owns a Percentage Interest of twenty-five percent (25%) in the Company, that Manager's vote shall be weighed as (25%) of the vote of all Managers. The Managers shall direct, manage and control the business of the Company to the best of such Person's ability, and shall have full and complete authority, power and discretion to make any and all decisions, and to do any and all things which the Managers deem necessary or desirable for that purpose, including those actions specified in Section 5.1 above, but specifically excluding those matters which require Member consent, as identified in Section 5.3 below.

A Person shall cease to be a Manager upon his, her or its bankruptcy, death, Permanent Total Disability, resignation, removal, if an employee of the Company, termination of employment with the Company, or, if a Member or owner of a Member of the Company, the sale of all Units held by the Managers.  For the purposes of this Section 5.2, "Permanent Total Disability" shall mean a Manager's inability to perform his or her customary duties for the Company for six (6) consecutive months as a result of physical or mental impairment.  A Manager may be removed by the affirmative vote of Members holding at least 75% of the outstanding Percentage Interests for any reason at any time.  The Members shall elect a substitute Manager to fill any vacancy occurring in the position of the Managers by Consent of the Members.  Managers need not be residents of the State of Illinois or Members of the Company.

The Members hereby elect Jamie D. Warmbir, Erik Barnlund, Jacob E. Davis, Arnold Lovin, and Michael Somers as the Managers of the Company.

5.3     Restrictions on Authority of the Managers.  Without the Consent of the Members, the Managers shall not have the authority to:

(i)      do any act in contravention of this Agreement;

(ii)     do any act which would make it impossible to carry on the ordinary business of the Company, except as otherwise provided in this Agreement;

(iii)    confess a judgment against the Company;

(iv)     possess Property, or assign rights in specific Property, for other than a Company purpose;

(v)      admit additional Members or Substituted Members to the Company;

(vi)     amend this Agreement or the Articles of Organization; or

(vii)    knowingly perform any act that would subject any Member to liability in any jurisdiction.

5.4     Duties and Obligations of the Managers.

(a)      The Managers shall take all actions on behalf of the Company which may be necessary or appropriate (i) for the continuation of the Company's valid existence as a limited liability company under the Act and (ii) for the accomplishment of the Company's purposes, including the acquisition, development, maintenance, preservation, and operation of Property in accordance with the provisions of this Agreement, the Act, and all other applicable laws and regulations.

(b)      The Managers shall devote to the Company such time as may be necessary for the proper performance of all duties hereunder, but the Managers shall not be required to devote full time to the performance of such duties.

(c)      The Managers shall conduct the affairs of the Company in the best interests of the Company and of the Members, including the safekeeping and use of all of the Property for the exclusive benefit of the Company.

(d)      The Managers shall be responsible for filing any federal, state, or local tax returns that need to be filed on behalf of the Company.

5.5     Indemnification of the Managers.

(a)      The Company, its receiver, or its trustee shall indemnify, save harmless, and pay all judgments and claims against the Managers relating to any liability or damage incurred by reason of any act performed or omitted to be performed by such Managers in connection with the business of the Company, including attorneys' fees incurred by such Managers in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred, including all such liabilities under federal and state securities laws (including the Securities Act of 1933, as amended) as permitted by law.

(b)     In the event of any action by a Member against the Managers, including a Company derivative suit, the Company shall indemnify, save harmless, and pay all expenses of such Manager, including attorneys' fees, incurred in the defense of such action, if such Manager(s) is successful in such action.

(c)     The Company shall indemnify, save harmless, and pay all expenses, costs, or liabilities of any Manager who for the benefit of the Company makes any deposit, acquires any option, or makes any other similar payment or assumes any obligation in connection with any property proposed to be acquired by the Company and who suffers any financial loss as the result of such action.

(d)     Notwithstanding the provisions of Sections 5.5(a), 5.5(b), and 5.5(c) above, no Manager shall be indemnified from any liability for fraud, bad faith, willful misconduct, or gross negligence.

5.6     <u>Compensation and Loans</u>.

(a)     Compensation and Reimbursement.  A Manager or Member may receive a salary, fee, or draw for services rendered to or on behalf of the Company, if reasonable for the services provided and approved by a majority of the Managers (said vote shall exclude the Manager or Member who is proposed to receive the compensation).

(b)     Expenses.   The Managers may charge the Company for any direct expenses reasonably incurred in connection with the Company's business.

(c)     Loans.   Any Person may, with the consent of the Managers, lend or advance money to the Company.  If any Member shall make any loan or loans to the Company or advance money on its behalf, the amount of any such loan or advance shall not be treated as a Capital Contribution but shall be a debt due from the Company.  The amount of any such loan or advance by a lending Member shall be payable out of the Company's cash and shall bear interest at such rate, and be payable on such terms, as the Manager and the lending Member shall agree. None of the Members shall be obligated to make any loan or advance to the Company.

5.7     <u>Life Insurance.</u>

The Managers may purchase life insurance on the lives of one or more Members or owners of Members. The proceeds of any life insurance benefits on behalf of such Members shall be distributed in accordance with Section 8.3(c).

