UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | | |
|---|---|---|---|
| MAVIDEA TECHNOLOGY GROUP, LLC | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| vs | ) | Case No. | 1:20-CV-1139 |
| | ) | | |
| JAMIE WARMBIR; CHARLOTTE WARMBIR; WARMBIR IT SOLUTIONS, LLC, an Illinois limited liability company; | ) ) ) | | |
| | ) | | |
| Defendants. | ) | | |

**DEFENDANT, CHARLOTTE WARMBIR'S ANSWER TO PLAINTIFF'S COMPLAINT**

NOW COMES the Defendant, CHARLOTTE WARMBIR, ("Defendant**"),** by and through her undersigned counsel, and for her Answer to the Complaint filed by Plaintiff, MAVIDEA TECHNOLOGY CROUP, LLC, ("Plaintiff" or "Mavidea"), states as follows:

## JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction over this action under 28 U.S.C. §1331 and 1367. The Court has federal question jurisdiction because Mavidea asserts claims under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §1836, et. seq.

**Answer:    Defendant admits the allegations of paragraph 1 of Plaintiff's Complaint.**

2.    The Court has supplemental jurisdiction over all claims for which the Court lacks original jurisdiction because Mavidea's claims arise out of the same common nucleus of operative facts, namely, Defendants improper and illegal actions immediately before and after Jamie Warmbir's separation from Mavidea.

1

**Answer:** Defendant admits that the Court has supplemental jurisdiction over all claims for which the court lacks original jurisdiction because Mavidea's claims arise out of the same common nucleus of operative fact. Defendant denies the remaining allegations of paragraph 2 of Plaintiff's Complaint.

3. This Court has general jurisdiction over Jamie Warmbir and Charlotte Warmbir as they are individuals domiciled in the State of Illinois.

**Answer:** Defendant admits the allegations of paragraph 3 of Plaintiff's Complaint.

4. This Court has general personal jurisdiction over Warmbir IT as it is an entity 1) formed under the laws of the State of Illinois, 2) maintains its principal place of business in the State of Illinois, 3) regularly conducts business in the State of Illinois.

**Answer:** Defendant admits the allegations of paragraph 4 of Plaintiff's Complaint.

5. Venue is proper in this District and Division pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to this action took place in this District and Division, the Defendants are all domiciled in this District and Division, Mavidea's principal place of business is in this District and Division, and the harm is felt in this District and Division.

**Answer:** Defendant admits that venue is proper in this District and Division pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to this action took place in this District and Division, the Defendants are all domiciled in this District and Division, Mavidea's principal place of business is in this District and Division. Defendant denies the remaining allegations of paragraph 5 of Plaintiff's Complaint.

## THE PARTIES

6.      Mavidea is an Illinois limited liability company with its principal place of business located at 14170 Carole Dr., Bloomington, Illinois. Mavidea is, and at all times mentioned was, authorized to conduct business in the State of Illinois.

**Answer:**      **Defendant admits the allegations of paragraph 6 of Plaintiff's Complaint.**

7.      Jamie Warmbir is an individual residing at 22 Pendleton Way, Bloomington, Illinois.

**Answer:**      **Defendant admits the allegations of paragraph 7 of Plaintiff's Complaint.**

8.      Charlotte Warmbir is an individual residing at 22 Pendleton Way, Bloomington, Illinois and is the spouse of Jamie Warmbir.

**Answer:**      **Defendant admits the allegations of paragraph 8 of Plaintiff's Complaint.**

9.      Warmbir IT is an Illinois limited liability company with its principal place of business located at 22 Pendleton Way, Bloomington, Illinois.

**Answer:**      **Defendant admits that Warmbir IT Solutions, LLC is an Illinois limited liability company. Defendant denies the remaining allegations of paragraph 9 of Plaintiff's Complaint.**

## FACTS

10.      Mavidea was formed on April 18, 2007 in the State of Illinois as a domestic manager-managed limited liability company. Mavidea is engaged in the business of IT Solutions, software development, digital marketing and website design.

**Answer: Defendant admits the allegations of paragraph 10 of Plaintiff's Complaint.**

11.     Warmbir Technology Incorporated, an entity wholly owned by Jamie Warmbir, was an original member of Mavidea. Jamie Warmbir was originally named as a manager of Mavidea and served as a manager until February 10, 2020.

