## FIRST AMENDED AND RESTATED OPERATING AGREEMENT
## OF
## MAVIDEA TECHNOLOGY GROUP, LLC

This OPERATING AGREEMENT (the "Agreement") is entered into and shall be effective as of the 17th day of April, 2019, by and among MAVIDEA TECHNOLOGY GROUP, LLC, an Illinois Limited Liability Company (the "Company"), Jamie D. Warmbir, Erik Barnlund, Jacob E. Davis, Arnold Lovin, and Michael Somers (the "Managers"), and the persons whose names are set forth on Exhibit A attached hereto (the "Members").

### Article I
### THE COMPANY

1.1    Organization.    The Company has been organized as a limited liability company pursuant to the provisions of the Act. Articles of Organization creating the Company were filed with the Illinois Secretary of State on April 18, 2007 in accordance with and pursuant to the Act.

1.2    Company Name; Property.    The name of the Company shall be MAVIDEA TECHNOLOGY GROUP, LLC, or such other name as the Managers shall hereafter designate with the Consent of the Members, and all business of the Company shall be conducted in such name. The Company shall hold all of its property in the name of the Company and not in the name of any Member.

1.3    Purpose.    The purpose of the Company is to transact any and all other lawful business for which limited liabilities companies may be organized under the Act. However, the Company shall not operate in a manner which would cause it to be treated as an investment company under the Investment Company Act of 1940.

1.4    Principal Place of Business.    The principal place of business of the Company shall be 14170 Carole Dr., Bloomington, Illinois, or such other place as the Managers may designate.

1.5    Registered Agent and Office.    The Company shall at all times maintain a registered office and a registered agent as required under the Act which shall be the office and agent as stated in the Articles or as otherwise may be determined from time to time by the Members. The current registered agent and registered office, respectively are Jamie Warmbir, 14170 Carole Dr., Bloomington, IL 61705.

1.6    Term.    The term of the Company commenced on the date the Articles of Organization were issued by the Illinois Secretary of State and shall continue until the winding up and liquidation of the Company and its business is completed following a Liquidating Event, as provided in Article IX hereof.

1.7    Independent Activities.    Except to the extent specified in Section 15-3 of the Act, each Member and Manager may, directly or indirectly, independently or with others,

engage in or possess any interest in whatever activities he, she or it chooses, whether the same as or competitive with the Company or otherwise, without having or incurring any obligation to offer any interest in such activities to the Company or any Member, or to account in any way to any such Person.

1.8     No Payments of Individual Obligations.    The Members shall use the Company's credit and assets solely for the benefit of the Company.  No asset of the Company shall be transferred or encumbered for or in payment of any individual obligation of a Member.

1.9     Definitions.   Capitalized words and phrases used in this Agreement have the following meanings:

"Act" means the Illinois Limited Liability Company Act, as amended from time to time.

"Agreement" or "Operating Agreement" means this Operating Agreement, as amended from time to time.

"Capital Account" means, with respect to any Member, the Capital Account maintained for such Member pursuant to Section 3.1 of this Agreement.

"Capital Contributions" means, with respect to any Member, any contribution to the capital of the Company in cash or property by a Member whenever made.

"Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

"Company" means MAVIDEA TECHNOLOGY GROUP, LLC, an Illinois limited liability company.

"Consent of the Members" means and requires the consent of a Majority in Interest of the Members.

"Interest" means a Member's ownership interest in the Company, including any and all benefits to which the holder of such an Interest may be entitled as provided in this Agreement, together with all obligations of such Member to comply with the terms and provisions of this Agreement.

"Majority in Interest of the Members" means Members whose combined Percentage Interests represent more than 50% of the Percentage Interests of all Members.

"Managers" means the Persons referred to as such in Section 5.2 of this Agreement or who become Managers pursuant to the terms of this Agreement.

"Member" means any Person (i) whose name is set forth on Exhibit A attached hereto or who has become a Member pursuant to the terms of this Agreement, and (ii) who holds an Interest. "Members" means all such Persons.

2

"Percentage Interest" means the fraction, expressed in percentage form, obtained by dividing (i) the number of Units held by a Member by (ii) the total number of Units held by all Members.

"Person" means any individual, partnership, corporation, trust, limited liability company, or other legal entity.

"Property" means all real and personal property acquired by the Company and any improvements thereto, and shall include both tangible and intangible property.

"Regulations" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such Regulations may be amended from time to time.

"Transfer" means any voluntary or involuntary transfer, sale, pledge, hypothecation, grant of a security interest, or other disposition.

"Unit" means the number of units of membership interest set forth for each Member on Exhibit A, as may be changed from time to time pursuant to the terms of this Agreement.

## Article II
## MEMBERS

2.1  Members. The names of, Capital Contributions made by, and number of Units held by the Members are set forth on Exhibit A attached hereto, as may be amended from time to time.

2.2  Rights or Powers. The Members shall have the right to vote on the matters explicitly set forth in this Agreement. The Members shall otherwise have no right or power to take part in the management or control of the Company or its business affairs or to act for or to bind the Company in any way.

2.3  Member Liability. Except as otherwise provided by this Agreement, the Act, or other applicable law, no Member shall be liable for the debts, liabilities, contracts or any other obligations of the Company. A Member shall be liable only to make its Capital Contributions and shall not be required to lend any funds to the Company. A Member shall not be required to restore a deficit balance in his, her or its Capital Account.

