## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| **MAVIDEA TECHNOLOGY GROUP, LLC** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.**    1:20-CV-1139 |
| | ) | |
| **JAMIE WARMBIR; CHARLOTTE WARMBIR; WARMBIR IT SOLUTIONS, LLC, an Illinois limited liability company;** | ) | |
| | ) | |
| | ) | **JURY TRIAL REQUESTED** |
| **Defendants.** | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff, Mavidea Technology Group, LLC ("Mavidea"), by their undersigned counsel, move for a temporary restraining order.  In support of this motion, Plaintiffs state as follows:

## FACTUAL BACKGROUND

The relevant factual background to this case is set forth in Plaintiff's Verified Amended Complaint.  The factual allegations in Plaintiff's verified complaint have the same force as those in an affidavit.  *Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993).  Additionally, filed contemporaneously herein is the Declaration of Jake Davis who provides many more details and documents to support this Motion than are contained in the Plaintiff's *Verified Amended Complaint*.  The Plaintiff incorporates the *Verified Amended Complaint* and the *Declaration of Jake Davis*, along with their accompanying exhibits, into this Motion and Memorandum of Law.

The proof in this case is meticulously documented in Mr. Davis's Declaration which can be summarized as follows:

- All eleven clients taken by the Defendants after his departure on February 14, 2020 had valid ongoing contracts with the Plaintiff and constituted 40% of Plaintiff's IT Department's customers;

- Were it not for the Defendants' interference, there was every reason to suspect that Mavidea's normal client retention rate of 98% would have continued for these customers;

- The Defendants raided 5 of the 6 employees of the IT Department.  The one remaining employee retired shortly after his departure.  Three of five employees had employment contracts with non-competition provisions.  Two of the five employee's had missing employment contracts.  Jamie Warmbir signed all of these contracts while a Manager at Mavidea and knew of their contents.

- The tactics by Jamie Warmbir to convert Mavidea's clients included 1) falsely claiming that the partners threw him out while in fact he had resigned, 2) claiming that Mavidea would not be able to service their accounts due to his taking all of the employees, 3) claiming that Mavidea's software (that was chosen by him while at Mavidea) was creating security threats on their computer systems, 4) claiming that his contract was better than their prior contract with Mavidea due his discounting the costs, and 5) claiming that they were getting enhanced features that they did not receive with Mavidea.

- Jamie Warmbir delayed meetings and customer leads during his final months at Mavidea so as to take advantage of these Mavidea corporate opportunities with his own company.

- Jamie Warmbir went to great lengths to encourage customers to support his erroneous legal theory in this case, that being he had no issues if the customer contacted him first. Through discovery, however, it was learned that he in fact initiated contact with all of the customers except one. He encouraged the clients to quickly sign before there was an injunction put on him, to give his scripted letter to Mavidea terminating their contract, and to argue against paying Mavidea additional fees to get title to their equipment.

- A week after his departure, Jamie Warmbir had the employees over to his house for a pizza party where he created a ruse that would make it appear like the Mavidea employees were initiating contact with him to apply for jobs. The morning after the pizza party, employees started sending in their resumes pretending that they were spontaneously applying for positions he was posting, when in fact the entire exercise was simply a ruse made again to support his erroneous legal theory that if they contacted him first he was on solid legal footing.

- The Defendants efforts to take clients have continued with the same fervor as when he started, despite this lawsuit. In the week prior to this motion being filed, two additional customers have given Mavidea notice that they intend to depart.

<u>**ARGUMENT**</u>

Plaintiffs seek a temporary restraining order and a preliminary injunction to enjoin the Defendants' unlawful misconduct, specifically its ongoing and coordinated effort to systematically raid Plaintiffs' workforce, tortuously interfere with Plaintiff's contractual relations and business expectancies, and misappropriate Plaintiffs' highly confidential information, trade secrets and intangible property.

To be entitled to a preliminary injunction, the moving party must demonstrate that: (1) its case has some likelihood of success on the merits; (2) no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008). Courts in the 7th Circuit apply the same standards for granting a temporary restraining order and preliminary injunction. *Gray v. Orr, 4 F.Supp. 3d* 984, 989 (N.D.Ill. 2013). Plaintiffs believe that each of these elements is satisfied in these circumstances and request that the Court. Additionally, Plaintiffs assert that injunctive relief is warranted under several of its claims to relief and that each of its claims must be separately analyzed under the criteria.

