UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | | |
|---|---|---|---|
| MAVIDEA TECHNOLOGY GROUP, LLC | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| vs | ) | Case No. | 1:20-CV-1139 |
| | ) | | |
| JAMIE WARMBIR; CHARLOTTE WARMBIR; WARMBIR IT SOLUTIONS, LLC, an Illinois limited liability company; | ) | | |
| | ) | | |
| Defendants. | ) | | |

**DEFENDANTS, JAMIE WARMBIR, CHARLOTTE WARMBIR AND WARMBIR IT SOLUTIONS, LLC'S RESPONSE TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

NOW COMES the Defendants, Jamie Warmbir ("Warmbir"), Charlotte Warmbir and Warmbir IT Solutions, LLC ("WITS"), by and through their attorneys, Cox & Fulk, LLC, and for their Memorandum of Law in response to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. #31, 32), state as follows:

**I.      INTRODUCTION AND FACTUAL BACKGROUND**

Plaintiff, Mavidea Technology Group, LLC ("Plaintiff") brings the instant Motion for Temporary Restraining Order ("Plaintiff's Motion") seeking to enjoin Warmbir, Charlotte Warmbir and WITS from competing with Plaintiff for current and prospective customers and employees. Plaintiff is a Manager-Managed limited liability company. (See the Affidavit of Jamie Warmbir, attached as Exhibit A, ¶3)  Plaintiff's operating agreement (the "Operating Agreement") includes a provision which specifically permits managers and members of Plaintiff to engage in or own competing businesses or activities. (Exhibit A, ¶6); See Doc. # 28, Exhibit A.)   Distilled down to the heart of this conflict, Plaintiff's Motion must be denied because it impermissibly

1

attempts to prohibit Warmbir from doing the thing that Plaintiff explicitly permitted him to do in the Operating Agreement: compete.

The facts contained in the Affidavit of Jamie Warmbir are incorporated herein by reference. Following herein, is a summary of the significant facts in this matter.

Warmbir was one of the managers appointed for Plaintiff. (Exhibit A, ¶2). Additionally, Warmbir is the sole shareholder in Warmbir Technology, Inc. which is a member of Plaintiff. (Exhibit A, ¶4). Plaintiff has multiple industries in which it participates including information technology ("IT"). (Exhibit A, ¶8).

During Warmbir's time as manager of Plaintiff, Plaintiff had no specified criteria for potential customers. Any organization with computer and network service needs was a potential client of Plaintiff. (Exhibit A, ¶11). There was no unique method or standards which Plaintiff required its prospective clients to meet. (Exhibit A, ¶12).

From approximately January of 2017 to February 10, 2020, Warmbir was the head of the IT department of Plaintiff. (Exhibit A, ¶13). During Warmbir's time as head of the IT department of Plaintiff, the IT department employed industry standard practices to service the networks and computer needs of its customers. (Exhibit A, ¶14). The positions, techniques and roles that Plaintiff's IT department utilized are taught and trained by third-party vendors such as TruMethods on a contractual basis. (Exhibit A, ¶15). Plaintiff was not engaging in any service, practice technique or training that was novel or unique in the IT industry. (Exhibit A, ¶14 - 16).

On February 10, 2020, Warmbir resigned as manager of Plaintiff. (Exhibit A, ¶21). Following that, he issued an offer to purchase Plaintiff's IT division. (Exhibit A, ¶22). This offer was rejected on February 14, 2020. (Exhibit A, ¶22). At that time, the remaining managers of

Plaintiff took action to sever Warmbir's access to all of Plaintiff's files and records, despite the fact that Warmbir Technology, Inc. remained a member of Plaintiff. (Exhibit A, ¶23).

On February 17, 2020 Warmbir and his wife Charlotte, organized WITS. (Exhibit A, ¶25). Warmbir set up WITS consistent with industry standard practices, employee positions and techniques as taught by industry vendors such as TruMethods, with whom WITS has its own agreement. (Exhibit A, ¶25).

WITS received applications for employment and subsequently hired former employees from Plaintiff. (Exhibit A, ¶29). The employees hired by WITS were previously employees-at-will of Mavidea. (Exhibit A, ¶29;See the Affidavit of Christopher Boyer, attached as Exhibit J,¶3; See the Affidavit of Michael Cluney, attached as Exhibit K,¶3; See the Affidavit of Eric Even, attached as Exhibit L,¶3; See the Affidavit of Elizabeth Fornero, attached as Exhibit M,¶3; See the Affidavit of Matt Reichert, attached as Exhibit N,¶3; See the Affidavit of Jeffrey R. Shelton, attached as Exhibit O,¶3). While skilled at their respective positions, the employees hired by WITS, were not trained in any unique or novel methods. (Exhibit A, ¶32).

