UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| MAVIDEA TECHNOLOGY GROUP, LLC | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Case No.    1:20-CV-1139 ) |
| JAMIE WARMBIR; CHARLOTTE WARMBIR; WARMBIR IT SOLUTIONS, LLC, an Illinois limited liability company; | ) ) ) ) JURY TRIAL REQUESTED ) |
| Defendants. | ) |

### RESPONSE AND MEMORANDUM OF LAW TO DEFENDANT'S MOTION TO DISMISS COUNTS VIII AND IX

NOW COMES the Plaintiff, MAVIDEA TECHNOLOGY GROUP, LLC, by and through its counsel, Bartell Powell LLP, for its Memorandum of Law in Support of Plaintiff's Response to Defendant's Motion to Dismiss Counts VIII and IX, respectfully states to the Court as follows:

**A. Count VIII properly states a claim for violation of the Illinois Cable Piracy Act (ICPA).**

Plaintiff alleges in paragraph 132 that Mr. Warmbir violated 120 ILCS 5/16-18(a)(6)(E), which states:

> "(a.) Injury to wires or obtaining service with intent to defraud.  A person commits injury to wires or obtaining service with intent to defraud when he or she knowingly:
>
> (6) obtains, or attempts to obtain, any telecommunications service with the intent to deprive any person of the lawful charge, in whole or in part, for any telecommunications service:

(E) by any other trick, stratagem, impersonation, false pretense, false representation, false statement, contrivance, device, or means."

Defendant argues that the ICPA's definition of "Communication service" and "Communication service provider" suggest that there is no violation of the ICPA because Plaintiff has not and cannot allege that (1) Plaintiff is a communications service provider within the meaning of the ICPA and (2) Plaintiff's telephone was a communications service within the meaning of the ICPA or that (3) Warmbir attempted to deprive Plaintiff of the lawful charge for a telecommunications service.

However, in this context, the statute cited by the Defendant states clearly that the violation occurs against anyone who "obtains, or attempts to obtain, any <u>telecommunications service</u>" (emphasis added) and not Communication service. "Telecommunications service" is not defined. "Telecommunications" is simply defined in Merriam-Webster dictionary as "communication at a distance." The definition of "communication service" cited by the Defendant in the statute under 720 ILCS 5/16.01 holds that it includes service "… of any nature by telephone, including cellular telephones … and also any service lawfully provided by any radio, telephone…" Given that the Plaintiff complains about the Defendant taking its cellular phone and service, Plaintiff's *Amended Complaint* clearly satisfies the statute in terms of the subject matter that the statute pertains to.

The Defendant seems to suggest that the Plaintiff has the burden of showing that the Plaintiff is a "Communications Service Provider" within the meaning of the ICPA. The Plaintiff sees no statutory language that requires it to do so. Although it is a defined term in the statute, the term is not used in the portion of the statute that Plaintiff cites to in its *Amended Complaint*. In fact, the statute makes clear that it is only acts complained of under 720 ILCS 5/16-18**(b)**, <u>not</u>

720 ILCS 5/16-18**(a)** that pertain to communication service providers (ie. 720 ILCS 5/16-18(b)(1) which makes it unlawful when a person "(1) obtains or uses a communication service without the authorization of, or compensation paid to, the communication service provider." Additionally, the statute does not require the person bringing the claim to be a "Communications Service Provider."

### B. Count IX properly states a claim for violation of the RICO Act.

The Defendant states that "A pattern of racketeering activity consists of at least two predicate acts of racketeering committed within a ten year period," citing *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1019 (7th Cir. 1992). Defendant also states that the Plaintiff must allege a "pattern of racketeering activity," and that the predicate acts must be related to one another (the relationship prong) and pose a threat of continued criminal activity (the continuity prong). *Id.* Defendant suggests that Plaintiff does not provide specific allegations identifying whether Warmbir's alleged "pattern of racketeering activity" represents a closed or open-ended scheme. The Plaintiff disagrees and believes it has sufficiently plead the facts concerning an open-ended scheme.

First, there is not a case that states the Plaintiff must identify whether a scheme is "closed" or "open." The Seventh Circuit balances six factors identified in *Morgan v. Bank of Waukegan*, where the length of time the scheme took place is one of those factors. *Morgan vs. Bank of Waukegan*, 804 F.2d 970 (7th Cir. 1986). "Neither the presence or absence of any one of these factors is determinative" in the Seventh Circuit. *Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.* 63 F.3d 516, 524 (7th Cir. 1995). A litigant can maintain a RICO claim arising from acts occurring over only a short period of time "so long as there is a threat that conduct will recur in the future." *Corley v. Rosewood Care Center, Inc.* 142 F.3d 1041 (7th Cir. 1998). Such

threat exists when 1) a specific threat of repetition exists, 2) the predicates are a regular way of conducting an ongoing legitimate business, or 3) the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes. *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771 (7th Cir. 1994). In this case, Paragraph 39 of Plaintiff's Amended Complaint clearly identifies this as an ongoing scheme:

> 39) On February 10, 2020 Jamie Warmbir set his plan into action, relinquishing his authority to act as a manager/agent of Mavidea. He informed the remaining managers that they had the next four business days to either 1) sell the IT Division to him for the price that he demanded, or 2) that he would take the customers and employees without paying them anything for it. He informed them that his new competing business was ready to service customers immediately after any denial to sell it to him at his price.