Article VI
ACCOUNTING AND BANK ACCOUNTS

6.1     <u>Books and Records</u>.  The Company shall keep adequate books and records at its principal place of business in compliance with the Act, setting forth a true and accurate account of all business transactions arising out of and in connection with the conduct of the Company.  Any Member or his, her or its designated representative shall have the right, at any reasonable time, to have access to and inspect and copy the contents of such books or records.

9

6.2    <u>Annual Reports</u>.  Within a reasonable period after the end of each Company fiscal year, each Member shall be furnished with pertinent financial information regarding the Company and its activities during such period. The Managers shall have the authority to select the Company's accountants and to determine whether or not to obtain an audit of the Company's books and records.

6.3    <u>Tax Information</u>. Necessary tax information shall be delivered to each Member after the end of each fiscal year of the Company. Every effort shall be made to furnish such information within seventy-five (75) days after the end of each fiscal year.

6.4    <u>Fiscal Year</u>. The fiscal year of the Company shall be the calendar year.

6.5    <u>Bank Account(s)</u>. All funds of the Company shall be deposited in the name of the Company in such bank or banks as may be selected by the Managers and checks drawn on such account(s) shall require the signature of one of the Managers, or such other policy as the Managers may from time to time approve. All funds received from the operation and business of the Company shall be promptly deposited in the account(s) maintained in its name and all debts, expenses and charges shall be paid by checks drawn on such account(s). There shall be no commingling of the funds of the Company with the funds of any other entity.

Article VII
AMENDMENTS; MEETINGS

7.1    <u>Amendments</u>. Amendments to this Agreement shall require the Consent of the Members; provided, however, that this Agreement shall not be amended without the consent of each Member adversely affected if such amendment would (i) modify the limited liability of a Member, or (ii) alter the interest of a Member in profits, losses, other items thereof, or any Company distributions.

7.2    <u>Meeting of the Members</u>. Meetings of the Members may be called by any Member or one of the Managers. The call shall state the nature of the business to be transacted. Notice of any such meeting shall be given to all Members not less than three (3) days nor more than thirty (30) days prior to the date of such meeting. Members may vote in person or by proxy at such meeting. Whenever the vote or consent of Members is permitted or required under this Agreement or the Act, such vote or consent shall require the vote or consent of the Members holding a majority of the Percentage Interests (unless otherwise specified herein) and may be given at a meeting of Members or may be given in writing.

Article VIII
TRANSFERS OF INTERESTS

8.1    <u>Restrictions on Transfer and Dissociation</u>. No Member shall transfer any Unit except in accordance with this Article VIII. No Member shall otherwise resign, withdraw or dissociate himself, herself or itself from the Company without the prior written Consent of the Members. Such consent of any Member may be withheld entirely at such Member's discretion, for any or no reason. If a Member or Member's owner resigns from the Company other than as provided in this Article VIII, the Company shall be entitled to offset the damages resulting from such withdrawal against amounts otherwise distributable to the resigned Member hereunder.

10

8.2    Restriction on Lifetime Sale or Disposition.

(a)    General.  No Member shall sell, assign (by operation of law or otherwise), pledge, or in any manner whatsoever Transfer any Unit without first offering to sell such Unit to the Company and to the other Members in accordance with the terms and conditions of this Section 8.2.

(b)    Notice.  Any Member intending or desiring to Transfer any Unit (the "Selling Member") shall first give notice of such intention to the Company and the other Members.  Such notice shall specify the number of Units to be transferred, the intended transferee, the proposed selling price if the intended Transfer is a sale, and a description of the other terms and conditions of the intended Transfer.

(c)    Options to Purchase.  The Company and thereafter the other Members shall have an option for sixty (60) days after their receipt of the notice to purchase the Units described therein.  The price shall be as determined in accordance with Section 8.6 below.

(d)    Priority of Options.  If the Company has not exercised its option as to all of the Units described in such notice within the first forty (40) days of such sixty (60) day period, then for the next twenty (20) days the other Members shall have an option to purchase all but not less than all of the number of Units not purchased by the Company.  During such twenty (20) day period, the Company's option shall be subject to the prior right of the other Members to exercise their options.

(e)    Payment.  The purchase price shall be paid, at the election of the purchaser, (i) over a period of ten (10) years at a rate of six percent (6%) per annum, (ii) over such period as may be mutually agreed by the Selling Member and the purchaser(s) or, (iii) one hundred percent (100%) in cash at the Closing (as defined in Section 8.2(f) below).

(f)    Closing.  If one or more options are exercised, the sale or sales shall be closed at the office of the Company at a time (during its ordinary business hours) fixed by the Selling Member, not more than sixty (60) days after the expiration of the options (the "Closing").  If such options shall have been exercised in whole or in part by the Company and a Member, or by more than one Member, the sales shall be closed simultaneously.  In the event the entirety of the purchase price is not paid at closing pursuant to Paragraph 8.2(e), the Selling Member shall retain a security interest on the transferred interest until the Selling Member has been paid in full.