**Answer: Defendant admits the allegations of paragraph 11 of Plaintiff's Complaint.**

12.     From inception until February 10, 2020, Jamie Warmbir served as an officer of Mavidea.

**Answer: Defendant denies the allegations of paragraph 12 of Plaintiff's Complaint and demands strict proof thereof.**

13.     From inception until February 10, 2020, Jamie Warmbir led the Information Technology business at Mavidea.

**Answer: Defendant admits the allegations of paragraph 13 of Plaintiff's Complaint.**

14.     Jamie Warmbir provided these services on a full-time basis and was the highest paid individual with Mavidea at of February 10, 2020.

**Answer: Defendant admits that Jamie Warmbir provided services on a full-time basis. Further answering, Defendant lacks sufficient knowledge to admit or deny the remaining allegations of paragraph 14 of Plaintiff's Complaint.**

<u>Mavidea's Operating Agreement</u>

15.     In 2018 and 2019, the members and managers of Mavidea undertook a deliberative process to amend their operating agreement, which resulted in a fully executed agreement dated

April 17, 2019 (attached hereto as Exhibit "A" and is referred to as "Operating Agreement" herein).

**Answer:** **Defendant admits the allegations of paragraph 15 of Plaintiff's Complaint.**

16. The Operating Agreement under paragraph 1.8 held "The Members shall use the Company's credit and assets solely for the benefit of the Company."

**Answer:** **Defendant admits that paragraph 16 of Plaintiff's Complaint quotes a portion of Paragraph 1.8 of the Operating Agreement. Defendant denies the remaining allegations of paragraph 16 of Plaintiff's Complaint and demands strict proof thereof.**

17. The Operating Agreement holds, in part, under Paragraph 5.3:

5.3. Restrictions on the Authority of Managers. Without the consent of the Members, the Managers shall not have the authority to:

    (i.) do any act in contravention of this Agreement;…

    (ii.) do any act which would make it impossible to carry on the ordinary business of the Company, except as otherwise provided in this Agreement;…

    (iv.) possess Property, or assign rights in specific Property, for other than a Company purpose;

**Answer:** **Defendant admits that paragraph 17 of Plaintiff's Complaint quotes a portion of Paragraph 5.3 of the Operating Agreement. Defendant denies the remaining allegations of paragraph 17 of Plaintiff's Complaint and demands strict proof thereof.**

18. The Operating Agreement under Paragraph 5.4 imposed the following obligations on Managers:

5.4 Duties and Obligations of the Managers

(a) The Managers shall take all actions on behalf of the Company which may be necessary or appropriate… (ii) for the accomplishment of the Company's purposes, including the acquisition, development, maintenance, preservation, and operation of Property in accordance with

the provisions of this Agreement, the Act, and all other applicable laws and regulations…

(c) The Managers shall conduct the affairs of the Company in the best interests of the Company and of the Members, including the safekeeping and use of all of the Property for the exclusive benefit of the Company.

**Answer:** **Defendant admits that paragraph 18 of Plaintiff's Complaint quotes a portion of Paragraph 5.4 of the Operating Agreement. Defendant denies the remaining allegations of paragraph 18 of Plaintiff's Complaint and demands strict proof thereof.**

19. Paragraph 1.9 of the Operating Agreement defined "Property" to mean: "… all real and personal property acquired by the Company and any improvements thereto, and shall include both tangible and intangible property."

**Answer:** **Defendant admits the allegations of paragraph 19 of Plaintiff's Complaint.**

20. Some of the members/managers were members of other entrepreneurial ventures and wanted the operating agreement to reflect that their participation in such ventures would not be viewed as a breach of their fiduciary duty. Thus, while the Operating Agreement required any Manager to use any intangible property created or acquired by Mavidea for the "exclusive benefit of the Company," Paragraph 1.7 indicated that a Manager would not be required to offer the stock of any new independent or competing venture back to Mavidea providing the manager/member respected the intangible property interests of Mavidea under Section 5.3.

**Answer:** **Defendant denies the allegations of paragraph 20 of Plaintiff's Complaint and affirmatively states that Paragraph 1.7 of the Operating Agreement speaks for itself.**

21.     The Operating Agreement did not further modify the statutory or common law fiduciary duties of the members or managers. Thus, any fiduciary duty imposed by statute or common law that was not modified by Paragraph 1.7 remained in full effect.