2.4  Members' Capital Contributions.

(a)  Except as otherwise provided in this Agreement, no Member shall demand or receive a return of his, her or its Capital Contributions. A Member may withdraw from the Company at any time, but the Units held by such Member shall not be liquidated or redeemed without the Consent of the Members. If a Member's Units are not redeemed by the Company upon withdrawal, the Member shall forfeit all rights as a Member except the rights to allocations and distributions as provided in Articles III and IV as if such Person were still a Member, and such Member's Capital Account shall be distributed upon liquidation of the Company as

provided in Article IX hereof. Under circumstances requiring a return of any Capital Contributions, no Member shall have the right to receive Property other than cash except as may be specifically provided herein.

(b) No Member shall receive any interest, salary or drawing with respect to his, her or its Capital Contributions or such Member's Capital Account or for services rendered on behalf of the Company or otherwise in such person's capacity as a Member, except as otherwise provided in this Agreement.

2.5 Additional Capital Contributions. Except as otherwise unanimously agreed to by the Members, no Member shall be obligated to make any additional Capital Contribution to the Company.

## Article III
## CAPITAL ACCOUNTS AND ALLOCATIONS

3.1 Capital Accounts. A separate Capital Account will be maintained for each Member in accordance with Section 704(b) of the Code and Regulations Section 1.704-1(b)(2)(iv). Each Member's Capital Account will be increased by: (1) the amount of money contributed by the Member to the Company; (2) the fair market value of property contributed by the Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code); and (3) allocations to the Member of income and gain pursuant to Section 3.2 hereof. Each Member's Capital Account will be decreased by: (1) the amount of money distributed to the Member by the Company; (2) the fair market value of property distributed to the Member by the Company (net of liabilities secured by such distributed property that the Member is considered to assume or take subject to under Section 752 of the Code); (3) allocations to the Member of expenditures described in Section 705(a)(2)(B) of the Code; and (4) allocations to the Member of loss and deduction pursuant to Section 3.2 hereof.

In the event of a permitted sale or exchange of Units held by a Member, the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Units.

The manner in which Capital Accounts are to be maintained pursuant to this Section 3.1 is intended to comply with the requirements of Code Section 704(b) and the Regulations thereunder and shall be interpreted and applied in a manner consistent therewith. If, in the opinion of the Managers, the manner in which Capital Accounts are to be maintained should be modified in order to comply with Code Section 704(b) and the Regulations thereunder, then, notwithstanding anything to the contrary contained in the preceding provisions of this Section 3.1, the Managers may alter the method in which Capital Accounts are maintained; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between the Members.

3.2 Allocations of Profits and Losses. For each fiscal year, each item of the Company's income, gain, loss, deduction or credit shall be allocated to each of the Members in accordance with their respective Percentage Interests; provided, however, that such allocations

shall be made in accordance with Section 704 of the Code and applicable Regulations thereunder. Allocations of such items with respect to a Member whose Percentage Interest has changed in such fiscal year shall be made on an interim closing of the books method.

      3.3    Determination of Capital Accounts and Transfers. Except as otherwise provided in this Agreement, whenever it is necessary to determine the balance in the Capital Account of any Member for purposes of this Agreement, such balance shall be determined after first giving effect to all allocations, for transactions effected prior to the time as of which such determination is made, of items of income and loss and other items allocated pursuant to Section 3.2, for the current year; and second, after giving effect to all distributions or deemed distributions for such year in respect of transactions effected prior to the date as of which such determination is to be made; and third, after giving effect to all allocations of the Company's items of income and loss for the transaction in question (that is, prior to giving effect to distributions or deemed distributions as a result of such transaction).

      3.4    Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, any deficit balance in such Member's Capital Account as quickly as possible; provided that an allocation pursuant to this Section 3.4 shall be made only if and to the extent that such Member would have a deficit balance in his, her or its Capital Account after all other allocations provided for in this Article III have been tentatively made as if this Section 3.4 were not in the Agreement.

      3.5    Tax Allocations; Code Section 704(c). In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any Property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such Property to the Company for federal income tax purposes and the fair market value of such Property on the date on which such Property is contributed to the Company.

      In the event the fair market value of any Company asset is adjusted pursuant to the Regulations under Code Section 704(b), subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its fair market value in the same manner as under Code Section 704(c) and the Regulations thereunder.

      Any elections or other decisions relating to such allocations shall be made by the Managers in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 3.5 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of profits, losses, other items, or distributions pursuant to any provision of this Agreement.

Article IV
DISTRIBUTIONS

4.1 <u>Distributions to Pay Taxes</u>. The Company shall make distributions to each member of the amount necessary, as determined by the Managers, to pay federal, state and local income tax on income or gain of the Company allocated to the Members pursuant to Article III hereof, based on the Members' respective Percentage Interests.

4.2 <u>Other Distributions</u>. The Managers shall have the sole discretion to cause the Company to make any other distributions of cash or property to the Members. Such distributions shall be made in accordance with the Members' Percentage Interests.

4.3 <u>Restriction on Distributions</u>. Notwithstanding anything to the contrary in Sections 4.1 and 4.2 above, no distribution shall be made if, after giving effect to the distribution: (i) the Company would not be able to pay its debts as they become due in the ordinary course of business; or (ii) the Company's total assets would be less than the sum of its total liabilities.