## I. LIKLIHOOD OF SUCCESS ON THE MERITS

### A. Breach of Fiduciary Duty

The Plaintiff should be granted injunctive relief based on the likelihood it will be successful on the merits of its breach of fiduciary duty claim. A claim for breach of fiduciary duty must allege: 1) that a fiduciary duty exists; 2) that the fiduciary duty was breached, and 3) that such breach proximately caused the injury of which the party complains. *Lawlor v. North American Corp of Illinois*, 2012 IL 112530, 983 N.E.2d 414, 368 Ill.Dec.1 (2012). A duty of

loyalty to the employer extends to officers, directors, and employees. *Id.* Accordingly, a fiduciary cannot act inconsistently with his agency or trust and cannot solicit his employer's customers for himself. *Id.* Under the Limited Liability Company Act, 805 ILCS 180/5-1(b), a limited liability company must have at least on "member." An LLC is presumptively deemed to be a "member-managed" LLC. *Id.* §15-1(a). In such an LLC, the affairs of the LLC are decided by a majority vote of the members, *Id.*, §15-1(b)(2). If an LLC's operating agreement provides, the LLC may instead be "manager-managed". It is undisputed that Mavidea was a manager-managed LLC. The managers of a manager-managed LLC owe a fiduciary duty to the LLC. *Id.* §15-3(g)(2). That duty, broadly speaking, includes a duty of loyalty, a duty of care, and a duty of good faith and fair dealing. *Id.*; see also id. §15-3(b), (c), (d) and *Everen Securities, Inc. v. A.G. Edwards and Sons, Inc.*, 308 Ill.App.3d 268 (1999).

While employees, who may act in their own self-interest and prepare to compete with their current corporate employer as long as they don't actually commence competition while employed, corporate officers "stand on a different footing."[1] *Veco Corp. vs. Babcock*, 243 Ill.App.3d 153, 160, 611 N.E.2d 1054 (1993). They may not actively exploit their positions for a personal benefit while employed; they may not act in their self-interest while employed as an officer… They may not undertake any activities that would hurt the corporations' ability to continue as a business or exploit their status as an officer in any way, while employed. *Oliver vs. Isenberg*; 2019 IL App (1st), Feb. 26, 2020. <u>That includes not using information acquired, while employed as an officer, to one's competitive advantage post-employment. And that information</u>

---

[1] The case law appears to hold managers of LLC's and officers of corporations to a higher duty than employees who also have a fiduciary duty. That being said, the case law holds both LLC managers, Corporate officers, and Corporate board members to the highest level of fiduciary duty. Given that the case law does not seem to distinguish a different fiduciary duty between corporate officers/board of director members and cases such as this one, where an individual serves as a full-time Manager, leads a division of the company, regularly signs/executes contracts on the company's behalf, and is the highest paid individual in the company. Thus, we assert that fiduciary duty cases that discuss the duties for officers or board of director members are controlling in this case as well due to the fact that the underlying concept and purpose of a fiduciary duty is the same in each circumstance.

need not rise to the level of a trade secret; it is enough that the information was available to the officer by virtue of his or her position. Id., *Comedy Cottage, Inc. v. Berk*, 145 Ill.App.3d 355, 360, 99 Ill.Dec. 271, 495 N.E.2d 1006 (1986). Thus, for example, a defendant who was the corporation's vice president and general manager, who among other things was entrusted with the negotiations of the corporation's lease renewal, could not use his inside knowledge of the prior negotiations and the circumstances surrounding the termination of that lease to his advantage by resigning and obtaining the lease for himself and the new company he started up. *Id.* at 360-361. It was recognized in this case that the defendant may not have actually competed – that is, sign the lease for his new company and open the new shop – until after his formal resignation, but he nevertheless "remained bound by his fiduciary duty because his acquisition of the lease was based upon knowledge acquired during his employment." *Id.* at 361. In a similar case, a former officer of a manufacturer's representative company breached his fiduciary duty by hiring away key personnel from his former company, whom he knew to have specialized skills and knowledge after having worked with them. *Smith-Shrader Company v. Smith*, 136 Ill.App.3d 571, 578, 483 N.E.2d 283 (1985). In *Smith-Shrader*, the Court explicitly indicated that they did "not consider the actual date on which [the] employees were contacted to be indicative of [the former officer's] fairness in approaching them." Id. The Court explained that the former officer's "acquaintance with and knowledge of the ability and specialized training of [these solicited employees] were acquired as a direct result of his association with [the former company]. *Id.*

In *Foodcomm Intern. V. Barry*, 328 F.3d 300 (7th Cir. 2003), a food importer sought a temporary restraining order against two former sales representatives who left the food importer and opened a new importing business which competed with the food importer. In opening the

new business, the two former employees used contacts, information and resources of the food importer to establish a directly competing business. The Seventh Circuit found evidence to support a breach of fiduciary duty and a preliminary injunction issued by the trial court. The Seventh Circuit further held that the food importer's business would suffer irreparable harm if the former employees were allowed to continue their directly competing business with the food importer's former customers. The Seventh Circuit found that an injunction that prevented the offending parties from working with any of the customers taken from their former employer was an appropriate remedy, as long as the injunction did not prevent the offenders from earning a living off of working for another company in the industry or finding its own new customers. Id. at 305.

Mr. Warmbir will likely assert that Paragraph 1.7 of the Company's Operating Agreement allowed him to compete. This is simply a grossly improper reading of the Company's Operating Agreement, where the clause permitting competition was expressly conditioned on satisfying other criteria, including the requirement that a Manager conduct the affairs in the best interests of the Company/Other Members as well as safekeep and use all intangible property for the exclusive benefit of the Company. See Section I.E below for additional discussion. The actions referenced in the *Verified Amended Complaint* and the *Affidavit of Jake Davis* are an extreme deviation from these standards.