Eventually, Warmbir and WITS sought out business from Plaintiff's customers. (Exhibit A, ¶45; See the Affidavit of Children's Center for Dentistry, PLLC, attached as Exhibit B, ¶7; See the Affidavit of Eastland Lifestyle Center, attached as Exhibit C, ¶7; See the Affidavit of Illinois Corn Growers Association, attached as Exhibit D, ¶7; See the Affidavit of Ken's Truck Repairs, attached as Exhibit E, ¶37; See the Affidavit of Livingston County Chiropractic, attached as Exhibit F, ¶7; See the Affidavit of Tazwell County Resources Center, attached as Exhibit G, ¶7; See the Affidavit of Wesley United Methodist Church, attached as Exhibit H, ¶7; See the Affidavit of Youth Build McLean County, attached as Exhibit I, ¶7). Man of the clients that Warmbir and WITS sought business from were clients with whom Warmbir had pre-existing relationships or

had built a strong personal bond during Warmbir's time with Plaintiff. (See Exhibit A ¶45) Most significantly, no Defendant took any action to obtain any client from Plaintiff or hired any employee of Plaintiff until after February 14, 2020. (See Exhibit A ¶45).

## II.    LEGAL STANDARDS

A preliminary injunction "is an extraordinary and drastic remedy." *Mazurek v. Armstrong*, 520 U.S. 968, 972, 138 L. Ed. 2d 162, 117 S. Ct. 1865 (1997). Its purpose is to minimize the hardship to the parties pending the ultimate resolution of their lawsuit. *Anderson v. U.S.F. Logistics, Inc.*, 274 F.3d 470, 474 (2001). Generally, a party moving for a preliminary injunction must show that (1) its case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted. *Ty. Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). If the party moving for a preliminary injunction makes the threshold showing, the court should balance the harm to the moving party of wrongfully denying the injunction against the harm to the non-moving party in granting the injunction, as well as considering the public interest and the effect on non-parties of granting or denying the requested relief. *Meridian Mutual Insurance Company v. Meridian Insurance Group, Inc.*, 128 F.3d 1111, 1114 (7th Cir. 1997).

## III.    ARGUMENT

The central question in this litigation is whether Warmbir is entitled to compete with Plaintiff in the IT industry, including competing for current clients of Plaintiff, following his resignation as manager. The answer to this question is unequivocally yes, because the Operating Agreement of Plaintiff permits Warmbir to do so. Specifically, Article 1.7 of the Operating Agreement of Plaintiff provides:

"1.7   <u>Independent Activities</u>.      Except to the extent specified in Section 15-3 of the Act, each Member and Manager may, directly or indirectly, independently

or with others, engage in or possess any interest in whatever activities he, she, or it chooses, whether the same as or competitive with the Company or otherwise, without having or incurring any obligation to offer any interest in such activities to the Company or any Member, or to account in any way to any such person." ("Article 1.7"). (See Doc #28, Exhibit A.)

In Plaintiff's Motion, Plaintiff seeks to distract from this central fact by making incendiary statements about actions taken by Warmbir following his resignation. Plaintiff attempts to support its arguments by repeated references to common-law fiduciary duties of corporate officers under Illinois law. Such common-law duties, however, have no relevance to this issue.

Simply put, no Defendant has breached any fiduciary duty, misappropriated any trade secret, or otherwise violated any right of Plaintiff. Accordingly, Plaintiff's Motion must be denied.

A.    **Plaintiff Must Establish a Likelihood of Success on the Merits**

Plaintiff must offer sufficient evidence to show a likelihood of success on the merits. *United States v. Phillips*, 527 F. Supp. 1340, 1343 (N.D. Ill. 1981). In order to show a likelihood of success on the merits, a Plaintiff must do more than offer conclusory statements of Defendant's conduct. *Freudenberg Household Prods. LP v. Time Inc.,* No. 06 C 399, 2006 U.S. Dist. LEXIS 20774, at *23 (N.D. Ill. Apr. 18, 2006).

i.    **Plaintiff has not shown a likelihood of success on the merits of its claims for breach of fiduciary duty.**

Plaintiff cannot show a likelihood of success on the merits on its claim for breach of fiduciary duty because it cannot show that Warmbir breached any fiduciary duty to Plaintiff. Prevailing on a claim for a breach of fiduciary duty requires the complainant to establish that: (1) a fiduciary duty existed; (2) the duty was breached; and (3) the breach proximately caused an injury to the complainant. *Neade v. Portes*, 193 Ill. 2d 433, 444 (2000).

It is undisputed that Plaintiff is a manager-managed limited liability company formed under the Illinois Limited Liability Company Act (the "LLC Act"). Accordingly, Plaintiff is not a

corporation such that common-law propositions concerning officers and their duties dominate this conversation or are even relevant. *800 S. Wells. Commer. LLC v. Cadden,* 2018 Il App (1st) 162882, ¶31. When dealing with limited liability companies and fiduciary duties owed to them, reviewing courts must look "-first, foremost, and primarily" to the LLC Act. *Id.*

**Section 15-3** of the LLC Act states as follows:

"(**b**)A member's duty of loyalty to a member-managed company and its other members includes the following:

(**1**) to account to the company and to hold as trustee for it any property, profit, or benefit derived by the member in the conduct or winding up of the company's business or derived from a use by the member of the company's property, including the appropriation of a company's opportunity;
(**2**) to act fairly when a member deals with the company in the conduct or winding up of the company's business as or on behalf of a party having an interest adverse to the company; and
(**3**) to refrain from competing with the company in the conduct of the company's business before the dissolution of the company.