The threat of taking the customers and the employees without paying the Plaintiff for them was a specific threat that repetitive actions would be implemented. The only way that it would be possible to take all of the employees and all of the customers of the IT department would be to take the customer lists and the confidential contracts of Mavidea and utilize the trade secrets they contained, one by one. Each contract was a separate trade secret that required contacting separate parties and interfering into a separate relationship. Each contact was subject to a separate non-disclosure agreement that was contained within the contract with each customer. The rates, timeline, and work to be performed was also different with each customer.

In Paragraph 41, the Plaintiff asserts that Mr. Warmbir did an act that is the subject of Count VIII and is includable as a predicate act:

> 41) After learning that the Company wanted his phone and phone number back, he secretly contacted Verizon and posed as an Agent/Manager of Mavidea, even though he had already resigned such authority. He requested that Verizon transfer the telephone number from the account that Mavidea owned to a personal account that only he was in control of.

Paragraph 45 sets forth the scheme that was used for enticing each employee by using Mavidea's trade secrets:

45) Jamie Warmbir created a scheme whereby he would create positions at his new company for each of the employees of the Mavidea IT Department, with the exception of one individual who was retiring.  For each of the positions, Jamie Warmbir would create a job description that was tailored specifically for the employee he was trying to move over to his company.  Jamie Warmbir would then post a solicitation for that job in which each employee was then to "apply" for the position.  However, these solicitations were merely a ruse to make it appear that a legitimate job search process was occurring, when in actuality Jamie Warmbir knew these posts were to specifically solicit the team that he supervised at Mavidea.

Paragraphs 52, 53 and 55 detailed the actions taken with each customer

52) Jamie Warmbir immediately upon opening his business undertook an effort, using the customer names, backgrounds, contract terms, pricing data and other customer information, to have Mavidea's customers terminate their contracts with Mavidea and sign new contracts at his new venture.  In order to encourage them to terminate their contract with Mavidea, he commonly used the pitch that the employees who knew how to service their account were now employed by him and that Mavidea no longer had the ability to effectively and efficiently provide them services.

53) Within a few short weeks, Jamie Warmbir's efforts had resulted in eleven contract terminations with Mavidea.  In many cases, he provided them with a script they should use to terminate their contract with Mavidea and gave them specific advice on when and how they should terminate.  Attached as Exhibit "C" and incorporated herein is one such dialogue where Jamie Warmbir recommended specific action based on their contract with Mavidea.  The contracts that were terminated had been executed by Jamie Warmbir on behalf of Mavidea while he was a Manager.

55) Jamie Warmbir immediately undertook an effort, using the prospective customer names, backgrounds, prospective pricing data and other customer information to have Mavidea's prospective customers come to sign contracts with him instead of Mavidea.

The Amended Complaint identifies that there were at least 11 separate instances of trade secrets related to customers being taken (Amended Complaint ¶87), 5 separate instances of trade secrets related to employees being taken (Amended Complaint ¶47, 49, 50), and 1 instance of (Amended Complaint ¶41).  Moreover, the assertion that the Defendant claimed that his actions would continue until ALL of the customers and employees were taken suggests that the scheme will continue until this court puts an end to it or when every last contract is taken as a trade secret

and exploited for the Defendant's benefit.  Thus, clearly an open ended scheme has been alleged and the RICO claim is proper.

## CONCLUSION

WHEREFORE, for the reasons stated herein, the Defendant's Motion to Dismiss should be denied and for such other relief as this Court deems just and proper.

Dated: September 1, 2020                     Respectfully Submitted,


                                             Bartell Powell LLP

                                             /s/ Jason S. Bartell
                                             Jason S. Bartell, a partner of the firm

                                             ATTORNEYS FOR THE PLAINTIFF


Jason Bartell, ARDC# 6255602
Bartell Powell LLP
10 East Main Street
Champaign, IL  61820
(217) 352-5900
Facsimile (217) 352-0182
Email: jbartell@bartellpowell.com

Michael Powell, ARDC# 6257615
Bartell Powell LLP
207 West Jefferson St. Ste. 602
Bloomington, IL  61701
(309)807-5275
Facsimile (309)807-5015
Email: mpowell@bartellpowell.com

CERTIFICATE OF SERVICE

    I hereby certify that on September 1, 2020, I electronically filed the foregoing Response and Memorandum to Defendant's Motion to Dismiss with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following attorneys:

A. Christopher Cox
Cox & Fulk, LLC
2020 N. Center
Bloomington, IL 61701

                                              /s/ Jason S. Bartell