(g)    Non-Exercise of Options.  Upon receipt of the remaining Members' written consent, or upon termination of the options of the Company and the other Members unexercised as to any of the Units described in the Selling Member's notice, the Selling Member may Transfer the Units not purchased by the Company or the other Members substantially as outlined in such notice.  Such Transfer must be carried out within sixty (60) days after the written consent has been delivered, or the options have terminated.  However, as a condition of such Transfer, the transferee must expressly consent to be subject to the provisions of this Agreement in the manner set forth in Section 8.10.

8.3    Death of a Member

(a)     Options to Purchase.  In the event of the death of any owner of a Member, the Company and thereafter the other Members shall have an option, for a period of sixty (60) days after their receipt of written notice of the Member's Owner's death, to purchase from the representative or distributee of such Member Owner's estate (the "Transferor") the Units owned by such Member Owner's estate at the date of Closing.  The price shall be determined in accordance with the provisions of Section 8.6 and the terms shall be as set forth in Sections 8.2(b)-(f) (with the substitution of "Transferor" for "Selling Member").

(b)     Lapse of Options If Not Fully Exercised.  Upon the termination of the options of the Company and the other Members as to any of the Units held by the Transferor, the Units held by the Transferor (after giving effect to any exercise of options by the Company or other Members) shall be exchanged for the value of the life insurance proceeds held on the life of the deceased Member's owner.

(c)     Life Insurance Proceeds.  With the consent of the Managers, the proceeds of any life insurance policy held for a Member's Owner may be distributed to the deceased Member Owner's estate.  If the Managers elect to distribute the life insurance proceeds to the deceased Member Owner's estate, the deceased Member Owner's interest in the Company shall immediately be transferred to the Company at no additional cost to the Company.  Alternatively, if the Managers elect to retain the proceeds of such life insurance policy for the benefit of the Company, the Company shall pay to the deceased Member Owner's estate the purchase price for the deceased Member Owner's interest in accordance with Section 8.6 and on the terms set for in Sections 8.2(b)-(f).  The Managers shall have the discretion to determine whether to distribute the life insurance proceeds or, alternatively, pay the purchase price for the Member's interest, notwithstanding that either alternative may result in a difference in value paid to the Member Owner's estate.

(d)     Notwithstanding any other Section of this Agreement, the deceased Member's Owner's estate or the Member shall have no right to retain an interest in the Company following such Member's Owner's death.  The payment of such life insurance proceeds or purchase price shall be a complete release of the Member and its estate's interest in the Company.

8.4     Bankruptcy, Insolvency of a Member

(a)     Options to Purchase.  In the event of (i) the dissolution of any Member, (ii) the appointment of a receiver or trustee for any Member, (iii) the filing by a Member of a voluntary petition in bankruptcy or the filing against a Member of an involuntary petition in bankruptcy that is not dismissed within thirty (30) days, (iv) the making by a Member of an assignment for the benefit of creditors, or (v) the effecting by a Member of another act of insolvency, the Company and thereafter the other Members shall have an option, for a period of sixty (60) days after their receipt of written notice of an event described in (i)-(v) above, to purchase from such Member or his, her or its representative (the "Transferor"), the Units owned by such Member on the date of Closing.  The price shall be determined in accordance with the provisions of Section 8.6, and the terms shall be as set forth in Sections 8.2(b)-(f) (with the substitution of "Transferor" for "Selling Member").

(b)     Lapse of Options if Not Fully Exercised.  Upon the termination of the options of the Company and the other Members as to any of the Units held by the Transferor, the Units held by the Transferor (after giving effect to any exercise of options by the Company or other Members) may be transferred to the shareholders, trustees, receivers or distributees of the Transferor, providing the transferee expressly consents to be subject to the provisions of this Agreement in the manner set forth in Section 8.10.

8.5     Exercise of Options.  Neither the Selling Member nor Transferor, as the case may be, shall have any voice (directly or indirectly, and whether as an officer, Manager, Member or otherwise) in a decision by the Company to exercise or not to exercise any option hereunder.  Furthermore, the Selling Member and Transferor shall, at the request of the holders of a majority of the Percentage Interest of the Company owned by the other Members, cooperate in securing valid corporate action (by assisting in procuring the attendance of a quorum at any meeting of Members or Manager, by voting as a Member or Manager, by signing consents in lieu of formal action by vote, or otherwise) in exercising any option hereunder and in taking any action necessary or appropriate for the Company to exercise its rights or perform its obligations hereunder.  All options granted under this Agreement shall be deemed exercised upon receipt of written notice of such exercise by the Selling Member or Transferor, where applicable.

8.6     Purchase Price.

(a)     The Members hereby agree that the purchase price for purposes of Sections 8.2-8.4 above shall be determined by the fair market value of the Units to be purchased (without including any discounts for lack of marketability or minority interest).  The purchase price shall be the amount which the Selling Member or Transferor would receive if all the Company Property were sold at its appraised fair market value and the proceeds were applied in accordance with Section 9.2.  The Managers shall in good faith calculate the fair market value of all Units to be purchased and provide notice to all Members and the Selling Member or Transferor of the fair market value assigned by the Managers.