**Answer:        The allegations of paragraph 21 of Plaintiff's Complaint constitute legal conclusions and therefore Defendant neither admits nor denies same but demands strict proof thereof. To the extent an answer is required to the allegations of paragraph 21 of Plaintiff's Complaint, Defendant denies each allegation of paragraph 21 and demands strict proof thereof.**

22.     Paragraph 10.9 of the Operating Agreement indicated that each Member irrevocably waives any right to partition any of the company's Property.

**Answer:        Defendant admits the allegations of paragraph 22 of Plaintiff's Complaint.**

<u>Mavidea's Business</u>

23.     Mavidea has provided Information Technology services since its inception, although the business model has changed over time. At all times relevant herein, Mavidea used a "managed services" business model where Mavidea would serve businesses throughout central Illinois by entering into a contract with them. The customer would pay a monthly base fee which would include a "scope" of services that Mavidea would provide. In most cases, Mavidea would undergo a significant amount of upfront labor to understand the customer's existing computer system and implement the software needed to properly service the contract, with the goal being that the monthly fee later in the contract would cover these initial expenses.

**Answer:        Defendant admits that Mavidea has provided Information Technology services since its inception, although the business model has changed over time. Defendant**

admits that Mavidea used a "managed services" business model where Mavidea would serve businesses throughout central Illinois by entering into a contract with them. The customer would pay a monthly base fee which would include a "scope" of services that Mavidea would provide. Defendant denies the remaining allegations of paragraph 23 of Plaintiff's Complaint and demands strict proof thereof.

24.     Locating customers that are in need of essentially outsourcing their IT department is a difficult task. Mavidea needs to identify businesses that do not have a full time IT person or department, but have significant enough IT needs to require regular servicing. Mavidea also requires that the customer's business culture and integrity be consistent with their own. As a result, Mavidea employs a full-time employee to call small businesses all over Central Illinois just to find prospects that meet Mavidea's selection criteria.

**Answer:**     **Defendant admits that, as of the date Jamie Warmbir resigned as Manager of Mavidea, Mavidea employed a full-time employee to call small businesses all over Central Illinois to find prospects. Defendant denies the remaining allegations of paragraph 24 of Plaintiff's Complaint and demands strict proof thereof.**

25.     In 2019, Mavidea made 17,516 phone calls to prospective customers, which led to 1,635 conversations and 87 first time meeting appointments being accepted. Of those 87 meeting appointments, Mavidea further investigated the prospects and completed 57 of those appointments. Out of the 57 meetings, 11 of the prospects were added as potential clients that Mavidea would like to do business with. Of those 11 potential clients, Mavidea actually signed contracts with three in the 2019 fiscal year. Mavidea maintains a confidential detailed database of the information it has learned through this sales cycle.

**Answer:** **Defendant admits that Mavidea maintained a database of the information pertaining to its sales cycle. Defendant denies the remaining allegations of paragraph 25 of Plaintiff's Complaint and demands strict proof thereof.**

26.     As the director of the IT Department, Jamie Warmbir, at all times, relevant herein, had access to this database and would be the individual that would qualify and meet with those in the final stages of the sales cycle. Jamie Warmbir would also negotiate and sign the contracts with these businesses. As a result of his role, he had access to critical proprietary information concerning the identity, pricing terms, contract lengths and services included for each customer of Mavidea. He also had access to and regularly reviewed the proprietary underlying data concerning how much labor and costs had been expended for each contract. As a result, he understood the profitability of each customer and the cost it would take to service each contract.

**Answer:** **Defendant admits that Jamie Warmbir, had access to the database pertaining to Mavidea's sales cycle. Defendant admits that Jamie Warmbir would have qualified and met with prospective clients in the final stages of the sales cycle during the later portion of the time in which he served as Manager of Mavidea but denies that he did so for the entirety of his tenure as Manager. Defendant admits that Jamie Warmbir, had access to information concerning the identity, pricing terms, contract lengths and services for each customer of Mavidea as well as the data concerning labor and cost pertaining to each customer of Mavidea. Defendant admits that Jamie Warmbir periodically reviewed the labor involved with servicing Mavidea's IT clients. Defendant denies that the information identified in paragraph 26 is proprietary. Defendant denies the remaining allegations of paragraph 26 of Plaintiff's Complaint and demands strict proof thereof.**