## Article V
## MANAGEMENT

5.1 <u>Authority of the Managers</u>. Except to the extent otherwise provided herein, the Managers shall have the sole and exclusive right to manage the business of the Company including, without limitation, the right and power to:

(a) acquire by purchase, lease, or otherwise any real or personal property which may be necessary, convenient, or incidental to the accomplishment of the purposes of the Company;

(b) operate, maintain, finance, improve, construct, own, grant options with respect to, sell, convey, assign, mortgage, and lease any real estate and any personal property necessary, convenient, or incidental to the accomplishment of the purposes of the Company;

(c) execute any and all agreements, contracts, documents, certifications and instruments necessary or convenient in connection with the management, maintenance, and operation of Property, or in connection with managing the affairs of the Company;

(d) borrow money and issue evidences of indebtedness necessary, convenient, or incidental to the accomplishment of the purposes of the Company, and secure the same by mortgage, pledge, or other lien on any Property;

(e) execute, in furtherance of any or all of the purposes of the Company, any deed, lease, mortgage, deed of trust, mortgage note, promissory note, bill of sale, contract, or other instrument purporting to convey or encumber any or all of the Property;

(f) prepay in whole or in part, refinance, increase, modify, or extend any liabilities affecting the Property and in connection therewith execute any extensions or renewals of encumbrances on any or all of the Property;

(g) maintain and distribute funds to the Members by way of cash, income, return of capital, or otherwise in accordance with the provisions of this Agreement;

(h)　　　contract on behalf of the Company for the employment and services of employees and/or independent contractors, such as lawyers and accountants, and delegate to such Persons the duty to manage or supervise any of the assets or operations of the Company;

(i)　　　engage in any kind of activity and perform and carry out contracts of any kind (including contracts of insurance covering risks to Property and the Managers' liability) necessary or incidental to, or in connection with, the accomplishment of the purposes of the Company under the laws of each state in which the Company is then formed or qualified;

(j)　　　make any and all elections for federal, state, and local tax purposes, and act as the "Tax Matters Member" under the Code and in any similar capacity under state or local law.

(k)　　　institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought on or in behalf of, or against, the Company or the Members in connection with activities arising out of, connected with, or incidental to this Agreement, and to engage counsel or others in connection therewith.

5.2　　Number/Actions of Managers.　The Company shall have five Managers. The Managers must approve of any action by a majority vote before the Company can proceed with such act.　The weighted value of each Manager's vote shall be the same percentage as the Manager's, or an entity owned or controlled by said Manager, Percentage Interest owned in the Company.　For example, if a Manager, or an entity owned or controlled by said Manager, owns a Percentage Interest of twenty-five percent (25%) in the Company, that Manager's vote shall be weighed as (25%) of the vote of all Managers. The Managers shall direct, manage and control the business of the Company to the best of such Person's ability, and shall have full and complete authority, power and discretion to make any and all decisions, and to do any and all things which the Managers deem necessary or desirable for that purpose, including those actions specified in Section 5.1 above, but specifically excluding those matters which require Member consent, as identified in Section 5.3 below.

A Person shall cease to be a Manager upon his, her or its bankruptcy, death, Permanent Total Disability, resignation, removal, if an employee of the Company, termination of employment with the Company, or, if a Member or owner of a Member of the Company, the sale of all Units held by the Managers.　For the purposes of this Section 5.2, "Permanent Total Disability" shall mean a Manager's inability to perform his or her customary duties for the Company for six (6) consecutive months as a result of physical or mental impairment.　A Manager may be removed by the affirmative vote of Members holding at least 75% of the outstanding Percentage Interests for any reason at any time.　The Members shall elect a substitute Manager to fill any vacancy occurring in the position of the Managers by Consent of the Members.　Managers need not be residents of the State of Illinois or Members of the Company.

The Members hereby elect Jamie D. Warmbir, Erik Barnlund, Jacob E. Davis, Arnold Lovin, and Michael Somers as the Managers of the Company.

5.3　　Restrictions on Authority of the Managers.　Without the Consent of the Members, the Managers shall not have the authority to:

7

(i)        do any act in contravention of this Agreement;

(ii)       do any act which would make it impossible to carry on the ordinary business of the Company, except as otherwise provided in this Agreement;

(iii)      confess a judgment against the Company;

(iv)      possess Property, or assign rights in specific Property, for other than a Company purpose;

(v)       admit additional Members or Substituted Members to the Company;

(vi)      amend this Agreement or the Articles of Organization; or

(vii)     knowingly perform any act that would subject any Member to liability in any jurisdiction.

### 5.4    Duties and Obligations of the Managers.

(a)      The Managers shall take all actions on behalf of the Company which may be necessary or appropriate (i) for the continuation of the Company's valid existence as a limited liability company under the Act and (ii) for the accomplishment of the Company's purposes, including the acquisition, development, maintenance, preservation, and operation of Property in accordance with the provisions of this Agreement, the Act, and all other applicable laws and regulations.

(b)      The Managers shall devote to the Company such time as may be necessary for the proper performance of all duties hereunder, but the Managers shall not be required to devote full time to the performance of such duties.