**B. Tortious Interference with Contract and Business Expectancy**

*1) Employees*

Plaintiff brings claims for tortious interference with contract against the Defendants for its 1) interference with three separate employment contracts between Plaintiffs and their former

employees. Intentional employee raiding has been recognized to constitute tortious interference. See *ISC-Bunker Ramo Corp. v. Altech, Inc.*, 765 F.Supp.1310, 1338-40 (N.D.Ill. 1990); *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*, 420 F.Supp.2d 866, 871-872 (N.D.Ill. 2006) (defendant's admissions that they recruited the plaintiff's employees and customers established that judgment on the pleadings for plaintiffs was appropriate on claims for tortious interference with contract and prospective economic advantage).

In *ISC-Bunker*, the court granted preliminary injunctive relief to halt an employee raid, just as Plaintiffs seek here. In that case, the plaintiff – like Plaintiffs here – typically required its employees to execute an employment agreement containing a confidentiality provision and a restrictive covenant. See *Id.* The plaintiff further demonstrated that the defendant "repeatedly hired ex-ISC employees" and "sought to appropriate and exploit their ISC training, and their knowledge of ISC confidential information and trade secrets. *Id.* At 1338. The court found that their employment with the defendant in similar positions "inherently called upon them to use and disclose such training, confidential information and trade secrets." *Id.* As a result of this course of conduct, the court held that there was a significant threat that the defendant would "continue to use ex-ISC employees in violation of their restrictive covenants, and to raid ISC for still more new employees." *Id.* At 1339. Based on this finding, the court issued a preliminary injunction enjoining the defendant from interfering with any of the plaintiff's employees.

In another employee raiding case, *Lawson Prods., Inc. v. Chromate Indus. Corp.*, 158 F.Supp.2d 860 (N.D.Ill.2001), the court denied the argument that post-employment contractual obligations were unenforceable and found that the plaintiff sufficiently alleged a claim for tortious interference with employment contracts. In so doing, the court noted the allegations that the defendant had hired many of the plaintiff's former salespeople, who "continue[d] to service

their existing customers, only now selling [defendant's] products," and that the employees in question had executed employment agreements containing restrictive covenants limiting their ability to work for the plaintiff's competitors and prohibiting them from disclosing confidential information. *Id.* at 862. In making its ruling, the court noted the allegation that the former employees "are now using [plaintiff's] confidential information to solicit [plaintiff's] customers on behalf of their new employer." *Id.* at 865.

As in both *ISC-Bunker* and *Lawson Prods.*, Plaintiffs here allege claims for tortious interference with contract against a competitor that has hired numerous of their employees and is using their confidential information to compete against the former employer. These cases demonstrate that Plaintiffs state a viable claim against the Defendants arising out of their systemic raiding of Plaintiff's employees.

Mr. Warmbir is likely to argue that some, if not all, of the employment agreements that he signed while at Mavidea were unforceable due to a lack of consideration. He will assert that there is a bright line legal test that requires an employee to be at the Company for two years before the agreement becomes enforceable. He is likely to assert that he should be free to "switch sides" and argue immediately after leaving Mavidea that the contracts he drafted were not enforceable and that there is no problem with him taking these employees. This argument would be highly illustrative of the problem here, one in which Mr. Warmbir improperly believes he is free to do anything he wants after leaving the company. It fails to recognize that if any of the employment agreements he would have breached his fiduciary duty while at the Company by 1) not using good faith and due diligence in his drafting of the agreement in the first place and 2) upon learning of a possible defense to the contract, rather than raising the issue with the Managers so that corrective measures could be taken, he remained quiet silently plotting to take

advantage of the opportunity himself.  Additionally, he breached his fiduciary duties after leaving by taking advantage of the corporate opportunity to otherwise keep the employees at Mavidea.  As such, Mr. Warmbir should be equitably estopped from making any such arguments.

Additionally, the legal proposition that there is a two year bright line test for a non-competition agreement to be enforceable is not accurate.  In *Cumulus Radio Corporation*, Judge McDade held "As discussed below, the Court does not believe that the Illinois Supreme Court would adopt the bright-line test announced in Fifield.  Such a rule is overprotective of employees, and risks making post-employment restrictive covenants illusory for employers subject completely to the whimsy of the employee as to the length of his employment.  *Cumulus Radio Corporation v. Olson*, 80 F.Supp.3d 900 (C.D.Ill. 2015).  See also *Montel Aetnastak v. Miessen*, 998 F.Supp.2d 694, *Stericycle, Inc. v. Simota*, 2017 WL 4742197; *Allied Waste Services of North America, LLC v. Tibble*, 177 F.Supp.3d 1103;  *R.J. O'brien & Assoc., LLC v. Williamson*, 2016 WL 930628 and *Bankers Life & Cas. Co. v. Miller*, 2015 WL 515965.  In the case at hand, Elizabeth Fornero was slightly over the two year period when she was recruited to leave by the Defendants.  Christopher Boyer and Matthew Reichert were both under the two year period when they were recruited.  The two employees whose employment agreements were mysteriously lost by the IT department or never procured prior to Jamie Warmbir's departure were Eric Even and Michael Cluney who both been with Mavidea since 4th Quarter of 2014.