(**c**) A member's duty of care to a member-managed company and its other members in the conduct of and winding up of the company's business is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

(**d**) A member shall discharge his or her duties to a member-managed company and its other members under this Act or under the operating agreement and exercise any rights consistent with the obligation of good faith and fair dealing.

(**e**) A member of a member-managed company does not violate a duty or obligation under this Act or under the operating agreement merely because the member's conduct furthers the member's own interest.

….

(**g**) In a manager-managed company:

(**1**) a member who is not also a manager owes no duties to the company or to the other members solely by reason of being a member;
(**2**) a manager is held to the same standards of conduct prescribed for members in subsections (b), (c), (d), and (e) of this Section;…" 805 ILCS 180/15-3.

Notably, Section 15-3 of the LLC Act does not adopt common-law duties of fiduciary duty applicable to directors and officers of corporations. Instead, Section 15-3 of the LLC Act specifically provides the limits of members and managers fiduciary duties. When a statute governs a court's analysis, it is well established that it is the duty of the court to ascertain and give effect to the intent of the legislature via that statute's language, which, when clear, is the best indicator of legislative intent. *800 S. Wells. Commer. LLC v. Cadden,* 2018 Il App (1st) 162882, ¶31.

Section 15-5 of the LLC Act allows a limited liability company to "enter into an operating agreement to regulate the affairs of the company in the conduct of its business and to govern relations among the members, managers, and company. *800 S. Wells Commer. 2018 Il App (1rst) 162882,* ¶34. citing *805 ILCS 180/15-5(a).* The LLC Act applies to the extent that the company's operating agreement does not, to fill in any gaps. *Id.* If executed, an operating agreement comes to control. *Id.* Except in specific circumstances identified in 805 ILCS 180/15-5, the Operating Agreement may modify any provision of the LLC Act governing relations among the members, managers, and company. *Id.* An operating agreement may restrict or eliminate a fiduciary duty, other than the duty of due care described in subsection (c) of Section 15-3, if the restriction or elimination is clear and unambiguous. *805 ILCS 180/15-5(c)(1).* The operating agreement may also identify specific types or categories of activities that do not violate any fiduciary duty. *805 ILCS 180/15-5(c)(2).*

In this case, the members of Plaintiff entered into the Operating Agreement which explicitly established the fiduciary duties of Plaintiff's members and managers. Most significantly, by including Article 1.7 which permits members or managers of Plaintiff to engage in or own any competitive interest that the member or manager chooses, Plaintiff's Operating Agreement limited the requirements of Section 15 – 3 of the LLC Act. (See Doc #28, Exhibit A.) It is also significant

that Article 5.2 of the Operating Agreement provides that a manager of Plaintiff will cease to be a manager upon the manager's resignation. (See Doc #28, Exhibit A.) Therefore, applying the various relevant provisions of the Operating Agreement in conjunction with Section 15 – 3 of the LLC Act, it is clear that after his resignation as manager, Warmbir is entitled to own and engage in competitive actions with Plaintiff.

Nothing in the Operating Agreement or the LLC Act provides that a former manager has any ongoing fiduciary duty to Plaintiff following a resignation. The Operating Agreement does, however, include Article 10.11 which states that the Operating Agreement constitutes the entire agreement and understanding among the company, managers, members and supersedes any prior understandings. (See Doc #28, Exhibit A.) Therefore, Plaintiff cannot argue that any fiduciary duty Warmbir may have had as manager extended beyond the date of his resignation on February 10, 2020. To do so would require this court to insert language into either the terms of the Operating Agreement or the language of Section 15-3 that simply does not exist. If the contract imports on its face to be a complete expression of the whole agreement, it is presumed that the parties introduced into it every material item, and parole evidence cannot be admitted to add another term to the agreement. *Sunstream Jet Express Inc. vs. International Air Service Co. Ltd*. 734 F. 2d 1258, 1265 (7th Cir. 1984)( citing *Pecora v. Szabo*, 94 Ill App 3d 57, 63, (1981)).

When viewed in totality, Warmbir had specific fiduciary duties outlined in Section 15-3 of the LLC Act during the time in which he was a manager of Plaintiff. Those fiduciary duties terminated upon Warmbir's resignation as manager and Warmbir is now unequivocally free to compete with Plaintiff pursuant to the plain language of Article 1.7. Had Plaintiff wished to prevent Warmbir from competing following his resignation from Plaintiff, Plaintiff could have

included a non-compete or non-solicitation provision in the Operating Agreement. It did not do so.