(b)     If, within fifteen (15) business days after receipt of the notice containing the Managers' determination of the fair market value of the Units to be purchased, the Selling Member, Transferor or another Member disputes the value set by the Managers, the Selling Member, Transferor or other Member may obtain, at his, her or its own cost, an appraisal ("First Appraisal") of the fair market value of the Units to be purchased by an independent appraiser experienced in conducting appraisals of ventures with assets similar to the Company Property ("Qualified Appraiser") of his, her or its choice.  If more than one party disputes the value set by the Managers and such persons cannot agree on a Qualified Appraiser to conduct the First Appraisal, then the Selling Member or Transferor shall select the Qualified Appraiser to conduct the First Appraisal.  If the parties agree, the First Appraisal shall be used to determine the value of the Units to be purchased.

(c)     If, within fifteen (15) business days after receipt of the First Appraisal, the Company, the Selling Member, Transferor or another Member disputes the value determined by the First Appraisal, such party may obtain, at his, her or its own cost, a second appraisal ("Second Appraisal") of the fair market value of the Units to be purchased by a Qualified Appraiser of his, her or its choice.  If more than one party disputes the value determined by the

First Appraisal and such persons cannot agree on a Qualified Appraiser to conduct the Second Appraisal, then (i) if the Selling Member or Transferor selected the Qualified Appraiser for the First Appraisal, then the Company shall select the Qualified Appraiser to conduct the Second Appraisal and (ii) if the Selling Member or Transferor did not select the Qualified Appraiser for the First Appraisal, then the Selling Member or Transferor shall select the Qualified Appraiser to conduct the Second Appraisal. If the parties agree, the Second Appraisal shall be used to determine the value of the Units to be purchased.

(d)     If the two appraisals are performed and the parties cannot agree within ten (10) days which of the appraisals accurately reflects the value of the Units to be purchased, then the two appraisers selected under this section shall select a Qualified Appraiser to conduct a third appraisal ("Third Appraisal") of the fair market value of the Units to be purchased. The fair market value of the Units to be purchased established by the Third Appraisal shall be final and binding in all respects on all parties. The Selling Member or Transferor and the Company and/or other Members purchasing the Selling Member or Transferor's Units shall each pay fifty percent (50%) of the costs of the Third Appraisal.

(e)     Notwithstanding the subsections (a)-(d) of this Section, the Managers shall, once per year, use their best efforts to determine an appropriate valuation for the Company to be used as the agreed upon valuation for the subsequent twelve (12) month period. Such valuation shall be determined by unanimous agreement among the Managers.

8.7     Prohibited Transfers; Rights of Assignees not Admitted as Members; Restrictions on Entity-Type Members.

(a)     Any purported Transfer of any Unit that is not made in accordance with the requirements of this Article VIII shall be null and void and of no effect whatever; provided that, if the Company is required by the Act to recognize such a purported Transfer (or if the Company, in its sole discretion, elects to recognize such a Transfer), the Unit transferred shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the transferred Unit, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee of such Interest may have to the Company.

Likewise, a person who acquires a Unit, but who is not admitted as a substituted Member pursuant to Section 8.8 hereof, shall be entitled only to allocations and distributions with respect to such Unit in accordance with this Agreement, but shall not be entitled to inspect the books or records of the Company and shall not have any rights of a Member.

(b)     In the case of a Transfer or attempted Transfer of all or any portion of a Unit, or conducted in accordance with this Article VIII, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the other Members from all cost, liability, and damage that any of such indemnified Persons may incur (including, without limitation, incremental tax liability and attorneys' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

14

(c)     A change in ownership or interest in excess of ten percent (10%) in any underlying entity that is a Member of this Company shall be deemed a transfer of interest of this Company governed by this Article VIII and subject to the same transfer restrictions as those transfers contemplated hereunder.

8.8     Admission of New Members.   Subject to the other provisions of this Article VIII, any person who acquires a Unit may be admitted to the Company as a Member only upon satisfaction of the conditions set forth below in this Section 8.8:

(a)     The Managers consent to such admission;

(b)     The Unit with respect to which the transferee is being admitted was acquired in accordance with the provisions of this Article VIII;

(c)     The prospective new Member expressly consents in writing to be subject to all the provisions of this Agreement in the manner set forth in Section 8.10, and executes or delivers such further documents and instruments as the Managers may reasonably request to confirm such transferee as a Member of the Company and such transferee's agreement to be bound by the terms and conditions hereof;

(d)     The prospective new Member pays or reimburses the Company for all reasonable legal, filing, and other costs that the Company incurs in connection with the admission of the transferee as a Member with respect to the transferred Unit; and

(e)     If the prospective new Member is not an individual, the prospective new Member provides the Company with evidence satisfactory to counsel for the Company of the authority of the prospective new Member to become a Member and to be bound by the terms and conditions of this Agreement.