27.     At various times in 2019, the other managers of Mavidea noticed that Jamie

Warmbir appeared to be of general discontent. In October, 2019, the other managers had a meeting with Jamie Warmbir to discuss the discontentment and to see what improvement could be made. From these discussions, the other managers indicated to Jamie Wambir that they did not have an interest in selling the IT division of Mavidea to him, but that they would be open to discuss other possibilities of a departure for him if he desired. Jamie Warmbir's wife, Charlotte Warmbir, discussed with the managers some of the reason for discontentment. On October 14, 2019, Jamie Warmbir tendered a "Statement of Contentment" to the other managers affirming that he wanted to continue to be on the team.

**Answer:** **Defendant denies the allegations of paragraph 27 of Plaintiff's Complaint and demands strict proof thereof.**

28.    Shortly thereafter, however, Jamie Warmbir devised a scheme to forcibly take the IT Division from Mavidea by taking Mavidea's clients and employees in the event the managers of Mavidea would not sell it to him for the price he dictated.

**Answer:** **Defendant denies the allegations of paragraph 28 of Plaintiff's Complaint and demands strict proof thereof.**

29.    Jamie Warmbir concealed these intentions for months from the other Managers which enabled him a) learn additional confidential information from the company and its managers, b) further exploit the confidential information / Property of the Plaintiff, c) obtain an appraisal of Mavidea's IT business, d) meet with his attorney and other advisors to prepare for his new venture, e) put himself in a position with the employees of Mavidea to convert them to his new venture, f) identify and cultivate prospective clients that could be signed up by his new venture, and g) take other actions to prepare for the start of his new venture that are still being investigated.

**Answer:** **Defendant admits that Jamie Warmbir obtained an appraisal of Mavidea's IT business. Defendant denies the remaining allegations of paragraph 29 of Plaintiff's Complaint and demands strict proof thereof.**

30.     Additionally, Jamie Warmbir failed to follow the standard practice of Mavidea by either a) failing to procure non-competition agreements or b) destroying existing non- competition agreements with the two employees under his supervision that he most desired to come to his new business.

**Answer:** **Defendant denies the allegations of paragraph 30 of Plaintiff's Complaint and demands strict proof thereof.**

31.     To the information and belief of the Plaintiff, Jamie Warmbir memorized or otherwise recorded the Plaintiff's customer list, contract term dates, pricing data, and other customer information that was confidential information, trade secrets, and Property of the Plaintiff.

**Answer:** **Defendant admits that Jamie Warmbir has a record of the names of some of Mavidea's customers as of the date that he resigned as Manager of Mavidea. Defendant denies the remaining allegations of paragraph 31 of Plaintiff's Complaint and demands strict proof thereof. Further answering, Defendant affirmatively states that the information identified in paragraph 31 does not constitute trade secrets.**

32.     To the information and belief of the Plaintiff, Jamie Warmbir memorized or otherwise recorded the Plaintiff's prospective customer list, proposed pricing data, and other prospective customer information that was the confidential information, trade secrets, and Property of the Plaintiff.

**Answer:** **Defendant denies the allegations of paragraph 32 of Plaintiff's Complaint and demands strict proof thereof. Further answering, Defendant affirmatively**

**states that the information identified in paragraph 32 does not constitute trade secrets.**

33. Jamie Warmbir allowed appointments to be set up with prospective or existing customers past his resignation date in which he knew he could take advantage of after leaving. These appointments were confidential information, trade secrets, and Property of the Plaintiff.

**Answer: Defendant denies the allegations of paragraph 33 of Plaintiff's Complaint and demands strict proof thereof. Further answering, Defendant affirmatively states that the information identified in paragraph 33 does not constitute trade secrets.**

34. To the information and belief of the Plaintiff, Jamie Warmbir recruited his spouse, Charlotte Warmbir, to assist him in making preparations for his new business.

**Answer: Defendant denies the allegations of paragraph 34 of Plaintiff's Complaint and demands strict proof thereof.**

35. Jamie Warmbir accumulated additional contacts and proprietary company information on the phone that he wrongfully intended to take with him after leaving Mavidea.