(c)      The Managers shall conduct the affairs of the Company in the best interests of the Company and of the Members, including the safekeeping and use of all of the Property for the exclusive benefit of the Company.

(d)      The Managers shall be responsible for filing any federal, state, or local tax returns that need to be filed on behalf of the Company.

### 5.5    Indemnification of the Managers.

(a)      The Company, its receiver, or its trustee shall indemnify, save harmless, and pay all judgments and claims against the Managers relating to any liability or damage incurred by reason of any act performed or omitted to be performed by such Managers in connection with the business of the Company, including attorneys' fees incurred by such Managers in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred, including all such liabilities under federal and state securities laws (including the Securities Act of 1933, as amended) as permitted by law.

(b)     In the event of any action by a Member against the Managers, including a Company derivative suit, the Company shall indemnify, save harmless, and pay all expenses of such Manager, including attorneys' fees, incurred in the defense of such action, if such Manager(s) is successful in such action.

(c)     The Company shall indemnify, save harmless, and pay all expenses, costs, or liabilities of any Manager who for the benefit of the Company makes any deposit, acquires any option, or makes any other similar payment or assumes any obligation in connection with any property proposed to be acquired by the Company and who suffers any financial loss as the result of such action.

(d)     Notwithstanding the provisions of Sections 5.5(a), 5.5(b), and 5.5(c) above, no Manager shall be indemnified from any liability for fraud, bad faith, willful misconduct, or gross negligence.

5.6     Compensation and Loans.

(a)     Compensation and Reimbursement. A Manager or Member may receive a salary, fee, or draw for services rendered to or on behalf of the Company, if reasonable for the services provided and approved by a majority of the Managers (said vote shall exclude the Manager or Member who is proposed to receive the compensation).

(b)     Expenses.    The Managers may charge the Company for any direct expenses reasonably incurred in connection with the Company's business.

(c)     Loans.    Any Person may, with the consent of the Managers, lend or advance money to the Company. If any Member shall make any loan or loans to the Company or advance money on its behalf, the amount of any such loan or advance shall not be treated as a Capital Contribution but shall be a debt due from the Company. The amount of any such loan or advance by a lending Member shall be payable out of the Company's cash and shall bear interest at such rate, and be payable on such terms, as the Manager and the lending Member shall agree. None of the Members shall be obligated to make any loan or advance to the Company.

5.7     Life Insurance.

The Managers may purchase life insurance on the lives of one or more Members or owners of Members. The proceeds of any life insurance benefits on behalf of such Members shall be distributed in accordance with Section 8.3(c).

Article VI
ACCOUNTING AND BANK ACCOUNTS

6.1     Books and Records. The Company shall keep adequate books and records at its principal place of business in compliance with the Act, setting forth a true and accurate account of all business transactions arising out of and in connection with the conduct of the Company. Any Member or his, her or its designated representative shall have the right, at any reasonable time, to have access to and inspect and copy the contents of such books or records.

6.2     <u>Annual Reports</u>. Within a reasonable period after the end of each Company fiscal year, each Member shall be furnished with pertinent financial information regarding the Company and its activities during such period. The Managers shall have the authority to select the Company's accountants and to determine whether or not to obtain an audit of the Company's books and records.

6.3     <u>Tax Information</u>. Necessary tax information shall be delivered to each Member after the end of each fiscal year of the Company. Every effort shall be made to furnish such information within seventy-five (75) days after the end of each fiscal year.

6.4     <u>Fiscal Year</u>. The fiscal year of the Company shall be the calendar year.

6.5     <u>Bank Account(s)</u>. All funds of the Company shall be deposited in the name of the Company in such bank or banks as may be selected by the Managers and checks drawn on such account(s) shall require the signature of one of the Managers, or such other policy as the Managers may from time to time approve. All funds received from the operation and business of the Company shall be promptly deposited in the account(s) maintained in its name and all debts, expenses and charges shall be paid by checks drawn on such account(s). There shall be no commingling of the funds of the Company with the funds of any other entity.

Article VII
AMENDMENTS; MEETINGS

7.1     <u>Amendments</u>. Amendments to this Agreement shall require the Consent of the Members; provided, however, that this Agreement shall not be amended without the consent of each Member adversely affected if such amendment would (i) modify the limited liability of a Member, or (ii) alter the interest of a Member in profits, losses, other items thereof, or any Company distributions.

7.2     <u>Meeting of the Members</u>. Meetings of the Members may be called by any Member or one of the Managers. The call shall state the nature of the business to be transacted. Notice of any such meeting shall be given to all Members not less than three (3) days nor more than thirty (30) days prior to the date of such meeting. Members may vote in person or by proxy at such meeting. Whenever the vote or consent of Members is permitted or required under this Agreement or the Act, such vote or consent shall require the vote or consent of the Members holding a majority of the Percentage Interests (unless otherwise specified herein) and may be given at a meeting of Members or may be given in writing.

Article VIII
TRANSFERS OF INTERESTS

8.1     <u>Restrictions on Transfer and Dissociation</u>. No Member shall transfer any Unit except in accordance with this Article VIII. No Member shall otherwise resign, withdraw or dissociate himself, herself or itself from the Company without the prior written Consent of the Members. Such consent of any Member may be withheld entirely at such Member's discretion, for any or no reason. If a Member or Member's owner resigns from the Company other than as provided in this Article VIII, the Company shall be entitled to offset the damages resulting from such withdrawal against amounts otherwise distributable to the resigned Member hereunder.