Regardless of whether the employees broke their contract when they went to Jamie Warmbir's firm, under this legal theory, the existence of a contract between the company and the employee is **not** an element the Plaintiff must prove, as the Plaintiff can claim a benefit and expectancy from the relationship that it had with the employees.  This benefit is due to the

resources, time, and investment the Company had made in finding, training, and paying these employees so that they could specifically meet the needs of their specialized client base.

### 2) Customers

Mavidea had contracts with most of its customers taken by the Defendants. Most of these contracts automatically renewed on a yearly basis and others renewed on a monthly basis. Until terminated, the relationship created by an at-will contract that will presumptively continue in effect so long as the parties are satisfied, and therefore, such a relationship is sufficient to support an action for tortious interference. *Grund v. Donegan*, 298 Ill.App.3d 1034, 1038, 233 Ill.Dec. 56, 700 N.E.2d 157 (1998). The fact that the relationship is terminable at will does not of itself defeat an action for tortious interference because the action is not dependent upon an enforceable contract but, rather, upon an existing relationship. *La Rocco v. Bakwin*, 108 Ill.App.3d 723, 731, 64 Ill.Dec. 286, 439 N.E.2d 537 (1982). Until terminated, the relationship created by a contract terminable at will is subsisting and will presumptively continue in effect so long as the parties are satisfied. *Anderson v. Anchor Organization for Health Maintenance*, 724 Ill.App.3d 1001, 1013, 211 Ill.Dec. 213, 654 N.E.2d 675 (1995). See also *Dowd & Dowd, Ltd. v. Gleason*, 352 Ill.App.3d 365, 381, 287 Ill.Dec. 787, 816 N.E.2d 754, 768 (2004). Such relationship is sufficient to support an action for tortious interference. *Kemper v. Worcester*, 106 Ill.App.3d 121, 125, 62 Ill.Dec. 29, 435 N.E.2d 827 (1982).

In the case at hand, Mavidea has a 98% monthly retention rate of its customer base. *Aff. of Jake Davis* ¶11. Thus, the customers typically stay for a very long time, even after their contracts convert to year-to-year or month-to-month. The *Affidavit of Jake Davis* documents the incredulous effort the Defendants have taken to divert these clients to themselves.

## C. Illinois Trade Secrets Act ("ITSA")

As previously stated, the Court need not find a ITSA violation for there to be liability and injunctive relief for the Defendant. Plaintiff asserts, however, that the actions of the Plaintiff nevertheless show clear violations of the ITSA as well. The ITSA defines a trade secret as:

> information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d).

Mavidea asserts that the information taken, such as its lists of customers and prospective customers, the contracts and contract terms, the employee contracts and their terms, all constitute trade secrets.

It has been previously held that lists of actual *or* potential clients may constitute protectable trade secrets under the ITSA, but their status as such is dependent on the surrounding circumstances. *First Fin. Bank, N.A. v. Bauknecht*, 71 F. Supp. 3d 819, 839 (C.D. Ill. 2014) (citing *Multiut Corp. v. Draiman*, 834 N.E.2d 43, 50 (Ill. App. Ct. 2005)). For a client list (or potential client list) to be considered a trade secret, however, the list must be held to be sufficiently secret and that the list was subjected to sufficient efforts to be kept secret. 765 ILCS 1065/2(d).

In determining whether a client list is sufficiently secret to constitute a protectable trade secret, courts undertake a "value-added" analysis. *Bauknecht*, 71 F. Supp. 3d at 840; see also *Liebert Corp. v. Mazur*, 827 N.E.2d 909 (Ill. App. Ct. 2005). Following the first requirement that a trade secret must in fact be a secret, a phonebook's verbatim listings may not constitute a trade secret. It is not sufficient, however, to claim that a client list is not a trade secret because each of the clients happen to also appear in the same phonebook. *Liebert Corp.*, 827 N.E.2d at 277–78.

The court in *Sys. Dev. Servs. v. Haarmann* held that a list of customers serviced by an IT company, along with other related data, did not constitute a protectable trade secret under Illinois law. 907 N.E.2d at 78–79. The disputed customer list here was nothing more than a compilation of "names, addresses, and phone numbers" belonging to a wide variety of business types—many of which had not prior business relationship with the plaintiff-employer. *Id.* at 76. The Court reasoned here that the information contained within the list was "readily available" and that "[c]ompetitors in the computer network industry can quickly identify potential customers in a given area by referring to directories and other sources of publicly available data." *Id.* The holding in this case can lead to the false impression that the ITSA does not protect client lists or potential client lists as trade secrets. In reality, the holding in *System Development Services* serves to prevent an employer from claiming that a former employee violated the ITSA by engaging any client which could have also been serviced by the former employer in a given geographical area.