In Plaintiff's Verified Amended Complaint and in the Affidavit of Jake Davis executed in support of Plaintiff's Motion, Plaintiff identifies various activities that it believes constitute a breach of fiduciary duty by Warmbir.  Many of these allegations are vague allegations made on information and belief regarding what Plaintiff believes Warmbir did prior to his resignation. Warmbir denies these accusations. The other category of accusations consists of claims that Warmbir has competed with Plaintiff following his resignation. When viewed under the correct standard for assessing Warmbir's fiduciary duty, none of these actions amount to a breach as Warmbir owed no duty that these actions could violate. Moreover, for the first category of allegations, Plaintiff has no evidence that such activities actually incurred. The second category of allegations constitute competition which Warmbir is entitled to engage in.

In an effort to circumvent Warmbir's lack of fiduciary duty, Plaintiff repeatedly attempts to apply common-law fiduciary duties that Illinois courts have applied to corporations to the facts of this case. Plaintiff asserts in a foot note on page 5 of its Memorandum that "fiduciary duty cases that discuss the duties for corporate officers or Board of Directors members are controlling in this case".  *See Doc. 32, pg. 6.* As noted by the 1st District Court, however, "nothing could be further from the truth".  *800 S. Wells. Commer. LLC v. Cadden,* 2018 Il App (1st) 162882, ¶34. (A plaintiff's assertion that the LLC Act was not intended to supplant the common law concept that an officer of a corporation owes a fiduciary duty to that corporation could not be further from the truth.")

The sole case that Plaintiff cites pertaining to the fiduciary duty of members and managers of the LLC Act is the unreported case of *Oliver v. Isenberg*, 2019 IL App (1st) 181551-U. This

case does not support Plaintiff's contentions. On the contrary, the Court in that case did not contradict the holding in *800 S. Wells. Commer. LLC v. Cadden,* 2018 Il App (1st) 162882.

Even if the Court were to find that rules regarding corporate fiduciary obligations apply to an LLC, it is still apparent that the cases cited by Plaintiff are inapplicable. All of those cases involve special facts and circumstances that are inapplicable in this case because the facts show that Warmbir took no actions prior to resigning as manager and as shown in the section on trade secrets, there were no trade secrets or special facts or circumstances at issue here.

      **ii.    As Warmbir was entitled to compete and owed no fiduciary duty following his resignation as manager of Plaintiff, Plaintiff cannot show a likelihood of success on the merits on its breach of fiduciary duty count.**

Plaintiff has not shown a likelihood of success on the merits of its claim for violation of the Illinois Trade Secrets Act. In order to establish a violation of the Illinois Trade Secrets Act (ITSA), a plaintiff is required to establish the information "was (1) a trade secret; (2) misappropriated; and (3) used in the defendant's business. *Sys. Dev. Servs. v. Haarmann*, 389 Ill.App.3d 561, 571, (5th Dist. 2009). The ITSA defined a "trade secret" as follows:

> "(d) "Trade Secret" means information, including but not limited to technical or non-
> technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers that:
> (1) is sufficiently secret to derive economic value, actual or potential, form not being generally known to other persons who can obtain economic value from its disclosure or use; and
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality. *765 ILCS 1065/2.*

Whether the information sought to be protected qualifies as a trade secret focuses fundamentally on the secrecy of such information. *Sys. Dev. Servs. v. Haarmann*, 389 Ill.App.3d 561, 572. (5th Dist. 2009). The ITSA also recognizes that in a competitive market, employees must

be allowed to use their general knowledge and skills they acquire through experience in pursuing their chosen occupations. *Id.* The information at issue must be substantially secret to both its owner and its competitors because of its relative secrecy. *Id.* This requirement precludes protection for information not generally known to the public but clearly understood in a particular industry. *Id.* Where customer information is readily available to competitors through normal competitive means, no protectable interest exists. *Id.* A product or service that is within the realm of general skills and knowledge of industry cannot be a trade secret. *Id.*

The fact that Plaintiff's customer list, contracts and knowledge of the systems used by its customers do not constitute protectible trade secrets is conclusively shown by *Sys. Dev. Servs. v. Haarmann*, 389 Ill.App.3d 561 (5th Dist. 2009). In *Sys. Dev. Servs. v. Haarmann*, the 5th District Court reversed an injunction that was issued against a defendant that provided computer network services to businesses in the area on the grounds that the plaintiff's customer list and knowledge of its customer's computer systems and system requirements were not trade secrets under the ITSA. *Id.* at 578 – 579. The plaintiff in *Sys. Dev. Servs. v. Haarmann* was a corporation that furnished computer network services to businesses in central Illinois. *Id.* at 562. The defendants in the case consisted of four former employees of the plaintiff who started their own competing computer company. *Id.* The plaintiff accused the defendants of violating the ITSA by misappropriating, disclosing, using, and acquiring the plaintiff's customer list, manuals, marketing plans, profitability analysis pricing plans and determinations, and knowledge of the plaintiff's customer computer systems and system requirements. *Id.* Representatives of the plaintiff testified that plaintiff obtained the names of potential customers by making cold calls, attending business networking events and utilizing Chamber of Commerce lists and that the plaintiff's customer list represented 20 years of effort and work. *Id.* at 569. The defendants left the plaintiff to form their

own computer networking business. *Id.*at 568. Following the creation of the defendants' competing business, various customers of the plaintiff discontinued their service with the plaintiff and transitioned to defendant's competing venture. *Id.* Some of the customers that transitioned to the defendants had personal relationships with the defendants, while others chose to work with the defendants because they were personally familiar with the defendants and wanted to continue to use their services. *Id.*at 569-570.