8.9     Representations; Legend.   Each Member hereby represents and warrants to the Company and the Managers that such Member's acquisition of a Unit hereunder is made as principal for such Member's own account and not for resale or distribution of such Units. Each Member further hereby agrees that the following legend may be placed upon any counterpart of this Agreement, stock certificate, or any other document or instrument evidencing ownership of Units:

> The Units represented by this document have not been registered under any securities laws and the transferability of such Units is restricted. Such Units may not be sold, assigned or transferred, nor will any assignee, vendee, transferee or endorsee thereof be recognized as having acquired any such Units by the issuer for any purposes, unless (1) a registration statement under the Securities Act of 1933, as amended, with respect to such Units shall then be in effect and such transfer shall have been qualified under all applicable state securities laws, or (2) the availability of an exemption from such registration and qualification shall be established to the satisfaction of counsel to the Company.

The Units represented by this document are subject to further restrictions as to their sale, transfer, hypothecation, or assignment as set forth in the Operating Agreement and agreed to by each Member.

8.10    Consent.  Any consent to be subject to this Agreement shall be made in writing, in substantially the following form, and shall be filed with the Managers before the Managers may issue or transfer ownership of record of any Units on the books of the Company:

Consent to Operating Agreement.  In consideration of the [issuance] [transfer] to the undersigned of a Unit in the Company, the undersigned does hereby consent to become a party to and be governed by all the terms of the Operating Agreement among the Members of the Company dated as of the 17th of April, 2019, as amended (the "Agreement").  For purposes of the Agreement, I shall be considered a Member, as defined therein.

Article IX
DISSOLUTION AND WINDING UP

9.1    Liquidating Events.  The Company shall dissolve and commence winding up and liquidating upon the first to occur of any of the following ("Liquidating Events"):

(a)    The sale of all or substantially all of the Property;

(b)    The Consent of the Members to dissolve, wind up, and liquidate the Company;

(c)    The withdrawal of all of the Members of the Company; or

(d)    The happening of any other event that makes it unlawful, impossible, or impractical to carry on the business of the Company.

The Members hereby agree that, notwithstanding any provision of the Act, the Company shall not dissolve prior to the occurrence of a Liquidating Event.  If it is determined, by a court of competent jurisdiction, that the Company has dissolved prior to the occurrence of a Liquidating Event, the Members hereby agree to continue the business of the Company without a winding up or liquidation.

9.2    Winding Up.  Upon the occurrence of a Liquidating Event, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Members.  No Member shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs.  The Managers (or, in the event there is no Manager, any Person elected by Consent of the Members shall be responsible for overseeing the winding up and dissolution of the Company and shall take full account of the Company's liabilities and Property and the Property shall be liquidated as promptly as is consistent with obtaining the fair value thereof, and the proceeds therefrom, to the extent sufficient thereof, shall be applied and distributed in the following order:

(a)    First, to the payment and discharge of all of the Company's debts and liabilities to creditors including Members, including all expenses of the dissolution, winding up and liquidation;

(b)    Second, to the creation of such cash reserve as the Managers may deem necessary for any contingent and unforeseen liabilities of the Company;

(c)    Third, to the Members in accordance with and up to the positive balance in their Capital Accounts, after giving effect to all contributions, distributions, and allocations for all periods; and

(d)    Finally, to the Members, in proportion to their respective Percentage Interests.

9.3    <u>Compliance With Timing Requirements of Regulations.</u> In the event the Company is "liquidated" within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g), distributions shall be made pursuant to this Article IX to the Members who have positive Capital Accounts in compliance with Regulations Section 1.704-1(b)(2)(ii)(b)(2). If any Member has a deficit balance in his, her or its Capital Account (after giving effect to all contributions, distributions and allocations for all taxable years, including the taxable year during which such liquidation occurs), such Member shall have no obligation to make any contribution to the capital of the Company with respect to such deficit, and such deficit shall not be considered a debt owed to the Company or to any other Person for any purpose whatsoever. In the discretion of the Managers, a pro rata portion of the distributions that would otherwise be made to the Members pursuant to this Article IX may be:

(a)    distributed to a trust established for the benefit of the Members for the purpose of liquidating Company assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company or of the Members arising out of or in connection with the Company. The assets of any such trust shall be distributed to the Members from time to time, in the reasonable discretion of the Managers, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to this Agreement; or

(b)    withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company, provided that such withheld amounts shall be distributed to the Members as soon as practicable.

9.4    <u>Deemed Distribution and Recontribution.</u>   Notwithstanding any other provision of this Article IX, in the event the Company is liquidated within the meaning of Regulations Section 1.704-l(b)(2)(ii)(g) but no Liquidating Event has occurred, the Property shall not be liquidated, the Company's liabilities shall not be paid or discharged, and the Company's affairs shall not be wound up. Instead, the Company shall be deemed to have distributed the Property in kind to the Members, who shall be deemed to have assumed and taken subject to all Company liabilities, all in accordance with their respective Capital Accounts.