**Answer: Defendant denies the allegations of paragraph 35 of Plaintiff's Complaint and demands strict proof thereof.**

36. Jamie Warmbir delayed the signing of new clients so that he would not be encumbered by a Mavidea contract when starting his new venture.

**Answer: Defendant denies the allegations of paragraph 36 of Plaintiff's Complaint and demands strict proof thereof.**

37. Jamie Warmbir forwarded the confidential resume and an email dialogue with a prospective employee to his own personal email account so that he could utilize the information for his new company.

**Answer: Defendant admits that Jamie Warmbir forwarded an email dialogue**

with a prospective employee of Mavidea to his personal email account. **Defendant denies the remaining allegations of paragraph 37 of Plaintiff's Complaint and demands strict proof thereof.**

38.      Without permission, Jamie Warmbir released Plaintiff's confidential financial information to an appraiser for his own purposes in furtherance of the scheme.

**Answer:      Defendant denies the allegations of paragraph 38 of Plaintiff's Complaint and demands strict proof thereof.**

39.      On February 10, 2020 Jamie Warmbir set his plan into action, relinquishing his authority to act as a manager/agent of Mavidea. He informed the remaining managers that they had the next four business days to either 1) sell the IT Division to him for the price that he demanded, or 2) that he take would take the customers and employees without paying them anything for it. He informed them that his new competing business was ready to service customers immediately after any denial to sell it to him at his price.

**Answer:      Defendant admits that Jamie Warmbir resigned as Manager of Mavidea on February 10, 2020. Defendant denies the remaining allegations of paragraph 39 of Plaintiff's Complaint and demands strict proof thereof.**

40.      On February 14, 2020, the remaining managers informed Jamie Warmbir that the Company would not be accepting his offer and that he would need to tender any of Mavidea's Property back to the Company on that day.

**Answer:      Defendant admits the allegations of paragraph 40 of Plaintiff's Complaint.**

41.      After learning that the Company wanted his phone and phone number back, he secretly contacted Verizon and posed as an Agent of Mavidea, even though he had already resigned

such authority. He requested that Verizon transfer the telephone number from the account that Mavidea owned to a personal account that only he was in control of.

**Answer:** **Defendant denies the allegations of paragraph 41 of Plaintiff's Complaint and demands strict proof thereof. Further answering Defendant affirmatively states that the phone and phone number referenced in paragraph 41 were owned by Jamie Warmbir.**

42.     The telephone number that Jamie Warmbir used as his cell phone number was the point of contact for many customers and prospective customers of the IT Division. By converting the phone number to his own use, this has enabled Jamie Warmbir to wrongfully receive inquiries from the Company's customers, prospective customers, employees, and other third parties to divert Company Property for his own use in furtherance of his original scheme.

**Answer:** **Defendant denies the allegations of paragraph 42 of Plaintiff's Complaint and demands strict proof thereof.**

43.     On the next business day, Jamie Warmbir announced that he and his wife were opening a new business called "Warmbir IT Solutions, LLC" and that he welcomed new clients.

**Answer:** **Defendant denies the allegations of paragraph 43 of Plaintiff's Complaint and demands strict proof thereof.**

44.     Jamie Warmbir immediately undertook an effort to have the employees he supervised at Mavidea terminate their employment and come to his new venture. He was enable to shortcut his search for employees and enhance any offers to them by using the names, backgrounds, salary history. By short-cutting the normal search, it is believed his intentions were to quickly dismantle Mavidea's ability to provide service to its customers, enhancing his ability to pitch to Mavidea's customers that they would be better off terminating their contract and signing

up with his business.

**Answer:** **Defendant denies the allegations of paragraph 44 of Plaintiff's Complaint and demands strict proof thereof.**

45. Within a couple of weeks, Jamie Warmbir had hired the two employees that he had either 1) failed to obtain a non-competition agreement for or 2) destroyed a non-competition agreement while he supervised them.

**Answer:** **Defendant denies the allegations of paragraph 45 of Plaintiff's Complaint and demands strict proof thereof.**

46. Jamie Warmbir allowed the services of a third party to reach out and contact some employees so that he could attempt to deny knowledge of the activities.