## 8.2    Restriction on Lifetime Sale or Disposition.

(a)    General. No Member shall sell, assign (by operation of law or otherwise), pledge, or in any manner whatsoever Transfer any Unit without first offering to sell such Unit to the Company and to the other Members in accordance with the terms and conditions of this Section 8.2.

(b)    Notice. Any Member intending or desiring to Transfer any Unit (the "Selling Member") shall first give notice of such intention to the Company and the other Members. Such notice shall specify the number of Units to be transferred, the intended transferee, the proposed selling price if the intended Transfer is a sale, and a description of the other terms and conditions of the intended Transfer.

(c)    Options to Purchase. The Company and thereafter the other Members shall have an option for sixty (60) days after their receipt of the notice to purchase the Units described therein. The price shall be as determined in accordance with Section 8.6 below.

(d)    Priority of Options. If the Company has not exercised its option as to all of the Units described in such notice within the first forty (40) days of such sixty (60) day period, then for the next twenty (20) days the other Members shall have an option to purchase all but not less than all of the number of Units not purchased by the Company. During such twenty (20) day period, the Company's option shall be subject to the prior right of the other Members to exercise their options.

(e)    Payment. The purchase price shall be paid, at the election of the purchaser, (i) over a period of ten (10) years at a rate of six percent (6%) per annum, (ii) over such period as may be mutually agreed by the Selling Member and the purchaser(s) or, (iii) one hundred percent (100%) in cash at the Closing (as defined in Section 8.2(f) below).

(f)    Closing. If one or more options are exercised, the sale or sales shall be closed at the office of the Company at a time (during its ordinary business hours) fixed by the Selling Member, not more than sixty (60) days after the expiration of the options (the "Closing"). If such options shall have been exercised in whole or in part by the Company and a Member, or by more than one Member, the sales shall be closed simultaneously. In the event the entirety of the purchase price is not paid at closing pursuant to Paragraph 8.2(e), the Selling Member shall retain a security interest on the transferred interest until the Selling Member has been paid in full.

(g)    Non-Exercise of Options. Upon receipt of the remaining Members' written consent, or upon termination of the options of the Company and the other Members unexercised as to any of the Units described in the Selling Member's notice, the Selling Member may Transfer the Units not purchased by the Company or the other Members substantially as outlined in such notice. Such Transfer must be carried out within sixty (60) days after the written consent has been delivered, or the options have terminated. However, as a condition of such Transfer, the transferee must expressly consent to be subject to the provisions of this Agreement in the manner set forth in Section 8.10.

## 8.3    Death of a Member

(a)     Options to Purchase.  In the event of the death of any owner of a Member, the Company and thereafter the other Members shall have an option, for a period of sixty (60) days after their receipt of written notice of the Member's Owner's death, to purchase from the representative or distributee of such Member Owner's estate (the "Transferor") the Units owned by such Member Owner's estate at the date of Closing.  The price shall be determined in accordance with the provisions of Section 8.6 and the terms shall be as set forth in Sections 8.2(b)-(f) (with the substitution of "Transferor" for "Selling Member").

(b)     Lapse of Options If Not Fully Exercised.  Upon the termination of the options of the Company and the other Members as to any of the Units held by the Transferor, the Units held by the Transferor (after giving effect to any exercise of options by the Company or other Members) shall be exchanged for the value of the life insurance proceeds held on the life of the deceased Member's owner.

(c)     Life Insurance Proceeds.  With the consent of the Managers, the proceeds of any life insurance policy held for a Member's Owner may be distributed to the deceased Member Owner's estate.  If the Managers elect to distribute the life insurance proceeds to the deceased Member Owner's estate, the deceased Member Owner's interest in the Company shall immediately be transferred to the Company at no additional cost to the Company.  Alternatively, if the Managers elect to retain the proceeds of such life insurance policy for the benefit of the Company, the Company shall pay to the deceased Member Owner's estate the purchase price for the deceased Member Owner's interest in accordance with Section 8.6 and on the terms set for in Sections 8.2(b)-(f).  The Managers shall have the discretion to determine whether to distribute the life insurance proceeds or, alternatively, pay the purchase price for the Member's interest, notwithstanding that either alternative may result in a difference in value paid to the Member Owner's estate.

(d)     Notwithstanding any other Section of this Agreement, the deceased Member's Owner's estate or the Member shall have no right to retain an interest in the Company following such Member's Owner's death. The payment of such life insurance proceeds or purchase price shall be a complete release of the Member and its estate's interest in the Company.

8.4     Bankruptcy, Insolvency of a Member

(a)     Options to Purchase.  In the event of (i) the dissolution of any Member, (ii) the appointment of a receiver or trustee for any Member, (iii) the filing by a Member of a voluntary petition in bankruptcy or the filing against a Member of an involuntary petition in bankruptcy that is not dismissed within thirty (30) days, (iv) the making by a Member of an assignment for the benefit of creditors, or (v) the effecting by a Member of another act of insolvency, the Company and thereafter the other Members shall have an option, for a period of sixty (60) days after their receipt of written notice of an event described in (i)-(v) above, to purchase from such Member or his, her or its representative (the "Transferor"), the Units owned by such Member on the date of Closing.  The price shall be determined in accordance with the provisions of Section 8.6, and the terms shall be as set forth in Sections 8.2(b)-(f) (with the substitution of "Transferor" for "Selling Member").