Mavidea's efforts in creating and maintaining the client lists in question go way beyond simply compiling the contact information of local businesses which may require computer systems services. The lists developed by Mavidea were products of extensive labor over a period of at least a year. During this period a full-time employee, whose job function was tailored

specifically to this role of business development, made 17,516 phone calls in 2019 to ultimately identify 11 qualified prospective customers. This is unlike *System Development Services* where the customer list at issue did not require considerable time, effort, or expense to compile. 907 N.E.2d at 73. The holding in *Bauknecht* distinguishes itself from *System Development Services* through the level of difficulty one would experience in trying to "recreate the list without prior knowledge of its contents." *Bauknecht,* 71 F. Supp. 3d at 841. Where, in the instant case, the unrefined list with which Mavidea's business development employee began their work at the beginning of 2019 may not qualify as a trade secret—the 11 qualified prospects remaining after a year would.

Furthermore, the business model utilized by the Plaintiff is like comparing apples and oranges to the model used in System Development Services. The Plaintiffs utilize a model where they sign contracts with a screened and limited number of businesses to be their outsourced IT Department. This is in stark contrast with the business in *System Development Services* that sought to service anyone's computer who walked in their business and had no contracts with any of their customers.

For secret information to be protected under the ITSA as a trade secret, the owner of that information must make reasonable efforts to maintain the information's secrecy. 765 ILCS 1065/2(d). Courts have previously looked to an employer's use of various security techniques to determine whether reasonable efforts were made. See, e.g. *Stampede Tool Warehouse, Inc. v. May*, 651 N.E.2d 209, 216 (Ill. App. Ct. 1995). Some methods that courts have previously looked to include: use of access codes on computers, locked offices, checking garbage, limiting customer list access to employees on need to know basis, prohibiting the removal of confidential

hard copies from office, security camera use, requiring employees to sign confidentiality agreements, and frequent reminders that certain information is confidential. *Id.* at 215–16.

It is important to note that secret information which would otherwise be granted protection under the ITSA may fail trade secret status if the employer does not deploy reasonable means to maintain the secret. See *Gillis Associated Industries, Inc. v. Cari-All, Inc.*, 564 N.E.2d 881, 885–86 (Ill. App. Ct. 1990). In *Gillis*, the Court looked at the employer's security methods in a holistic manner. The Court refused trade secret protection where the customer lists were securely stored on a password-protected computer, but hard copies were printed freely and without instruction as to the confidentiality of the contents. *Id.*

In the instant case, Mavidea employs multiple methods to protect against theft the potential and actual client lists which are at issue. The company keeps this information stored on password protected computer networks which only certain employees can access—when necessary. *Mavidea Am. Compl.* at ¶ 64-65. Further restrictions are placed on managers—like Jamie Warmbir—prohibiting them from using any tangible or intangible property of Mavidea, except when it is for the "exclusive benefit of the Company." Id. at ¶¶ 18–20. Finally, Mavidea requires employees to sign a non-competition agreement which prohibits those employees from disclosing, inter alia, clients and client candidates. Id. at ¶ 47, 83(B).

Mavidea's efforts in protecting their client lists are distinguishable from the efforts put forth in *Gillis*. The protections here are more comprehensive and all-encompassing in approach. Because of this, it makes more sense to liken Mavidea's protections to those in *Stampede Tool Warehouse*. While it is true that the measures deployed by Mavidea do not go as far as those used in *Stampede Tool Warehouse*, but the test here is one of reasonableness. Now, unlike in the early to mid-nineties when *Stampede Tool Warehouse* and *Gillis* were decided, electronic

communication is the dominant medium for data storage. Hard copy file storage is not as important as a consideration in the instant case. Overall, Mavidea has used sufficient means to be considered "reasonable" for the circumstances.

**D. Federal Defend Trade Secrets Act ("DTSA")**

The DTSA allows that "[a]n owner of a trade secret that is misappropriated may bring a civil action. . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). In defining a trade secret, the federal statute includes the term to mean "all forms and types of financial, business, scientific, technical, economic, or engineering information. . ." 18 U.S.C. § 1839(3). The same definition specifically lists "compilations" as an example of a protectable trade secret. *Id.* Like the ITSA, the DTSA requires that for a trade secret to be protectable it must have been subjected to certain efforts to maintain the information as secret, as well as its capability of deriving economic value being contingent upon its secrecy. *Id.* A "trade secret is defined as "information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality. 18 U.S.C. 1839(3).

Under the DTSA, a Plaintiff must demonstrate that (1) a trade secret existed; (2) it was misappropriated through improper disclosure, or use; and (3) the misappropriation damaged the

trade secret's owner." *Aon Risk Servs. Cos. V. Alliant Ins. Servs.*, 415 F.Supp.3d 843, 848

(N.D.Ill. 2019)

Due to the substantial similarity between the requirements of the ITSA and DTSA

regarding efforts to maintain secrecy and secrecy being key to information's value, it is safe to

rely upon the previously made determination that the instant Mavidea trade secrets are

sufficiently secret under the ITSA also applies here. The actual and prospective client lists

assembled by and for Mavidea are sufficiently secret to meet the requirements of § 1839(3)(A)

and § 1839(3)(B).