On appeal, the 5th District Court noted that computers and computer networks are common business tools and all businesses are potential customers of computer network services. Locating potential customers is merely a matter of identifying businesses in a particular town, county, or area and looking up their contact information. This information is easily obtained from telephone directories, Chamber of Commerce directories, the Internet, and a variety of other sources. *Id.* The plaintiff's client list encompassed a wide range of business. *Id.* The plaintiff's competitors could quickly identify potential customers by referring to directories and other sources. *Id.* The evidence further demonstrated that defendants were able to lure customers away from the plaintiff because of personal relationships they developed with people at the businesses they serviced. *Id.* The Court also found that the information concerning the plaintiff's customers' computer systems, passwords, and networks "was the customer's own information," and the Plaintiff, "cannot control what a customer does with its own information." *Id.* at 577. The Court ultimately held that the defendants' knowledge of the customers' individual computer systems was akin to general skills and knowledge acquired in the course of employment. *Id.* at 577 citing *Midwest Micro Media, Inc. v. Machotka,* 76 Ill. App. 3d 698, 704 (5th Dist. 1979) ("knowledge of the individual customers is closely akin to his personal skills and abilities as a salesman and thus cannot be considered plaintiff's property.) The defendants could not be compelled to erase from their minds the

knowledge gained from working on a particular piece of computer equipment. *Id.* Lastly, the Court noted that plaintiff could have requested that the defendants sign restrictive covenants but did not do so. *Id.* at 578. The court noted that "it would really be unfair competition to allow the employer without such a covenant to obtain trade secret status for the fruits of ordinary experience in the business, thus compelling former employees to reinvent the wheel as the price for entering the competitive market". *Id.* at 578. citing *Fleming Sales Co v. Bailey.,* 611 F Supp. 507, 509 (N.D. Ill 1985).

      The facts of *Sys. Dev. Servs. v. Haarmann* are directly analogous to the facts of this case. Like the client list in *Sys. Dev. Servs. v. Haarmann*, Plaintiff's client list does not constitute a trade secret. The clients on Plaintiff's client list consist of a wide variety of businesses across a broad spectrum of industries. The only common denominator is that they all have computers. Anyone wishing to contact Plaintiff's clients need only do a minimum of internet research or consult a phone book. Likewise, Plaintiff cannot argue that its contract terms or pricing constitute trade secrets because there is no evidence to suggest that Plaintiff's contract terms or pricing are unique or not generally known to others in the business. In fact, Plaintiff's techniques and pricing model, as of the date of Warmbir's resignation as manager, were developed by TruMethods, which taught them to Plaintiff for a fee. Moreover, Plaintiff's contracts cannot be deemed trade secrets as it provides its contracts to third parties for signature putting its contract terms into the public domain. After doing so, it cannot claim that such terms are sufficiently secret to warrant trade secret protection. Likewise, Plaintiff cannot argue that its knowledge of the networks of its customers constitutes a trade secret. That specific information belongs to the customers, not Plaintiff.

      Plaintiff argues that its client list is sufficiently secret to constitute a trade secret because it had a staffer cold-call thousands of prospective clients over the course of a year. Plaintiff argues

that these efforts differentiate its client list from the list in *Sys. Dev. Servs. v. Haarmann*. This assertion is inaccurate, as the plaintiff in *Sys. Dev. Servs. v. Haarmann* had crafted its client list over the course of twenty years. The simple fact of the matter remains that Plaintiff's clients can be identified by doing basic research on the phone or internet, calling each business and asking basic questions regarding the client's system and needs. The Plaintiff's client list, therefore, does not constitute a trade secret. *Office Mates 5, North Shore, Inc. v. Hazen,* 234 Ill. App. 3d 557, 575 (1992).

The cases cited by Plaintiff's are unavailing. Each of those cases involves industries with unique and diffuse customers that are difficult to locate. That is not the case here. Plaintiff is performing basic IT services for customers from a variety of industries. This does not entitle Plaintiff's customer list to trade secret protection.

### iii. Plaintiff has not shown a likelihood of success on the merits of its claim for violation of the Defend Trade Secrets Act.

Plaintiff cannot show a reasonable likelihood of success under the Defend Trade Secrets Act (DTSA) for the same reason it cannot show a violation of the ITSA. The Plaintiff concedes that the DTSA does not include customer lists on its list of trade secrets. The only cases cited by Plaintiff with respect to the DTSA are only cited for the proposition that the same standards apply to the DTSA as apply to the ITSA.

Given the similarities between the DTSA and the ITSA, the same reasons that mandate that Plaintiff's claims fail under the ITSA also mandate that that Plaintiff's claims under the Defend Trade Secrets Act must also fail.