Immediately thereafter, the Members shall be deemed to have recontributed the Property in kind to the Company, which shall be deemed to have assumed and taken subject to all such liabilities.

9.5    Rights of the Members.  Except as otherwise provided in this Agreement, (a) each Member shall look solely to the assets of the Company for the return of his, her or its Capital Contribution and shall have no right or power to demand or receive property other than cash from the Company in accordance with the terms hereof, and (b) no Member shall have priority over any other Member as to the return of his, her or its Capital Contributions, distributions, or allocations.

9.6    Notice of Dissolution.  In the event a Liquidating Event occurs or an event occurs that would, but for provisions of Section 9.1, result in a dissolution of the Company, the Managers shall, within thirty (30) days thereafter, provide written notice thereof to each of the Members and to all other parties with whom the Company regularly conducts business (as determined in the discretion of the Managers) and shall provide all other notices as may be required by the Act or other applicable law.

Article X
MISCELLANEOUS

10.1    Notice.  All notices and other communications required or permitted under this Agreement shall be in writing and may be sent by certified U.S. mail, return receipt requested, postage prepaid, overnight air courier, facsimile, or personal delivery to the Members at their addresses as shown from time to time on the records of the Company.  Any Member may specify a different address by notifying the Company in writing of such different address.  Such notices shall be deemed given (i) three (3) days after mailing, (ii) the day after deposit with an overnight air courier, or (iii) when delivered in person or transmitted by fax machine (confirmation of transmission received), as the case may be.

10.2    Binding Effect.  Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, legatees, legal representatives, successors, transferees, and assigns.

10.3    Construction.  Every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member.

10.4    Headings.  Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof.

10.5    Severability.  Every provision of this Agreement is intended to be severable.  If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.

10.6    Incorporation by Reference.  Every exhibit, schedule, and other appendix attached to this Agreement and referred to herein is hereby incorporated in this Agreement by reference.

10.7    Further Action.  Each Member, upon the request of the Managers, agrees to perform all further acts and execute, acknowledge, and deliver any documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

10.8    Governing Law.  The laws of the State of Illinois shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the Members.

10.9    Waiver of Action for Partition.  Each of the Members irrevocably waives any right that he may have to maintain any action for partition with respect to any of the Property.

10.10   Counterpart Execution.  This Agreement may be executed in any number of counterparts with the same effect as if all of the Members had signed the same document.  All counterparts shall be construed together and shall constitute one agreement.

10.11   Entire Agreement.  This Agreement constitutes the entire agreement and understanding among the Company, the Managers and the Members hereof, and supersedes any prior understandings or written or oral agreements among them respecting the subject matter hereof.

<u>EXHIBIT A</u>

FIRST AMENDED AND RESTATED OPERATING AGREEMENT OF MAVIDEA
TECHNOLOGY GROUP, LLC

Members

| <u>Names</u> | <u>Capital Contributions</u> | <u>Units</u> |
|---|---|---|
| Warmbir Technology, Inc. | $17,921.45 | 22.39988 |
| The Wonder Boy Company | $17,921.45 | 22.39988 |
| J E Davis, Inc. | $16,359.01 | 22.39988 |
| Emerging Business Services, LLC | $29,999.28 | 4.79998 |
| Somers Midwest, Inc. | $49,998.81 | 7.99998 |
| **Totals** | $132,200.00 | 79.9996 |

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the date first above set forth.

MAVIDEA TECHNOLOGY GROUP, LLC

By: _____
Jamie D. Warmbir, Manager

By: _____
Erik Barnlund, Manager

By: _____
Jacob E. Davis, Manager

By: _____
Arnold Lovin, Manager

By: _____
Michael Somers, Manager

_____
Warmbir Technology, Inc., Member
By: Jamie D. Warmbir, President

_____
The Wonder Boy Company, Member
By: Erik Barnlund, President

_____
LE Davis, Inc., Member
By: Jacob E. Davis, President

_____
Emerging Business Services, LLC, Member
By: Arnold Lovin, Manager

_____
Somers Midwest, Inc., Member
By:  Michael Somers, President

E-FILED
Friday, 03 April, 2020 03:23:57 PM
Clerk, U.S. District Court, ILCD

## BARTELL POWELL
LLP | ATTORNEYS AT LAW

JASON S. BARTELL*
MICHAEL A. POWELL **
FRANK A. JANELLO **
JACOB P. SMITH

<u>REPLY TO:</u>
CHAMPAIGN ADDRESS

* ALSO LICENSED IN INDIANA
** ALSO LICENSED IN MISSOURI

### <u>CEASE AND DESIST / PRESERVATION NOTICE</u>

March 11, 2020

Via email to counsel and certified mail to recipient

Mr. Jamie Warmbir
22 Pendleton Way
Bloomington, IL 61704

Dear Mr. Warmbir:

As you are aware, our law firm represents Mavidea Technology Group, LLC (the "Company"). You, personally, served as a manager of the Company and an entity that you wholly own, Warmbir Technology, Inc., holds 28% of the membership interests of Company. Prior to February 10, 2020 you played a substantial day-to-day role in the Company since its inception and received a guaranteed payment from the Company for those services through your entity.