**Answer:** **Defendant denies the allegations of paragraph 46 of Plaintiff's Complaint and demands strict proof thereof.**

47. Shortly thereafter, he encouraged another Mavidea employee to cease employment at Mavidea and join his competing company. Said employee gave notice to Mavidea that he was leaving for this purpose on March 26, 2020. Jamie Warmbir had prepared and executed the non-competition agreement on behalf of Mavidea with this employee on September 23, 2019, fully knowing that said contract contained the following provisions:

7(d) Employee shall not, following the termination of his/her employment with Mavidea, either directly or indirectly, or by action in concert with others, either for Employee's own benefit or for the benefit of any other person or entity:

(i) Make known to any person the names, address or telephone numbers or any of the client candidates, clients, projects, contracts, designs, specifications or plans of Mavidea or any other Trade Secrets and/or Confidential Information pertaining to them;

(ii) For a period of twelve (12) months following the termination of Employee's employment with Mavidea Technology Group, LLC, call on, solicit, divert, interfere with or take away, or attempt to call on, solicit, divert, interfere with

or take away any of the projects, clients, client candidates, employees, employee candidates, or consultants of Mavidea, including without limitation all those clients, client candidates, employees, employee candidates, consultants and/or projects with whom Employee became acquainted during his/her employment with Mavidea, either for Employee's own benefit or for the benefit of any other person or entity;

(iii)Induce in any way, directly or indirectly, Mavidea's employees and/or persons working with and/or contracting with Mavidea, to disclose Mavidea's Trade Secrets and/or Confidential Information to any person;

(iv)  For a period of twelve (12) months following the termination of Employee's employment with Mavidea, hire or take away, or attempt to hire or take away, any of Mavidea's employees, and/or independent contractors, and/or persons working with and/or contracting with Mavidea; and

(v) For a period of twelve (12) months following the termination of Employee's employment with Mavidea, induce or influence (or seek to induce or influence) any person who is engaged (as an employee, agent, independent contractor, or otherwise) by Mavidea to terminate his or her employment or engagement or to breach their duties or obligations owed to Mavidea

(e) For the duration of this Agreement, or for a period of twelve (12) months following the termination of Employee's employment with Mavidea, Employee shall not, directly or indirectly, either as an employee, employer, consultant, agent, principal, partner, stockholder, corporate officer, director or in any other individual or representative capacity, engage or participate in any business that is in competition in any manner whatsoever with the business of Mavidea, without the prior written consent of the Management…"

**Answer:    Defendant denies the allegations of paragraph 47 of Plaintiff's Complaint and demands strict proof thereof.**

48.    Jamie Warmbir immediately upon opening his business undertook an effort, using the customer names, backgrounds, contract terms, pricing data and other customer information, to have Mavidea's customers terminate their contracts with Mavidea and sign new contracts at his new venture;

**Answer:    Defendant denies the allegations of paragraph 48 of Plaintiff's Complaint and demands strict proof thereof.**

49.    Within a few short weeks, Jamie Warmbir's efforts had resulted in eight contract

terminations with Mavidea.

**Answer:**      **Defendant admits that certain customers of Mavidea terminated their contracts with Mavidea and became clients of Warmbir IT Solutions, LLC. Defendant denies the remaining allegations of paragraph 49 of Plaintiff's Complaint and demands strict proof thereof.**

50.    Jamie Warmbir immediately undertook an effort, using the prospective customer names, backgrounds, prospective pricing data and other customer information to have Mavidea's prospective customers come to sign contracts with him instead of Mavidea.

**Answer:**      **Defendant denies the allegations of paragraph 50 of Plaintiff's Complaint and demands strict proof thereof.**

51.    Within a few short weeks, Jamie Warmbir's efforts had resulted in at least one prospective customer signing with his company instead of Mavidea.

**Answer:**      **Defendant denies the allegations of paragraph 51 of Plaintiff's Complaint and demands strict proof thereof.**

52.    Jamie Warmbir utilized the appointments and engagements set for him while at Mavidea to convert these customers and prospective customers to his own business.

**Answer:**      **Defendant denies the allegations of paragraph 52 of Plaintiff's Complaint and demands strict proof thereof.**

53.    In his attempt to convert clients, Jamie Warmbir used falsehoods about Mavidea, such as "At Mavidea, IT is not a priority compared to other projects."