(b)     Lapse of Options if Not Fully Exercised.  Upon the termination of the options of the Company and the other Members as to any of the Units held by the Transferor, the Units held by the Transferor (after giving effect to any exercise of options by the Company or other Members) may be transferred to the shareholders, trustees, receivers or distributees of the Transferor, providing the transferee expressly consents to be subject to the provisions of this Agreement in the manner set forth in Section 8.10.

8.5     Exercise of Options.  Neither the Selling Member nor Transferor, as the case may be, shall have any voice (directly or indirectly, and whether as an officer, Manager, Member or otherwise) in a decision by the Company to exercise or not to exercise any option hereunder.  Furthermore, the Selling Member and Transferor shall, at the request of the holders of a majority of the Percentage Interest of the Company owned by the other Members, cooperate in securing valid corporate action (by assisting in procuring the attendance of a quorum at any meeting of Members or Manager, by voting as a Member or Manager, by signing consents in lieu of formal action by vote, or otherwise) in exercising any option hereunder and in taking any action necessary or appropriate for the Company to exercise its rights or perform its obligations hereunder.  All options granted under this Agreement shall be deemed exercised upon receipt of written notice of such exercise by the Selling Member or Transferor, where applicable.

8.6     Purchase Price.

(a)     The Members hereby agree that the purchase price for purposes of Sections 8.2-8.4 above shall be determined by the fair market value of the Units to be purchased (without including any discounts for lack of marketability or minority interest).  The purchase price shall be the amount which the Selling Member or Transferor would receive if all the Company Property were sold at its appraised fair market value and the proceeds were applied in accordance with Section 9.2.  The Managers shall in good faith calculate the fair market value of all Units to be purchased and provide notice to all Members and the Selling Member or Transferor of the fair market value assigned by the Managers.

(b)     If, within fifteen (15) business days after receipt of the notice containing the Managers' determination of the fair market value of the Units to be purchased, the Selling Member, Transferor or another Member disputes the value set by the Managers, the Selling Member, Transferor or other Member may obtain, at his, her or its own cost, an appraisal ("First Appraisal") of the fair market value of the Units to be purchased by an independent appraiser experienced in conducting appraisals of ventures with assets similar to the Company Property ("Qualified Appraiser") of his, her or its choice.  If more than one party disputes the value set by the Managers and such persons cannot agree on a Qualified Appraiser to conduct the First Appraisal, then the Selling Member or Transferor shall select the Qualified Appraiser to conduct the First Appraisal.  If the parties agree, the First Appraisal shall be used to determine the value of the Units to be purchased.

(c)     If, within fifteen (15) business days after receipt of the First Appraisal, the Company, the Selling Member, Transferor or another Member disputes the value determined by the First Appraisal, such party may obtain, at his, her or its own cost, a second appraisal ("Second Appraisal") of the fair market value of the Units to be purchased by a Qualified Appraiser of his, her or its choice.  If more than one party disputes the value determined by the

First Appraisal and such persons cannot agree on a Qualified Appraiser to conduct the Second Appraisal, then (i) if the Selling Member or Transferor selected the Qualified Appraiser for the First Appraisal, then the Company shall select the Qualified Appraiser to conduct the Second Appraisal and (ii) if the Selling Member or Transferor did not select the Qualified Appraiser for the First Appraisal, then the Selling Member or Transferor shall select the Qualified Appraiser to conduct the Second Appraisal. If the parties agree, the Second Appraisal shall be used to determine the value of the Units to be purchased.

(d)     If the two appraisals are performed and the parties cannot agree within ten (10) days which of the appraisals accurately reflects the value of the Units to be purchased, then the two appraisers selected under this section shall select a Qualified Appraiser to conduct a third appraisal ("Third Appraisal") of the fair market value of the Units to be purchased. The fair market value of the Units to be purchased established by the Third Appraisal shall be final and binding in all respects on all parties. The Selling Member or Transferor and the Company and/or other Members purchasing the Selling Member or Transferor's Units shall each pay fifty percent (50%) of the costs of the Third Appraisal.

(e)     Notwithstanding the subsections (a)-(d) of this Section, the Managers shall, once per year, use their best efforts to determine an appropriate valuation for the Company to be used as the agreed upon valuation for the subsequent twelve (12) month period. Such valuation shall be determined by unanimous agreement among the Managers.

8.7     Prohibited Transfers; Rights of Assignees not Admitted as Members; Restrictions on Entity-Type Members.

(a)     Any purported Transfer of any Unit that is not made in accordance with the requirements of this Article VIII shall be null and void and of no effect whatever; provided that, if the Company is required by the Act to recognize such a purported Transfer (or if the Company, in its sole discretion, elects to recognize such a Transfer), the Unit transferred shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the transferred Unit, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee of such Interest may have to the Company.

Likewise, a person who acquires a Unit, but who is not admitted as a substituted Member pursuant to Section 8.8 hereof, shall be entitled only to allocations and distributions with respect to such Unit in accordance with this Agreement, but shall not be entitled to inspect the books or records of the Company and shall not have any rights of a Member.