Left for analysis is whether the DTSA grants protection to client lists as trade secrets.

Informative on this issue is *Mickey's Linen v. Fischer*. In *Mickey's Linen*, as in the instant case,

the plaintiff-employer filed a complaint in federal court claiming misappropriation of client lists

as trade secrets under the DTSA and ITSA. No. 17 C 2154, 2017 U.S. Dist. LEXIS 145513, at

*28 (N.D. Ill. Sept. 8, 2017). The Court in that case is not deciding on the issue of client list

protection under the DTSA, but they do state that "[t]he DTSA imposes the same requirements

[as the ITSA]." *Id.* This same approach is taken in *Moss Holding Co. v. Fuller*, where the Court

combined their analysis for making a determination regarding the DTSA and ITSA. No. 20-cv-

01043, 2020 U.S. Dist. LEXIS 39068, at *14 (N.D. Ill. March 6, 2020). In *Moss Holding Co.* the

Court also stated that a customer list could be a trade secret. *Id.* Where *Moss Holding Co.* is

combining their analysis for the DTSA and the ITSA and it is determined that customer lists can

be protectable trade secrets, it follows that the DTSA allows the protection of customer lists as

trade secrets.  A trade secret may also include a compilation of confidential business and

financial information… Courts often look to how easily information can be duplicated without

involving substantial time, effort or expense." *Master Tech. Prods. V. Prism Enters.*, 2020 WL 475192, at 5, 2002 U.S. Dist. LEXIS 5481, at 12 (N.D.Ill.Mar.26, 2002).

### E. Breach of Operating Agreement

Under Illinois law, breach of contract requires (1) the existence of a valid and enforceable contract, (2) performance by the plaintiff; (3) breach of the contract by the defendant, and 4) resultant injury to the Plaintiff." *Gonzalzles v. Am.Express Credit Corp.*, 315 Ill.App.3d 199, 206, 247 Ill.Dec. 881, 887, 733 N.E.2d 345 (2000).

While the Amended Complaint establishes the factual basis for these elements, at issue is whether Mr. Warmbir breached the contract with the Plaintiff.

The Operating Agreement under paragraph 1.8 held "The Members shall use the Company's credit and assets solely for the benefit of the Company." The Operating Agreement holds, in part, under Paragraph 5.3:

> 5.3 Restrictions on Authority of the Managers. Without the Consent of the Members, the Managers shall not have the authority to:
>
> (i) do any act in contravention of this Agreement;…
>
> (ii) do any act which would make it impossible to carry on the ordinary business of the Company, except as otherwise provided in this Agreement;…
>
> (iv) possess Property, or assign rights in specific Property, for other than a Company purpose;

The Operating Agreement under Paragraph 5.4 imposed the following obligations on Managers:

> 5.4 <u>Duties and Obligations of the Managers</u>
>
> (a) The Managers shall take all actions on behalf of the Company which may be necessary or appropriate… (ii) for the accomplishment of the Company's

purposes, including the acquisition, development, maintenance, preservation, and operation of Property in accordance with the provisions of this Agreement, the Act, and all other applicable laws and regulations…

(c) The Managers shall conduct the affairs of the Company in the best interests of the Company and of the Members, including the safekeeping and use of all of the Property for the exclusive benefit of the Company.

Paragraph 1.9 of the Operating Agreement defined "Property" to mean: "… all real and personal property acquired by the Company and any improvements thereto, and shall include both tangible and intangible property."

As stated in the *Verified Amended Complaint*, some of the members/managers were members of other entrepreneurial ventures and wanted the operating agreement to reflect that their participation in such ventures would not be viewed as a breach of their fiduciary duty. Thus, while the Operating Agreement required any Manager to use any intangible property created or acquired by Mavidea for the "<u>exclusive benefit of the Company</u>," Paragraph 1.7 indicated that a Manager would not be required to offer the stock of any new independent or competing venture back to Mavidea <u>providing</u> the manager/member respected the intangible property interests of Mavidea under Section 5.3.

The *Amended Complaint* and *Affidavit of Jake Davis* illustrated several instances where Jamie Warmbir did not conduct the affairs of the Company "in the best interests of the Company" safekeeping and using all of its Property for the exclusive benefit of the Company while he was a manager of the Plaintiff.  See *Aff. Jake Davis* 44, 45, 50, 51, 52, 58-60. *Am. Compl.* 83-84.  These included, but are not limited to, a) concealing his intentions to leave Mavidea to enable him to take several actions to put him in a better position to take clients and customers after leaving, b) failing to protect employee contracts, c) delaying signing up new customers until after his departure date, d) forwarding information on prospective employees to

himself for use after he left, e) not implementing enhanced software that met the security requirements of clients, and f) conveying confidential financial information to third parties.