     **iv.**    **Plaintiff has failed to show a likelihood of success on the merits on its claims for tortious interference with Contract or business expectancy**.

          **a.**    **Plaintiff cannot show a reasonable probability of success on the merits on its claim for tortious interference with its customer contracts or business expectancy.**

Plaintiffs allege both tortious interference with business expectancy and its contractual rights. In its Motion, Plaintiff concedes that each of the applicable customer contracts are terminable at will. Illinois courts have held that "An action for tortious interference with a contract terminable at will is classified as one for intentional interference with prospective economic advantage. *Fellhauer v. City of Geneva* 142 Ill. 2d 495, (1991). Accordingly, although Plaintiff has plead a claim for both tortious interference with contract and tortious interference with business expectancy, the claims are evaluated the same.

To prevail in such an action, a plaintiff must prove: "(1) his reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference.' *Fellhauer,* 142 Ill. 2d at 511." Moreover, to prevail on the claim, a plaintiff must show not merely that the defendant has succeeded in ending the relationship or interfering with the expectancy, but "'purposeful interference,'" meaning the defendant has committed some impropriety in doing so. *Dowd & Dowd, Ltd v Gleason,* 181 Ill. 2d 460, 485 (1998) quoting Restatement (Second) of Torts § 766B, Comment a (1979). Under Illinois law, acts of impropriety are generally defined as including "fraud, deceit, intimidation, or deliberate disparagement." *Belden Corp. v. Internorth, Inc.* 90 Ill. App. 3d 547, 553 (1rst Dist. 1980).

In this case, Plaintiff cannot show that Defendants purposefully interfered with Plaintiff's purported business expectancy with its customers. Plaintiff has made no showing that Warmbir

acted with fraud, deceit, intimidation or deliberate disparagement in his competition with Plaintiff. Plaintiff makes only a few conclusory allegations but those allegations are inconsequential insofar as they fail to provide any legitimate factual basis to support them.

Additionally, Warmbir's actions fall within the established privilege of competition. The privilege to engage in business and to compete allows one to divert business from one's competitors generally as well as from one's particular competitors provided one's intent is, at least in part, to further one's business and is not solely motivated by spite or ill will. *Miller v. Lockport Realty Group, Inc.*, 377 Ill. App. 3d 369, 377 (1st Dist. 2007). That privilege extends to the tort of interference with a prospective business relation or economic advantage. *Galinski v. Kessler* (1985), 134 Ill. App. 3d 602, 610 (1st Dist. 1985) ("the right to engage in a business relationship is not absolute, and must be exercised with regard to the rights of others").

In this case, the facts show that the conduct of Warmbir and WITS were motivated by a desire to further their own business interests. Plaintiff attempts to plead around this privilege by alleging fraudulent conduct by Warmbir, including allegations of Warmbir's discontentment with Plaintiff prior to Warmbir's resignation as manager. Such allegations do not defeat Warmbir's privilege of competition as they do not demonstrate that Warmbir's actions are not at least partially motivated by his own legitimate business interests.

      **b.**    **Plaintiff cannot show a reasonable probability of success on the merits on its claim for tortious interference with its employee contracts or business expectancy.**

To state a claim for tortious interference with contractual relations, a plaintiff must show: (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the

defendant's wrongful conduct; and (5) damages. *Belden Corp. v. Internorth, Inc.*, 90 Ill.App.3d at 551.

Postemployment restrictive covenants are carefully scrutinized by Illinois courts because they operate as a partial restriction on trade, and Illinois courts abhor restraints on trade. *McInnis v. OAG Motorcycle Ventures, Inc.*, 2015 IL App (1st) 142644, ¶ 26, 394 Ill. Dec. 107, 394 Ill. Dec. 107. A restrictive covenant, assuming it is ancillary to a valid employment relationship, is reasonable only if the covenant: (1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee; (2) does not impose undue hardship on the employee-promisor, and (3) is not injurious to the public. *Id.* A blanket bar on all activities for competitors in an employer's noncompetition covenant is void because if a former employee were working in "an entirely noncompetitive capacity, he would still be violating the terms of the contract". *Cambridge Eng'g, Inc. v. Mercury Partners 90 Bl, Inc.*, 378 Ill.App.3d 437, 455 (1st Dist. 2007).

Plaintiff asserts that Warmbir has tortuously interfered with its employee agreements with three of its former employees. First, Plaintiff's argument fails as the employees have not breached the terms of their agreements. The agreements prohibit competition "directly or indirectly" with Plaintiff for one year following the termination of the employee's employment. The agreements define "directly or indirectly" to mean that the employee will derive some benefit from an affiliation or consultant with any business that is engaged in the microfilm, printer or distribution business. (See Doc. #34, Exhibit A-1; D-3; E-2). Neither the employees nor any Defendant are engaged in such a business. Moreover, none of the employees are using trade secrets of Plaintiff or soliciting clients of Plaintiff. Accordingly, Plaintiff cannot succeed on its claims as no breach of the contract has occurred.