### <u>BACKGROUND</u>

On Monday, February 10, 2020, you tendered 1) a letter resigning as Manager and 2) a separate letter proposing a buyout of the Company's IT Division. You indicated that in the event the offer is not accepted by 5pm Central Time on February 14, 2020, it was your intention to immediately form a new LLC and solicit the Company's IT clients to migrate to your new venture if the deadline passed without acceptance of your proposal. You also indicated that the

| CHAMPAIGN | BLOOMINGTON |
|---|---|
| 10 EAST MAIN STREET | 207 WEST JEFFERSON STREET, SUITE 602 |
| CHAMPAIGN, IL 61820 | BLOOMINGTON, IL 61701 |
| P 217.352.5900 | F 217.352.0182 | P 309.807.5275 | F 309.807.5015 |

IT Division employees are very loyal to you and that you would be encouraging all of them to immediately leave the employ of the Company.

The Company has a substantial list of IT Division clients that have been developed through the efforts of you, other managers, and employees. The Company has put a significant effort into the development of a sales pipeline of future clients. The company has systemized processes that it has developed and used to service its IT customers. The Company has also put a large amount of effort and resources into the development of its brand, ethos, and employee selection/retention.

The Company's customers have a contractual relationship with the Company that include fixed terms with automatic renewals and, in many cases, multi-year work scopes. Prior to receiving the proposal, most customers are satisfied with the services of the Company and it would be expected that all or substantially most of the customers would simply permit the automatic renewal clause to effectuate a renewal of their contracts.

The IT Division of the Company handles the security and safekeeping of large amounts of data for its customers, including data with heightened privacy concerns. Your potential access to these materials per the means described below is particularly concerning and may require injunctive action if not immediately remedied.

<u>WRONGFUL ACTS</u>

Our investigation of the facts pertaining to your separation is in its early stages. We intend on pursuing further investigations through written discovery, forensic data collection, the issuance of subpoenas to third parties, and depositions of you, certain employees and customers, as well as third parties who have been identified in assisting in your indirect efforts to procure and take advantage of the Company's intellectual property. Notwithstanding the foregoing, we are aware of the following wrongful acts:

1) You relinquished your authority to act as a manager/agent of the Company on February 10, 2020. On February 14, you were informed that the Company would not be accepting your offer and that you would need to tender any of the Company's property back to the Company on that day. Your telephone and telephone number are owned by the Company on a Company wireless plan. After learning that you would be required to give back your phone, you contacted the wireless company and wrongfully posed as an agent of the Company and requested that the wireless company transfer the Company's phone number and the phone to a plan owned by you in a personal capacity. This has enabled you to wrongfully receive inquiries from the Company's customers, prospective customers, employees, and other third parties to divert Company property for your own use. Furthermore, in today's world, a cell phone is similar to a laptop in that you have access to client data, vendor sign-ons,

and network password.  You were previously notified on multiple occasions that this was not acceptable, yet you have failed to remedy the situation.

2) You have used direct and indirect means to raid the employees of the Company by either contacting or using third parties to contact these employees to entice them to leave and enter your employ.  You stated at the time of your resignation your intent to convert them to your business.  Through recent resignations, we have learned that you have followed through on this threat.

3) Knowing that you would be starting a competing venture and that your email access would likely be cut off, on February 12, 2020, you forwarded an email chain you had with an individual who had applied for a senior level position at the Company and was on hold due to budgetary considerations.  It was likely that you were intending on taking advantage of this prospect at a future time in your own company.

4) While serving as a Manager of the Company, you either 1) failed to follow Company policy on procuring contracts with non-competition agreements on certain employees, or 2) caused such agreements to be deleted from the archives of the Company.  This was done for the purpose of being able to immediately transfer these employees to your new competing entity after your termination without restriction.

5) You have knowingly contacted or reached out to prospective customers utilizing the information on our prospect client "Warm 250" list to interfere with the Company's ability to gain a prospective economic advantage from these relationships it has invested a great deal of time and effort developing.

6) You have been coordinating and discussing your efforts to obtain the Company's clients with our current employees in an attempt lure them to employment with your company.

7) You converted a new client, Holt Supply, who had confirmed the client relationship with the Company in writing.  This was accomplished through breaking protocol of long-established procedures for onboarding new clients and acting on time sensitive information in a way that benefited your new endeavor while you were a Manager of our Company.

## OPERATING AGREEMENT OBLIGATIONS

While the operating agreement does permit managers to have outside business interests, the document does not alleviate obligations to protect the Company's proprietary information and not use it for your own advantage.  The Operating Agreement states as follows:

5.4 <u>Duties and Obligations of the Managers</u>

(a)  The Managers shall take all actions on behalf of the Company which may be necessary or appropriate (i) for the continuation of the Company's valid existence as a limited liability company under the Act and (ii) for the accomplishment of the Company's purposes, including the acquisition, development, maintenance, preservation, and operation of Property in accordance with the provisions of this Agreement, the Act, and all other applicable laws and regulations.