**Answer:**      **Defendant denies the allegations of paragraph 53 of Plaintiff's Complaint and demands strict proof thereof.**

54.    To the information and belief of the Plaintiff, he assisted customers in terminating

their contracts with the Plaintiff by providing them with suggested language to use in their termination notice.

**Answer:** **Defendant admits the allegations of paragraph 54 of Plaintiff's Complaint.**

55. On or about March 11, 2020, Mavidea's attorney sent Jamie Warmbir's attorney a cease and desist letter that also demanded they preserve all evidence (said letter is attached hereto as Exhibit "B").

**Answer:** **Defendant admits the allegations of paragraph 55 of Plaintiff's Complaint.**

56. On or about March 16, 2020, Jamie Warmbir's attorney tendered a response labeled "For Settlement Purposes Only" which effectively rejected all of the Plaintiff's assertions and did not contain any proposal to settle the matter. The foregoing wrongful efforts have continued without any pause.

**Answer:** **Defendant admits that on or about March 16, 2020, his attorney tendered a response labeled "For Settlement Purposes Only" which effectively rejected all of the Plaintiff's assertions and did not contain any proposal to settle the matter. Defendant denies the remaining allegations of paragraph 56 of Plaintiff's Complaint.**

## COUNT I

## VIOLATION OF THE FEDERAL DEFEND TRADE SECRETS ACT AGAINST JAMIE WARMBIR AND WARMBIR IT SOLUTIONS, LLC

Count I of Plaintiff's Complaint makes no allegations against Defendant, CHARLOTTE WARMBIR, and therefore, Defendant, CHARLOTTE WARMBIR makes no response to the same.

## COUNT II

**BREACH OF FIDUCIARY DUTY AGAINST JAMIE WARMBIR**

Count II of Plaintiff's Complaint makes no allegations against Defendant, CHARLOTTE WARMBIR, and therefore, Defendant, CHARLOTTE WARMBIR makes no response to the same.

## COUNT III

**BREACH OF OPERATING AGREEMENT AGAINST JAMIE WARMBIR**

Count III of Plaintiff's Complaint makes no allegations against Defendant, CHARLOTTE WARMBIR, and therefore, Defendant, CHARLOTTE WARMBIR makes no response to the same.

## COUNT IV

**CIVIL CONSPIRACY AGAINST CHARLOTTE WARMBIR**

97.     Mavidea repeats and realleges each and every allegation contained in Paragraphs 1 through 56 of the Complaint as if set forth fully herein.

**Answer:        Defendant repeats and realleges her answers to paragraphs 1-56 as and for her answers to paragraph 97 of Count IV of Plaintiff's Complaint.**

98.     Shortly after the formation of Warmbir IT Solutions, LLC, Jamie Warmbir announced on LinkedIn that "My wife, Charlotte, will be running the business with me… We are going to provide services to clients in the central Illinois marketplace and will be based out of Bloomington, IL."

**Answer:        Defendant admits the allegations of paragraph 98 of Plaintiff's Complaint.**

99.     Charlotte Warmbir knew that Jamie Warmbir owed a fiduciary duty to the Mavidea.

**Answer:** **Defendant denies the allegations of paragraph 99 of Plaintiff's Complaint and demands strict proof thereof.**

101. To the knowledge and belief of the Plaintiff, Charlotte Warmbir assisted and is currently assisting Jamie Warmbir with the violations of law outlined in this Complaint.

**Answer:** **Defendant denies the allegations of paragraph 101 of Plaintiff's Complaint and demands strict proof thereof.**

102. Charlotte Warmbir acted purposefully when she aided and abetted Jamie Warmbir's wrongful violations referenced herein.

**Answer:** **Defendant denies the allegations of paragraph 102 of Plaintiff's Complaint and demands strict proof thereof.**

103. Charlotte Warmbir's wrongful conduct resulted in breaches of Jamie Warmbir's fiduciary duties.

**Answer:** **Defendant denies the allegations of paragraph 103 of Plaintiff's Complaint and demands strict proof thereof.**

104. As a direct and proximate result of Charlotte Warmbir's wrongful actions, Mavidea has been damaged by:

**Answer:** **Defendant denies the allegations of paragraph 104 of Plaintiff's Complaint and demands strict proof thereof.**

105. These wrongful actions have caused the following damages to Mavidea:

A) The Defendants have caused at least eight customers to cancel their contracts with the Plaintiff;