(b)     In the case of a Transfer or attempted Transfer of all or any portion of a Unit, or conducted in accordance with this Article VIII, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the other Members from all cost, liability, and damage that any of such indemnified Persons may incur (including, without limitation, incremental tax liability and attorneys' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

14

(c)     A change in ownership or interest in excess of ten percent (10%) in any underlying entity that is a Member of this Company shall be deemed a transfer of interest of this Company governed by this Article VIII and subject to the same transfer restrictions as those transfers contemplated hereunder.

8.8     Admission of New Members.     Subject to the other provisions of this Article VIII, any person who acquires a Unit may be admitted to the Company as a Member only upon satisfaction of the conditions set forth below in this Section 8.8:

(a)     The Managers consent to such admission;

(b)     The Unit with respect to which the transferee is being admitted was acquired in accordance with the provisions of this Article VIII;

(c)     The prospective new Member expressly consents in writing to be subject to all the provisions of this Agreement in the manner set forth in Section 8.10, and executes or delivers such further documents and instruments as the Managers may reasonably request to confirm such transferee as a Member of the Company and such transferee's agreement to be bound by the terms and conditions hereof;

(d)     The prospective new Member pays or reimburses the Company for all reasonable legal, filing, and other costs that the Company incurs in connection with the admission of the transferee as a Member with respect to the transferred Unit; and

(e)     If the prospective new Member is not an individual, the prospective new Member provides the Company with evidence satisfactory to counsel for the Company of the authority of the prospective new Member to become a Member and to be bound by the terms and conditions of this Agreement.

8.9     Representations; Legend.     Each Member hereby represents and warrants to the Company and the Managers that such Member's acquisition of a Unit hereunder is made as principal for such Member's own account and not for resale or distribution of such Units. Each Member further hereby agrees that the following legend may be placed upon any counterpart of this Agreement, stock certificate, or any other document or instrument evidencing ownership of Units:

> The Units represented by this document have not been registered under any securities laws and the transferability of such Units is restricted. Such Units may not be sold, assigned or transferred, nor will any assignee, vendee, transferee or endorsee thereof be recognized as having acquired any such Units by the issuer for any purposes, unless (1) a registration statement under the Securities Act of 1933, as amended, with respect to such Units shall then be in effect and such transfer shall have been qualified under all applicable state securities laws, or (2) the availability of an exemption from such registration and qualification shall be established to the satisfaction of counsel to the Company.

> The Units represented by this document are subject to further restrictions as to their sale, transfer, hypothecation, or assignment as set forth in the Operating Agreement and agreed to by each Member.

8.10    Consent.  Any consent to be subject to this Agreement shall be made in writing, in substantially the following form, and shall be filed with the Managers before the Managers may issue or transfer ownership of record of any Units on the books of the Company:

> Consent to Operating Agreement.  In consideration of the [issuance] [transfer] to the undersigned of a Unit in the Company, the undersigned does hereby consent to become a party to and be governed by all the terms of the Operating Agreement among the Members of the Company dated as of the 17th of April, 2019, as amended (the "Agreement").    For purposes of the Agreement, I shall be considered a Member, as defined therein.

## Article IX
## DISSOLUTION AND WINDING UP

9.1    Liquidating Events.  The Company shall dissolve and commence winding up and liquidating upon the first to occur of any of the following ("Liquidating Events"):

(a)    The sale of all or substantially all of the Property;

(b)    The Consent of the Members to dissolve, wind up, and liquidate the Company;

(c)    The withdrawal of all of the Members of the Company; or

(d)    The happening of any other event that makes it unlawful, impossible, or impractical to carry on the business of the Company.

The Members hereby agree that, notwithstanding any provision of the Act, the Company shall not dissolve prior to the occurrence of a Liquidating Event.  If it is determined, by a court of competent jurisdiction, that the Company has dissolved prior to the occurrence of a Liquidating Event, the Members hereby agree to continue the business of the Company without a winding up or liquidation.

9.2    Winding Up.  Upon the occurrence of a Liquidating Event, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Members.  No Member shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs.  The Managers (or, in the event there is no Manager, any Person elected by Consent of the Members shall be responsible for overseeing the winding up and dissolution of the Company and shall take full account of the Company's liabilities and Property and the Property shall be liquidated as promptly as is consistent with obtaining the fair value thereof, and the proceeds therefrom, to the extent sufficient thereof, shall be applied and distributed in the following order:

(a)     First, to the payment and discharge of all of the Company's debts and liabilities to creditors including Members, including all expenses of the dissolution, winding up and liquidation;

(b)     Second, to the creation of such cash reserve as the Managers may deem necessary for any contingent and unforeseen liabilities of the Company;

(c)     Third, to the Members in accordance with and up to the positive balance in their Capital Accounts, after giving effect to all contributions, distributions, and allocations for all periods; and

(d)     Finally, to the Members, in proportion to their respective Percentage Interests.