### F. Illinois Cable Piracy Act

In Illinois:

[a] person commits injury to wires or obtaining service with intent to defraud when he or she knowingly. . . obtains, or attempts to obtain, any telecommunications service with the intent to deprive any person of the lawful charge, in whole or in part, for any telecommunications service. . . by any trick, stratagem, impersonation, false pretense, false, representation, false statement, contrivance, device, or means.

720 ILCS 5/16-18(a)(6)(E) (2020). While a criminal statute, this law provides for a private right of action which states that a court may "grant preliminary and final injunctions to prevent or restrain violations without a showing by the plaintiff of special damages, irreparable harm or inadequacy of other legal remedies. . . ." *Id.* at (h)(1)(A).

It is important to understand what is meant when the statute prohibits "depriv[ing] any person of the lawful charge." *Id.* at (a)(6)(E). This term is not defined in the statute, but the context suggests the "lawful charge" refers to the customer or subscriber who is lawfully paying for services from the telecommunications service provider. In the instant case, the lawful charge would belong to Mavidea. The relevant telecommunications service provider is Verizon.

Specific reference is made in the statute to telephone services which are at issue in the instant action. The provided definitions for "communication device" and "communication service" explicitly include telephones and telephone services. 720 Ill. Comp. Stat. Ann. § 5/16-0.1 (2020). This inclusion makes an interpretation that includes telephones and telephone

services a straightforward, plain-language interpretation.  The Illinois Cable Piracy Act defines relevant terms in such a way to unambiguously allow plaintiffs recourse where the communications service at issue is telephone related. <u>See</u> 720 Ill. Comp. Stat. Ann. § 5/16-0.1 (2020).

In the instant case, Jamie Warmbir made a call to Verizon on or after February 14, 2020, following the relinquishing of his authority as a Manager of Mavidea on February 10, 2020. This course of action was taken in opposition to a request made by Mavidea on February 14, 2020 that Jamie Warmbir return any company property to Mavidea by the end of that day. Jamie Warmbir instead posed as a qualified agent of Mavidea to convert that phone number which served as the IT Division's main point of contact to a private account held by Jamie Warmbir.  In order for Verizon to carry out the request made by Warmbir to transfer the phone number; Verizon had to have believed that Warmbir was an agent of Mavidea—as well as being an agent authorized to carry out such an action. When Jamie Warmbir maintained the illusion that he was authorized to request this change he was impersonating an individual with authority to make such a request and he would have had to have made false statements or false representations in furtherance of this scheme. <u>See</u> 720 Ill. Comp. Stat. Ann. § 5/16-18 (2020).


**II. NO ADEQUATE REMEDY AT LAW EXISTS**

To obtain a temporary restraining order and a preliminary injunction, the Plaintiff must show that it has no adequate remedy at law and, as a result, that it will suffer irreparable harm if the injunction is not issued.  Inadequate remedy at law does not mean wholly ineffectual; rather the remedy must be seriously deficient as compared to the harm suffered.  *Roland Machinery Co. v. Dresser Industries*, 749 F.2d, 386 (7th Cir. 1984).

In the *Foodcomm* case cited above, the Seventh Circuit indicated that the most important injuries in a case similar to the case at hand are the Plaintiff's complete loss of its customer relationships. *Foodcomm* at 304. Because it is not practicable to calculate damages to remedy that kind of harm, the Court found no remedy at law can adequately compensate Foodcomm for its injury. *Id.* at 304. Also citing *Cross Wood Products, Inc. v. Suter*, 97 Ill.App.3d 282, 52 Ill. Dec. 744, 422 N.E.3d 953, 957 (1981); *Preferred Meal Systems, Inc. v. Guse*, 199 Ill.App.3d 710, 145 Ill.Dec. 736, 557 N.E.2d 506, 516-17(1990). Intangible harms can include loss of a competitive position and losing customers. *Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d. 630, 632 (7th Cir. 2005).

## III. IRREPARABLE INJURY

The 7th Circuit has held that there is no irreparable injury to a Defendant's ability to earn a livelihood when they are enjoined from doing work with prior customers, as they can simply get new customers on their own or earn a living through working for another company. We do not claim a more expansive injunction than was imposed in *Foodcomm*. Id. at 305. While the Defendants might argue that they would then be forced to breach their new contracts with the same customers, this argument is not persuasive and does not change the circumstances here from Foodcomm. The Defendants were made aware of the Plaintiff's claims informally prior to his leaving the company and formally shortly after, all prior to the time he signed new contracts with the customers. The Defendants encouraged the customers that they needed to sign quickly because the judge was likely to grant an injunction against them and that if they did not get a contract signed before the injunction took effect, they would not be able to utilize the staff he had taken.

The irreparable injury being inflicted on the Plaintiff is significant. Not only has the Defendant taken 40% of the Plaintiffs, he continues his attempts to take more every day. In the week prior to the filing of this Motion, two additional customers gave notice that they were terminating their relationship. The relentless and aggressive tactics utilized by the Defendants as documented in the Declaration of Jake Davis filed contemporaneously with the Motion detail the telling of outright falsehoods, using scare tactics that Mavidea's security system is not adequately protecting them (the same system implemented by Mr. Warmbir while a Manager of the Plaintiff), and claiming that Mavidea is likely to have service issues due to his taking the entirety of the IT Department staff. The destruction of its customer relationships and its reputation cannot be compensated for and will cause irreparable harm. Additionally, Warmbir IT is a start-up with limited capitalization that is not likely to be able to even pay for a significant damage award.