Further, the agreements are void as they have a geographic range of "wherever the internet touches". (See Doc. #34, Exhibit A-1; D-3; E-2). This range is so broad as to function as a total restraint on trade for the employees. By the terms of the Agreement, if this range is deemed to broad, the range becomes the state of Illinois or any state that borders or touches Illinois. Even this default range is clearly so broad as to render the covenant unenforceable.

Lastly, if Plaintiff were truly concerned about the enforceability of its contracts with its former employees, it could easily have sought a TRO or injunction against the employees directly. It has not done so. (Exhibit "A", ¶33).

Accordingly, Plaintiff cannot show a likelihood of success on the merits in its claim for tortious interference with contract. Additionally, any claim that Warmbir has tortuously interfered with a business expectancy Plaintiff may have had in its at-will employees fails for the same reason that Plaintiff's claims for tortious interference with its business expectancy in its customers fails.

> iv.    **Plaintiff has not shown a reasonable chance of success on the merits of its claim for Breach of the Operating Agreement.**

In its claim for breach of contract, Plaintiff cites to the duties of a manager and the duties of a member in the Operating Agreement. As discussed above, Warmbir took no action in furtherance of any competitive venture until after he resigned as manager. Per the plain language of the Operating Agreement, Warmbir ceased to be a manager upon his resignation. Nothing in the language of the Operating Agreement provides that Warmbir has any ongoing obligation following his resignation as manager. Moreover, Warmbir is not, himself a member of Plaintiff.

Plaintiff has only insufficient conclusory allegations premised upon information and belief to support that Warmbir took any action prior to his resignation. "Allegations on information and belief are insufficient to support an injunction order." *Bowles v. Montgomery Ward & Co.*, 143 F.2d 38, 43 (7th Cir. 1944); See also *Phelan v. Wright* 54 Ill. App. 2d 178, 181, (1964). As the

Operating Agreement does not provide him with any contractual obligations following his resignation, Plaintiff cannot show there is any chance of success on the merits on this count.

> **v.      Plaintiff does not have a reasonable success on the merits on his claim for violation of the Illinois Cable Piracy Act.**

Warmbir has filed a motion to dismiss Plaintiff's claim for violation of the Illinois Cable Piracy Act pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Doc. #37.* Warmbir incorporates by reference the arguments made in that motion.

As discussed in greater detail in that motion, Plaintiff's claim fails because it cannot show that 720 ILCS 5/16-18(a)(6)(E) applies to this case. The Plaintiff concedes that for purposes of the statute, Verizon is the relevant telecommunications service provider and therefore cannot show that Warmbir deprived Plaintiff, or acted with the intent to deprive Plaintiff, of any charge for telecommunications service because Plaintiff was not the provider of that service. Plaintiff has no likelihood of success on the merits of this claim.

> **B.      Plaintiff Has an Adequate Remedy at Law and Will Not Suffer Irreparable Harm**

"Irreparable Harm is harm which cannot be repaired, retrieved, put down again, atoned for . . .[t]he injury must be of a particular nature, so that compensation in money cannot atone for it." *Graham v. Medical Mut. Of Ohio, you now* 130 F.3d 293, 296 (7th Cir. 1997). In this Circuit, a "general rule" applies which states that "a defendant's ability to compensate plaintiff in money damages precludes issuance of a preliminary injunction." *Signode Corp. v. Weld-Loc Sys., Inc.,* 700 F.2d 1108, 1109 (7th Cir. 1983.) If proof of particular injuries can be supplied, then the injury is reparable by money damages. *Hess Newmark Owens, Wolf, Inc v. Owens* 415 F. 3d 630, 632 (7th Cir. 2005). Delay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered.

*Ty, Inc. v. Jones Group Inc.*, 237 F.3d 891, 902-902 (7th Circ. 2001). Moreover, injunctive relief is inappropriate where a large part of the harm, from which all the harms alleged by a party would flow, has already happened, and is beyond the court's power to remedy this harm with injunctive relief. *Argonaut Ins. Co. v. Broadspire Servs.*, No. 05 C 0218, 2005 U.S. Dist. LEXIS 8278.

Plaintiff cannot show that it has an no adequate remedy at law so it would suffer irreparable harm if an injunction is not granted. Plaintiff cites to the 7th Circuit's holding in *Foodcomm Int'l v Barry 328 F3d 300, 2003* in support of this position. Two years after *Foodcomm Int'l v Barry*, the Seventh Circuit Court held that if proof of particular injuries can be supplied, harm is reparable by damages. *Hess Newmark Owens Wolf, Inc. v. Owens,* 415 F.3d 630, 632 (7th Cir. 2005)

Plaintiff provided in detail a precise itemization of lost revenues from the clients that have transferred to Warmbir IT Solutions, LLC. (See Plaintiff's Answer to Interrogatory No. 6, 12 attached as Exhibit P). Because Plaintiff has already admitted the precise amount of monetary damages that it has lost from each client that transferred to WITS, it is inappropriate to grant injunctive relief with regard to those clients.