(c)  The Managers shall conduct the affairs of the Company in the best interests of the Company and of the Members, including the safekeeping and use of all of the Property for the exclusive benefit of the Company.

These obligations are not erased upon the resignation of a manager.

FIDICIARY DUTY AS MANAGER

Although it is generally permissible for employees who are not officers or managers to "plan, form, and outfit a competing corporation while still working for the employer," officers and managers have a broader fiduciary duty to their corporate employer not to (1) actively exploit their positions within the corporation for their own personal benefit, or (2) hinder the ability of a corporation to continue the business for which it was developed." *Veco Corp. v. Babcock*, 243 Ill.App.3d 153, 160.

Additionally, your fiduciary duty did not end on the day that you tendered the notice resigning as manager.  Your duty to the Company continues to this day.  You cannot take the confidential information, business plans, knowledge of the customer base and their contracts, the prospective customer list, the relationship the Company has with the employees, and knowledge of the business operations and utilize those in a manner to the detriment to the Company.  Not only would such actions be unethical, such actions are a breach of your fiduciary obligations. You are not free to utilize this knowledge coupled with these relationships upon leaving, nor are you permitted to indirectly do the same by allowing third parties to undertake the same activities.

ILLINOIS TRADE SECRETS ACT

765 ILCS 1065/2(d)(1) and (2) state:
"(d) 'Trade secret' means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:
      (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
      (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality."

"[Plaintiff's] customer lists, which it alleged take considerable effort, time, and money to compile, could be deemed a trade secret and sufficiently secret to derive economic value." *Strata Mktg., Inc. v. Murphy*, 317 Ill. App. 3d 1054, 1069, 740 N.E.2d 1166, 1177 (1st Dist. 2000). "Items such as customer lists, pricing information, and business techniques can be trade secrets if the employer has developed the information 'over a number of years at great expense'" *Abbott-Interfast Corp. v. Harkabus*, 250 Ill. App. 3d 13, 22, 619 N.E.2d 1337, 1344 (2nd Dist. 1993) (quoting *Reinhardt Printing Co. v. Feld*, 142 Ill. App. 3d 9, 18 (1st Dist. 1986)). "[K]nowing the prices offered by competitor to a specific customer for a specific set of services certainly would enable a competitor to make a more attractive bid in an attempt to displace the current provider." *SKF USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 712 (N.D. Ill. 2009). *See also Covenant Aviation Security, LLC v. Berry*, 15 F. Supp. 3d 813 (N.D. Ill. 2014).

## TORTIOUS INTERFERENCE WITH CONTRACTS AND PROSPECTIVE ECONOMIC ADVANTAGES

Under Illinois law, the elements for a claim of tortious interference with contractual relations are: 1) the existence of a valid and enforceable contract, 2) defendant's awareness of the contractual obligation, 3) defendant's intentional and unjustified inducement of a breach, 4) subsequent breach caused by defendant's unlawful conduct, and 5) damages. *See Seip v. Rogers Raw Materials Fund, L.P.*, 408 Ill.App.3d 434, 444.

Furthermore, the elements for a claim of interference with a prospective economic advantage are: 1) the plaintiff's reasonable expectation of entering into a valid business relationship, 2) the defendant's knowledge of the plaintiff's expectancy, 3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship, and 4) damages to the plaintiff resulting from such interference. *See Dowd & Dowd, Ltd. v. Gleason*, 181 Ill.2d 460, 484.

In order to prevail on a claim in this context, the Company would not be required to prove that you relied on the Company's confidential information. Please see *Dames & Moore v. Baxter & Woodman, Inc.*, 21 F. Supp. 2d 817, 823 (N.D.Ill. 1998) where the defendant solicited plaintiff's employees and encouraged plaintiff's customers to end their relationships with the plaintiff. We would simply need to prove that you used the Company's confidential information to do so.

## PRESERVATION NOTICE

You have possession or control of paper documents or electronically stored information ("ESI") relevant to the foregoing claims the Company has against you.

Please do not destroy, alter or erase any paper documents or ESI in your possession or control relating to the Defects or Concealment (for example, letters, memoranda, reports, handwritten notes, emails, voice messages, computer records and programs, data, DVDs/CDs, plans).

This Preservation Notice applies to all sources of ESI including, but not limited to, company and home computer networks, laptop and tablet PCs, fast drives, cell phones and similar devices.

You must continue to retain these materials until further notice.

CONCLUSION

In conclusion, you are not permitted to perform additional actions or inactions in violation of the law. To the extent possible, the Company demands that you mitigate their damages. Furthermore, we implore that you immediately release the Company's telephone number and return any and all other Company property, intellectual or tangible, back to the Company.

Very Truly Yours,

Jason S. Bartell