B) The Defendants have caused two employees to terminate their employment with the Plaintiff and one employee to give his notice;

C) The Defendants have caused the Plaintiffs to incur additional labor costs both on a short term and long term basis to mitigate the damages caused by Defendants' wrongful actions;

D) The Defendants have caused the Plaintiffs to not receive prospective customer calls due to the theft of Plaintiff's phone number by the Defendant;

E) The Plaintiff and its Managers/Members have lost business other divisions of the Company due to the immediate actions and attention required to mitigate damages caused by the Defendants;

F) The Plaintiff has had to reassign its Managers to tasks related to mitigating damages caused by the Defendants increasing its labor costs;

G) The Plaintiff has lost a significant amount of money in its valuation as a going concern;

H) The Plaintiff has had to institute this legal action to collect damages due to the wrongful refusal of the Defendant to pay the same. As a result, the Plaintiff has suffered a cost related to the time value of money at its applicable borrowing rate;

I) The Plaintiff has been required to hire attorneys to prosecute this claim, as well as incur other costs related to the lawsuit;

J) Additional Damages either unknown or still accumulating.

**Answer:** **Defendant denies the allegations of paragraph 105 of Plaintiff's Complaint and demands strict proof thereof.**

106. The Defendant's wrongful acts are characterized by wantonness, malice, oppression and other circumstances of aggravation. The pattern of conduct by the defendants were motivated by more than mere ignorance or oversight, but by personal gain.

**Answer:** Defendant denies the allegations of paragraph 106 of Plaintiff's Complaint and demands strict proof thereof.

WHEREFORE, Defendant, CHARLOTTE WARMBIR, prays that Count IV of Plaintiff's Complaint be stricken and dismissed with prejudice, and for such other and further relief as the Court deems equitable and just.

## COUNT V

### BREACH OF ILLINOIS TRADE SECRETS ACT AGAINST JAMIE WARMBIR AND WARMBIR IT SOLUTIONS, LLC

Count V of Plaintiff's Complaint makes no allegations against Defendant, CHARLOTTE WARMBIR, and therefore, Defendant, CHARLOTTE WARMBIR makes no response to the same.

## COUNT VI

### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS AGAINST JAMIE WARMBIR AND WARMBIR IT SOLUTIONS, LLC

Count VI of Plaintiff's Complaint makes no allegations against Defendant, CHARLOTTE WARMBIR, and therefore, Defendant, CHARLOTTE WARMBIR makes no response to the same.

## COUNT VII

### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AGAINST JAMIE WARMBIR AND WARMBIR IT SOLUTIONS, LLC

Count VI of Plaintiff's Complaint makes no allegations against Defendant, CHARLOTTE WARMBIR, and therefore, Defendant, CHARLOTTE WARMBIR makes no response to the same.

Dated:  June 2, 2020

                                        CHARLOTTE WARMBIR,

                                        Defendant

                                        /s/ A. Christopher Cox_____

A. Christopher Cox
ARDC# 6296142
Cox & Fulk, LLC
202 North Center Street
Bloomington, IL 61701
(309) 828-7331
christophercox@cxflegal.com

## Certificate of Service

The undersigned, an attorney, hereby certifies that on the 2nd day of June, 2020, a true and correct copy of the foregoing Notice of Filing was electronically served for filing and served on the persons shown below as follows:

Jason Bartell                      Michael Powell
10 E. Main St.                     207 W. Jefferson St.
Champaign, IL 61820                Ste. 602
jbartell@bartellpowell.com         Bloomington, IL 61701
                                   mpowell@bartellpowell.com

( )     I served this notice by delivering a copy personally to each person to whom it is directed.

()      I served this Notice by mailing a copy to each person to whom it is directed and depositing the same in the U. S. Mail at Bloomington, Illinois, with proper postage.

( )     I served this notice by faxing a copy to each person to whom it is directed from (309) 827-7423.

( X )   I served this notice by emailing a PDF copy to each person to whom it is directed from the email address of christophercox@cfxlegal.com

Date:   June 2, 2020

                                        /s/A. Christopher Cox


A. Christopher Cox
ARDC # 6296142
Cox & Fulk, LLC
202 North Center Street
Bloomington, IL 61701
(309) 828-7331
christophercox@cfxlegal.com