9.3     Compliance With Timing Requirements of Regulations. In the event the Company is "liquidated" within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g), distributions shall be made pursuant to this Article IX to the Members who have positive Capital Accounts in compliance with Regulations Section 1.704-1(b)(2)(ii)(b)(2). If any Member has a deficit balance in his, her or its Capital Account (after giving effect to all contributions, distributions and allocations for all taxable years, including the taxable year during which such liquidation occurs), such Member shall have no obligation to make any contribution to the capital of the Company with respect to such deficit, and such deficit shall not be considered a debt owed to the Company or to any other Person for any purpose whatsoever. In the discretion of the Managers, a pro rata portion of the distributions that would otherwise be made to the Members pursuant to this Article IX may be:

(a)     distributed to a trust established for the benefit of the Members for the purpose of liquidating Company assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company or of the Members arising out of or in connection with the Company. The assets of any such trust shall be distributed to the Members from time to time, in the reasonable discretion of the Managers, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to this Agreement; or

(b)     withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company, provided that such withheld amounts shall be distributed to the Members as soon as practicable.

9.4     Deemed Distribution and Recontribution. Notwithstanding any other provision of this Article IX, in the event the Company is liquidated within the meaning of Regulations Section 1.704-l(b)(2)(ii)(g) but no Liquidating Event has occurred, the Property shall not be liquidated, the Company's liabilities shall not be paid or discharged, and the Company's affairs shall not be wound up. Instead, the Company shall be deemed to have distributed the Property in kind to the Members, who shall be deemed to have assumed and taken subject to all Company liabilities, all in accordance with their respective Capital Accounts.

Immediately thereafter, the Members shall be deemed to have recontributed the Property in kind to the Company, which shall be deemed to have assumed and taken subject to all such liabilities.

9.5     Rights of the Members.  Except as otherwise provided in this Agreement, (a) each Member shall look solely to the assets of the Company for the return of his, her or its Capital Contribution and shall have no right or power to demand or receive property other than cash from the Company in accordance with the terms hereof, and (b) no Member shall have priority over any other Member as to the return of his, her or its Capital Contributions, distributions, or allocations.

9.6     Notice of Dissolution.  In the event a Liquidating Event occurs or an event occurs that would, but for provisions of Section 9.1, result in a dissolution of the Company, the Managers shall, within thirty (30) days thereafter, provide written notice thereof to each of the Members and to all other parties with whom the Company regularly conducts business (as determined in the discretion of the Managers) and shall provide all other notices as may be required by the Act or other applicable law.

## Article X
## MISCELLANEOUS

10.1     Notice.  All notices and other communications required or permitted under this Agreement shall be in writing and may be sent by certified U.S. mail, return receipt requested, postage prepaid, overnight air courier, facsimile, or personal delivery to the Members at their addresses as shown from time to time on the records of the Company.  Any Member may specify a different address by notifying the Company in writing of such different address.  Such notices shall be deemed given (i) three (3) days after mailing, (ii) the day after deposit with an overnight air courier, or (iii) when delivered in person or transmitted by fax machine (confirmation of transmission received), as the case may be.

10.2     Binding Effect.  Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, legatees, legal representatives, successors, transferees, and assigns.

10.3     Construction.  Every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member.

10.4     Headings.  Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof.

10.5     Severability.  Every provision of this Agreement is intended to be severable.  If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.

10.6  Incorporation by Reference.  Every exhibit, schedule, and other appendix attached to this Agreement and referred to herein is hereby incorporated in this Agreement by reference.

10.7  Further Action.  Each Member, upon the request of the Managers, agrees to perform all further acts and execute, acknowledge, and deliver any documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

10.8  Governing Law.  The laws of the State of Illinois shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the Members.

10.9  Waiver of Action for Partition.  Each of the Members irrevocably waives any right that he may have to maintain any action for partition with respect to any of the Property.

10.10  Counterpart Execution.  This Agreement may be executed in any number of counterparts with the same effect as if all of the Members had signed the same document.  All counterparts shall be construed together and shall constitute one agreement.

10.11  Entire Agreement.  This Agreement constitutes the entire agreement and understanding among the Company, the Managers and the Members hereof, and supersedes any prior understandings or written or oral agreements among them respecting the subject matter hereof.

## EXHIBIT A

### FIRST AMENDED AND RESTATED OPERATING AGREEMENT OF MAVIDEA TECHNOLOGY GROUP, LLC

Members

| Names | Capital Contributions | Units |
|-------|----------------------|-------|
| Warmbir Technology, Inc. | $17,921.45 | 22.39988 |
| The Wonder Boy Company | $17,921.45 | 22.39988 |
| J E Davis, Inc. | $16,359.01 | 22.39988 |
| Emerging Business Services, LLC | $29,999.28 | 4.79998 |
| Somers Midwest, Inc. | $49,998.81 | 7.99998 |
| **Totals** | $132,200.00 | 79.9996 |

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the date first above set forth.

MAVIDEA TECHNOLOGY GROUP, LLC

By: Redacted

Jamie D. Warmbir, Manager

By: Redacted

Erik Barnlund, Manager

By: Redacted

Jacob E. Davis, Manager

By: Redacted

Arnold Lovin, Manager

By: Redacted

Michael Somers, Manager

Redacted

Warmbir Technology, Inc., Member
By: Jamie D. Warmbir, President

Redacted

The Wonder Boy Company, Member
By: Erik Barnlund, President

Redacted

J E Davis, Inc., Member
By: Jacob E. Davis, President

Redacted

Emerging Business Services, LLC, Member
By: Arnold Lovin, Manager

Redacted

Somers Midwest, Inc., Member
By: Michael Somers, President