## IV.  BALANCE OF HARMS

If the moving party makes an initial showing that it has satisfied the three requirements for injunctive relief, the court then balances the irreparable harm that the moving party would endure without a preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief. *Girl Scouts of Manitou Council, Inc.* at 1086.

<u>Balance of harms in this case should favor injunctive relief because granting the requested relief would only prohibit the Defendants from using the clients, employees, and confidential materials that they should not have taken in the first place.</u> See *Mintel Int'l Grp., Ltd. V. Neergheen*, 2008 WL 2782818, at 6, 2008 U.S.Dist.LEXIS 54119, at 16 (N.D.Ill. July 16,

2008).  In *Vendavo*, the Court found that prohibiting an employee from working on any client that she previously worked with while she worked for the plaintiff company was warranted but indicated that she was "certainly allowed to compete against Plaintiff given the absence of a non-compete in her agreement."  *Vendavo, Inc. v. Kim Long*, 397 F.Supp.3d at 1141, 1144 (N.D.Ill. 2019).   We urge the Court to utilize a similar remedy in this case and ask the Court to impose an injunction preventing the Defendants from doing work for any of the customers taken from Mavidea and preventing them from utilizing the services of the employees that they raided.  The harm that the Plaintiff is suffering is enormous and irreparable and include losses to reputation, losses in customer relationships, losses in income, and losses of institutional knowledge that was possessed by the employees the Defendants raided.  The Company has had to unprofitably hire on an emergency basis a new IT team and divert other Managers and employees to service the remaining customers.  Otherwise, the Company could have suffered breach of contract actions from those customers remaining and could have faced a claim by the Defendants that they failed to mitigate their damages.

Additionally, when a fiduciary breaches his duty of loyalty by misappropriating corporate assets or by usurping corporation opportunities, restitution can be compelled by means of a constructive trust.  *Lindenhurst Drugs, Inc. v. Becker*, 154, Ill.App.3d 61, 506 N.E.2d 645 (1987).  *Graham v. Mimms*, 111 Ill.App.3d 751, 762, 67 Ill.Dec. 313, 444 N.E.3d 549 (1982). The Plaintiff requests that this Court order that any funds earned from Mavidea clients be put into the trust account of either counsel in this case and held pending the final outcome and order of this Court.

## V.  BOND

Rule 65 of the Federal Rules of Civil Procedure "makes security mandatory… but also anticipates the exercise of discretion in determining the amount of the bond to be posted." *Gateway E. Ry. V. Terminal R.R. Ass'n*, 35 F.3d 1134, 1141 (7th Circ. 1994).  While the Plaintiff feels it should not have to take out a bond to prevent the Defendants from continuing to exploit its employee and customer base, the Plaintiff understands that the statute seems to dictate otherwise.  The Court in *Moss Holding Company* recently imposed a $25,000 bond instead of the $1,000 requested due to it being "too low and not on par with the bond amounts in other trade secret cases."  *Moss Holding Company v. Fuller*, 2020 WL 1081730 (March 6, 2020, N.D. Illinois).  The Court in *Mickey's Linen* also required a $25,000 bond.  *Mickey's Linen*, 2017 WL 3970593, at 20, 2017 U.S. Dist. LEXIS 145513, at 67 (Sept. 8, 2017, 2017, N.D. Illinois).  The Plaintiff asserts that this is a reasonable amount in this case as well, especially considering that the Plaintiff is seeking to have any funds obtained from Mavidea clients be held in a constructive trust instead of being tendered directly to the Plaintiff.

## VI.  CONCLUSION

The Plaintiff has met the requisite elements for a temporary restraining order and preliminary injunction under several theories of law, although only one is needed.  The Plaintiff respectfully requests this Court swiftly grant its request and implement the restrictions outlined in the Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction.

Respectfully Submitted,

Bartell Powell LLP

<u>/s/ Jason S. Bartell</u>
Jason S. Bartell, a partner of the firm

ATTORNEYS FOR THE PLAINTIFF

Jason Bartell, ARDC# 6255602
Bartell Powell LLP
10 East Main Street
Champaign, IL  61820
(217) 352-5900
Facsimile (217) 352-0182
Email: jbartell@bartellpowell.com

Michael Powell, ARDC# 6257615
Bartell Powell LLP
207 West Jefferson St. Ste. 602
Bloomington, IL  61701
(309)807-5275
Facsimile (309)807-5015
Email: mpowell@bartellpowell.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 12, 2020, I electronically filed the foregoing Memorandum in Support of Injunctive Relief with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following attorneys:

A.  Christopher Cox
Cox & Fulk, LLC
2020 N. Center
Bloomington, IL 61701

<u>/s/ Jason S. Bartell</u>