Warmbir resigned as manager on February 10, 2020. Despite the fact that Plaintiff knew that customers were transferring to WITS, it took no action to even attempt to stop that until filing Plaintiff's Motion. There is no evidence before this Court that the customers who transferred to WITS will return to Plaintiff if this court enjoined WITS from continuing to work with them. Therefore, granting an injunction prohibiting these customers from working with WITS will likely provide no relief to Plaintiff. The only available relief is monetary damages and clearly the Plaintiff has already determined what it believes those damages to be.

Accordingly, Plaintiff cannot show an inadequate remedy at law or that it will suffer irreparable harm without the entry of an injunction.

**C.**     **Even if Plaintiff has Successfully Demonstrated the Elements that Would Otherwise Entitle Plaintiff to a Preliminary Injunction, the Harm to Defendants Outweighs the Harm Allegedly Suffered by Plaintiff.**

Even if the moving party demonstrates a likelihood of success on the merits, no adequate remedy at law, and irreparable harm, the Court must then balance the irreparable harm the moving party will suffer if the injunction is denied, and the public interest, i.e. the effect that granting or denying the injunction will have on the defendant and non-parties. *Valencia v. City of Springfield, Ill.*, 888 F.3d 959, 965 (7th Cir. 2018); *see also Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1067 (7th Cir. 1994); *Wis. Music Network v. Muzak Ltd.,* 5 F.3d 218, 221 (7th Cir. 1993).

For the reasons discussed above, if this Court finds that Plaintiff has some possibility of success on the merits, at best those chances could be said to be little better than negligible. Accordingly, the balance of harm to the Plaintiff from not entering the injunction must strongly outweigh the balance of harm to the Defendants and non-parties from entering the injunction.

In this case, the potential harm to the Defendants outweighs any potential harm to Plaintiff. An injunction prohibiting WITS from servicing customers who transferred from Plaintiff will only harm those customers without providing any benefit to Plaintiff. This harm will be inflicted after Plaintiff waited months to file this injunction allowing these customers to reasonably believe that it raised no objection to the transfer. Thus, the benefit to Plaintiff from granting an injunction against Defendants with regard to those customers is virtually nonexistent but the harm to customers from losing their IT services is significant.

In addition, if an injunction is entered which prohibits WITS from servicing these customers or utilizing funds from the service of these customers, it will have a serious, negative and potentially fatal impact on WITS. (Exhibit "A"**, ¶**47)**.**

### D. Plaintiff's Proposed Injunction harms the public interest.

Similarly, Plaintiff's proposed injunction negatively impacts the public interest by denying customers the right to receive services from the IT provider of their choice. Accordingly, the impact on the public good favors denial of Plaintiff's motion for injunction.

### E. Bond

Plaintiff requests that this Court order a $25,000 bond. This amount, however, is clearly inadequate to compensate Defendants in the event that the court enters an injunction and later finds that injunction was entered inappropriately. Defendants ask that if an injunction is granted, a bond be awarded in an amount that fairly and adequately protects Defendants from the economic loss they will incur in the event that such injunction is found to have been improperly granted.

## IV. CONCLUSION

WHEREFORE, for the reasons stated herein, Defendants, Jamie Warmbir, Charlotte Warmbir and Warmbir IT Solutions, LLC respectfully ask this Court to deny Plaintiff's Motion For Temporary Restraining Order and Preliminary Injunction and for whatever other relief this Court deems just and proper.

Dated: August 24, 2020

JAMIE WARMBIR, CHARLOTTE WARMBIR, WARMBIR IT SOLUTIONS, LLC, Defendants

/s/ A. Christopher Cox_____

A. Christopher Cox
ARDC# 6296142
christophercox@cxflegal.com
J. Harrison Fulk
ARDC# 6292850
jakefulk@cxflegal.com
Cox & Fulk, LLC
202 North Center Street
Bloomington, IL 61701
(309) 828-7331

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing Memorandum complies with the word count provisions of C.D.LR 7.1 in that it contains 6,907 words.

JAMIE WARMBIR, CHARLOTTE WARMBIR, WARMBIR IT SOLUTIONS, LLC, Defendants,

Defendants

/s/ A. Christopher Cox_____

A. Christopher Cox
ARDC# 6296142
christophercox@cxflegal.com
J. Harrison Fulk
ARDC# 6292850
jakefulk@cxflegal.com
Cox & Fulk, LLC
202 North Center Street
Bloomington, IL 61701
(309) 828-7331

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on August 24, 2020 I electronically filed the foregoing documents with the Clerk of Court using the CM/ECF system that will send notification of such filing(s) to the following:


Jason Bartell                 Email:  jbartell@bartellpowell.com


Michael Powell            Email:  mpowell@bartellpowell.com


                           <u>/s/ A. Christopher Cox</u>

A. Christopher Cox
ARDC# 6296142
christophercox@cxflegal.com
J. Harrison Fulk
ARDC# 6292850
jakefulk@cxflegal.com
Cox & Fulk, LLC
202 North Center Street
Bloomington, IL 61701
(309) 828-7331