## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MAVIDEA TECHNOLOGY GROUP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-1139-JES-JEH |
| | ) | |
| JAMIE WARMBIR; CHARLOTTE | ) | |
| WARMBIR; and WARMBIR IT | ) | |
| SOLUTIONS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

# <u>ORDER & OPINION</u>

This matter is now before the Court on Plaintiff's Motion (Doc. 31) for Temporary Restraining Order and Memorandum (Doc. 32) in Support. Defendants have filed a Response (Doc. 44) and the Court heard argument from the parties on August 26, 2020. For the reasons set forth below, Plaintiff's Motion (Doc. 31) is GRANTED.

### BACKGROUND

**1. Plaintiff's Amended Complaint**

The following facts are taken from Plaintiff's Amended Complaint. Doc. 28. Plaintiff Mavidea Technology Group ("Mavidea") was formed in 2007 and is engaged in the business of providing IT solutions, software development, digital marketing, and website design. Doc. 28, at 3. Warmbir Technology is entirely owned by Jamie Warmbir, who was an original member of Mavidea, and served in that role until February 10, 2020. Warmbir led Mavidea's Information Technology business and supervised its employees at all relevant times. Warmbir was the highest paid individual at Mavidea *Id*.

The members and managers of Mavidea began the process of amending their operating agreement in 2019, and on April 17, 2019, they executed an amended operating agreement ("the Operating Agreement"). The agreement provides that the members shall use the company's credit and assets solely for the benefit of the company; that managers shall not have the authority, without the consent of the members, to do any act in contravention of the agreement, to do any act which would make it impossible to carry on the ordinary business of the company, or to possess property or assign rights in specific property for other than a company purpose. The Agreement further provided that managers shall conduct the affairs of the company in the best interests of the company, including the safekeeping and use of all of the property for the exclusive benefit of the company. *Id*. at 3–4.

Because some of the members and managers were members of other ventures, the Agreement required any manager to use intangible property created or acquired by Mavidea for the exclusive benefit of the company, but the manager would not be required to offer the stock of any new independent or competing venture back to Mavidea provided the member or manager respected the intangible property interests of Mavidea. *Id*. at 4.

Mavidea's business used a "managed services" business model where Mavidea would serve businesses in the area by entering into contracts with them. The customer would pay a monthly base fee which would include a "scope of services" which Mavidea would provide. Often, Mavidea would put in a significant amount of labor upfront in order to understand the customer's existing computer system and to implement the software needed to properly service the contract, with the goal that the monthly fee would eventually cover these expenses. *Id*. at 5.

Locating customers is an important part of Mavidea's business, and it employees someone full time to call potential customers. In 2019, Mavidea made 17,516 phone calls to

prospective customers, leading to 11 potential clients and 3 signed contracts in the 2019 fiscal year. Mavidea maintains a confidential detailed database of the information it has learned through the sales cycle. *Id*. at 6.

Warmbir, as director of the IT department, had access to the database and would be the individual that would qualify and meet with prospective clients in the final stages. As a result of his role, he had access to critical proprietary information concerning the identity, pricing terms, contract lengths and services included for each customer of Mavidea. He also had access to and regularly reviewed the proprietary underlying data concerning how much labor and costs had been expended for each contract, i.e., he understood the profitability of each customer and the cost it would take to service each contract. *Id*. at 6.

In 2019, other managers at Mavidea noticed Warmbier was discontent. In October 2019, Warmbir tendered a "statement of contentment" to the other managers affirming that he wanted to continue to be on the team. *Id*. Shortly thereafter, Warmbir devised a scheme to forcibly take the IT division from Mavidea by taking Mavidea's clients and employees in the event the managers of Mavidea would not sell it to him for the price he dictated. *Id*. at 7.

Warmbir concealed his intentions for months from the other managers, enabling him to a) learn additional confidential information from the company and its managers, b) further exploit the confidential information and property of Mavidea, c) obtain an appraisal of Mavidea's IT business, d) meet with his attorney and other advisors to prepare for his new venture, e) put himself in a position with the employees of Mavidea to convert them to his new venture, f) identify and cultivate prospective clients that could be signed up by his new venture, g) attend conferences paid for by Mavidea where he could learn new methods and ways to differentiate his

new company from Mavidea, and h) take other actions to prepare for the start of his new venture that are still being investigated. *Id*. at 7.

Warmbir failed to follow the standard practice of Mavidea by either failing to procure non-competition agreements or allowing the destruction of existing non-competition agreements with two employees under his supervision that he desired to come to his new business. *Id*. Upon information and belief, Warmbir memorized or otherwise recorded Mavidea's prospective customer and customer list that pertained to the IT department, along with contract term dates, pricing data, and other customer information that was confidential information, trade secrets, and property of Mavidea. *Id*. at 7–8.

Warmbir allowed appointments to be set up with prospective of existing customers past his resignation date which he knew he could take advantage of after leaving. Upon information and belief, Warmbir recruited his wife, Charlotte Warmbir, to assist him in making preparations for his new business. Warmbir accumulated additional contacts and proprietary company information on the phone that he wrongfully intended to take with him after leaving Mavidea. *Id*. at 8.

Warmbir delayed the signing of new clients so that he would not be encumbered by a Mavidea contract when starting his new venture. Warmbir forwarded the confidential resume and an email with a prospective employee to his own personal email account so that he could utilize the information for his new company. Warmbir, without permission, released the confidential financial information to an appraiser for his own purposes in furtherance of his scheme. *Id*.

On Friday, February 10, 2020, Warmbir set his plan into action, relinquishing his authority to act as manager of Mavidea. He informed the remaining managers that they had 4 business days to either sell the IT division to him at the price he demanded, or he would take the

customers and employees without paying them anything for it. He informed them that his new competing business was ready to service customers immediately after any denial to sell it to him at his price. *Id*. at 8. Mavidea rejected Warmbir's offer on February 14, 2020 and informed him he would need to tender any of Mavidea's property back to the company that day. In response, Warmbir secretly contacted Verizon and posed as an agent or manager of Mavidea, requesting Verizon transfer the telephone number from the account Mavidea owned to his personal account. *Id*. at 9. This allowed him to continue receiving calls from existing and prospective clients of Mavidea. The next day, Warmbir announced he and his wife were opening a new business called Warmbir IT Solutions LLC.

On February 21, 2020, Warmbir requested a former Mavidea employee contact all other employees of the Mavidea IT department and come to his house for pizza and beverages. Plaintiff alleges Warmbir created a scheme whereby he would create positions at his new company for each of the employees of the Mavidea IT department, with the exception of one individual who was retiring soon. For each position, Warmbir created a job description that was tailored specifically for the employee he was trying to move over to his company. Warmbir would then post a solicitation for that job in which each employee was then to apply for the position. Plaintiff alleges these solicitations were merely a ruse to make it appear that a legitimate job search process was occurring. *Id*. at 10.

Warmbir then undertook an effort to have the employees he supervised at Mavidea terminate their employment and come to his new venture. He was able to reduce his search for employees and enhance offers to them by using their names, background, and salary history. Plaintiff alleges the purpose of this quick turnaround was to enhance Warmbir's competing

venture's ability to pitch to Mavidea's customers that they would be better off terminating their contract and signing up with his business. *Id*.

On February 22, 2020, the day after the pizza party, Mavidea employee Eric Even sent Warmbir a message with his resume applying for the position Warmbir created for him. Within a couple weeks, Warmbir hired the two employees that he had either failed to obtain a non-compete agreement for or allowed the non-compete to be destroyed. *Id*.

Warmbir utilized the services of a third party to reach out and contact the salesperson of Mavidea to determine whether she would be willing to leave Mavidea and come to his new company. Shortly thereafter, he encouraged another Mavidea employee, Chris Boyer, to cease employment at Mavidea and join his competing company. Boyer gave notice of his intent to leave on March 26, 2020. Warmbir had prepared and executed a non-compete on behalf of Mavidea with Boyer on September 23, 2019, knowing that the contract contained various prohibitions on competing with Mavidea. *Id*.

Warmbir also hired Elizabeth Fornero and Matthew Reichert, who also had similar non-compete agreements with Mavidea that Warmbir had executed. Each employee that terminated their employment with Mavidea and went to work for Warmbir had specialized skills and knowledge, including knowledge of the customers' specific computer system architecture, programs and processes utilized by each client. These skills took a large amount of Mavidea's time and financial resources to develop. *Id*. at 12.

Upon opening his new business, Warmbir used customer names, backgrounds, contract terms, pricing data and other customer information to have Mavidea's customers terminate their contracts with Mavidea and sign new contracts with Warmbir. In order to encourage Mavidea's customers to leave, he told them that the employees who knew how to service their account were

now employed by him and that Mavidea no longer had the ability to effectively and efficiently provide them services. Within a few weeks, Warmbir's efforts resulted in 11 contract terminations with Mavidea. In many cases, he provided them with a script they should use to terminate their contract with Mavidea and gave them specific advice on when and how they should terminate. *Id*. at 12.

Plaintiff alleges the legal advice given to Mavidea customers constituted the unauthorized practice of law. Warmbir also used potential customer information to recruit Mavidea's prospective customers for his new venture, and at least one prospective customer agreed to work with Warmbir's new company instead of Mavidea. Plaintiff also alleges Warmbir told clients "at Mavidea, IT is not a priority compared to other projects." *Id*. at 13.

On March 11, 2020, Mavidea's attorney sent Warmbir a cease and desist letter and demanded he preserve all evidence. On March 16, 2020, Warmbir's attorney tendered a response "for settlement purposes only" which did not include any settlement offer and denied all liability. *Id*.

## LEGAL STANDARD

A temporary restraining order is an emergency remedy issued to maintain the status quo until a hearing can be held on an application for a preliminary injunction. *Coca–Cola Co. v. Alma–Leo U.S.A., Inc.*, 719 F. Supp. 725, 726 (N.D. Ill. 1989). The purpose of a TRO, similar to that of a preliminary injunction, is to minimize the hardship to the parties pending the ultimate resolution of the suit. *Faheem–El v. Klincar*, 841 F.2d 712, 717 (7th Cir. 1988). In this circuit, the standards for a TRO and a preliminary injunction are functionally identical. *Bernina of America, Inc. v. Fashion Fabrics International*, 2001 WL 128164, at * 1 (N.D. Ill. Feb. 9, 2001).

A temporary restraining order must (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required. Fed. R. Civ. P. 65(d).

Injunctive relief, including the entry of a TRO, is warranted if the movant can make a threshold showing: (1) that the movant has some likelihood of success on the merits of the underlying litigation; (2) that no adequate remedy at law exists; and (3) that the movant will suffer irreparable harm if the injunction is not granted. If these three conditions are met, then the Court must balance the harm to the movant if the injunction is not issued against the harm to the defendant if it is issued improvidently and consider the interest of the public in whether the injunction is to be granted or denied. *Crue v. Aiken*, 137 F. Supp. 2d 1076, 1082–83 (C.D. Ill. 2001); *see also Duct–O–Wire Co. v. U.S. Crane, Inc.,* 31 F.3d 506, 509 (7th Cir. 1994), *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 314–15 (7th Cir. 1994), *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11–12 (7th Cir. 1992), *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006).

DISCUSSION

## 1. Breach of Fiduciary Duty

In its motion and memorandum, Plaintiff argues a temporary restraining order is necessary with respect to several of its claims. Doc. 32, at 4. Plaintiff first addresses its request for a TRO in the context of its breach of fiduciary duty claim. *Id*. Under Illinois law, a breach of fiduciary duty claim consists of the following elements: (1) a fiduciary duty exists; (2) the fiduciary duty was breached; and (3) such breach proximately caused the injury of which the party complains. *Lawlor v. N. Am. Corp. of Illinois*, 2012 IL 112530, ¶ 69, 983 N.E.2d 414, 433 (citing *Neade v. Portes*, 193 Ill.2d 433, 444, 250 Ill.Dec. 733, 739 N.E.2d 496 (2000)).

"Employees as well as officers and directors owe a duty of loyalty to their employer." *Id*. Moreover, "a fiduciary cannot act inconsistently with his agency or trust and cannot solicit his employer's customers for himself." *Id*. (citing *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.*, 62 Ill.App.3d 671, 683, 20 Ill.Dec. 160, 379 N.E.2d 1228 (1978)).

Under the Illinois Limited Liability Company Act, managers (like Warmbir) of a manager-managed LLC owe fiduciary duties to the LLC, including a duty of loyalty, duty of care, and a duty of good faith and fair dealing. 805 ILCS 180/15-3. Plaintiff equates the fiduciary duties owed by officers and directors of corporations to the fiduciary duties owed by managers of a manager-managed LLC, and relies on cases discussing fiduciary duties of corporate officers and directors. *See* Doc. 32, at 5–7.

In their Response, Defendants argue common law fiduciary duties of officers and directors of corporations do not apply here. Doc. 44, at 6. Defendants go on to cite §15-3 of the Illinois LLC Act in support of its argument that "by including Article 1.7 [of the Operating Agreement] which permits members or managers of Plaintiff to engage in or own any competitive interest that the member or manager chooses, Plaintiff's Operating Agreement limited the requirements of Section 15-3 of the LLC Act." *Id*. at 7.

Regardless of whether common law fiduciary duty principals apply to LLCs, Defendants are mistaken in their belief that "Plaintiff's Operating Agreement limited the requirements of Section 15-3 of the LLC Act." This is so because the article of the Operating Agreement Defendants allude to explicitly states "[e]xcept to the extent specified in Section 15-3 of the Act. . . ." Thus, the Operating Agreement incorporates the fiduciary duties owed by managers under the Act into the Operating Agreement; it does not limit those duties, as Defendants suggest. Accordingly, as a manager of Mavidea, Warmbir owed fiduciary duties to the company,

including a duty of loyalty, duty of care, and a duty of good faith and fair dealing. 805 ILCS 180/15-3.

Plaintiff alleges Warmbir breached his fiduciary duties to Mavidea in numerous ways, including by delaying meetings and customer leads during his final months at Mavidea so as to take advantage of Mavidea's corporate opportunities with his own company. Doc. 32, at 3. In support of this assertion, Plaintiff has submitted the Declaration of Jake Davis. Doc. 34. Therein, Davis attaches an exhibit of an April 2020 email communication between a Mavidea customer and Warmbir wherein Warmbir instructs the Mavidea customer on how to cancel her contract with them, noting "Mavidea did not contact you before the end of your 36 month term to ask how you want to proceed . . . . That's their issue." Doc. 34-91, at 1 (Exhibit R-23). Plaintiff asserts that Warmbir was the one responsible for notifying clients prior to the end of their contract term while he was a manager of Mavidea.

The Davis Declaration also refers to a January 30, 2020 email between Warmbir and a prospective customer where Warmbir states he will "run some numbers on partnering with you" and he will "be in touch next week." Doc. 34-92, at 1 (Exhibit R-24). Instead of responding to the potential customer while employed at Mavidea, Warmbir waited until February 28, 2020 to email the potential customer and solicit his business under Warmbir's new company. Doc. 34-93, at 1 (Exhibit R-25); Doc. 34-94, at 1 (Exhibit R-26).

Additionally, the Davis Declaration asserts Warmbir was scheduled to meet with a potential client on February 11, 2020, just days before his resignation, and then usurped the corporate opportunity for himself. Doc. 34, at 17; Doc. 34-99, at 1 (Exhibit R-31). Finally, Davis refers to a February 12, 2020 email between a Mavidea client and Warmbir where Warmbir

delays a meeting scheduled that day with the client and reschedules for February 19, 2020. Doc. 34-100, at 1 (Exhibit R-32).

The above allegations and supporting evidence are sufficient to establish a likelihood of success on Plaintiff's breach of fiduciary duty claim. Regardless of the legal consequences of Warmbir resigning from his role at Mavidea, Plaintiff has produced evidence that Warmbir breached his duties of loyalty, care, and good faith and fair dealing *while still employed at Mavidea*. Specifically, Warmbir encouraged Mavidea clients to take advantage of Mavidea's failure to provide notice in order to get out of the contract and switch to his new company, even though Warmbir was responsible for providing notice to Mavidea clients. The evidence produced by Plaintiff also supports its argument that Warmbir attempted to delay signing new customers or contracts in the days leading up to his resignation, and then solicited those same customers soon after he started his own venture. Conduct of the sort described above violates a fiduciary's duty of loyalty. *See Everen Securities, Inc. v. A.G. Edwards and Sons, Inc.*, 308 Ill. App. 3d 268, 276 (3d Dist. 1999) ("Corporate Officers owe a fiduciary duty of loyalty to their corporate employer not to actively exploit their positions within the corporation for their own personal benefit or hinder the ability of a corporation to continue the business for which it was developed."); *Lawlor v. N. Am. Corp. of Illinois*, 2012 IL 112530, ¶ 69, 983 N.E.2d 414, 433 ("[A] fiduciary cannot act inconsistently with his agency or trust and cannot solicit his employer's customers for himself."). Plaintiff has established a likelihood of success on its breach of fiduciary duty claim.

**(2) Tortious Interference with Contract and Business Expectancy**

Plaintiff brings tortious interference with contract and business expectancy claims alleging Warmbir interfered with three separate employment contracts between Mavidea and its former employees, and that Warmbir interfered with the contracts between Mavidea and its

customers. Doc. 32, at 7–8, 11. "[T]o prevail on a claim for tortious interference with a prospective economic advantage, a plaintiff must prove: (1) his reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference." *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 511, 568 N.E.2d 870, 878 (1991).

Here, Plaintiff argues Warmbir intentionally raided Mavidea's employees, and relies on two cases in support, *ISC-Bunker Ramo Corp. v. Altech, Inc.*, 765 F. Supp. 1310 (N.D. Ill. 1990) and *Lawson Prod., Inc. v. Chromate Indus. Corp.*, 158 F. Supp. 2d 860 (N.D. Ill. 2001). In *ISC-Bunker*, the court found the plaintiff "introduced substantial evidence to show that Altech repeatedly hired ex-ISC employees to work on the installation, service, and repair of ISC computer systems and their component parts. In so doing, Altech sought to appropriate and exploit their ISC training, and their knowledge of ISC confidential information and trade secrets." *Id*. at 1338. Further, the court found substantial evidence that "the Altech ex-ISC employees have, and are continuing to use and disclose confidential information and trade secrets of ISC for Altech's benefit" because "[t]hey have been, and are presently employed in positions with Altech that inherently call upon them to use and disclose such training, confidential information and trade secrets." *Id*. In granting injunctive relief, the *ISC* court found "the extensive and continuing nature of Altech's interference with ISC's employment agreements intensifies and compounds the irreparable nature of ISC's injury." *Id*. at 1339.

Similarly, in *Lawson*, the defendant

solicited many of the soon-to-be-former Premier salespeople with job offers, including signing bonuses and guaranteed compensation. Defendant also

represented to these salespeople that they were not bound by their confidentiality promises to plaintiffs and that Chromate would indemnify them in any legal action. Chromate eventually hired several of them, also as independent sales agents. These salespeople continue servicing their existing customers, only now selling Chromate products.

*Lawson Prod., Inc.*, 158 F. Supp. 2d at 862. Plaintiff likens its case to *ISC-Bunker* and *Lawson*, arguing that like those cases, Plaintiff alleges claims for tortious interference with contract against a competitor that has hired numerous of their employees and is using their confidential information to compete against the former employer. Doc. 32, at 9.

In their Response, Defendants argue Plaintiff cannot show Defendants personally interfered with Mavidea's employee agreements because the agreements' definition of direct or indirect competition is limited to "microfilm, printer or distribution" businesses. Doc. 44, at 17; Docs. 34-1, 34-12, 34-15. While the employment agreements do contain this language, they also contain other prohibitions which Defendant does not specifically address, such as prohibitions on disclosing to others clients, potential clients, contracts, plans, and confidential information of Mavidea for 12 months after termination of employment; prohibitions on soliciting or interfering with Mavidea projects, clients, employees for 12 months after termination of employment; prohibitions on inducing Mavidea employees to disclose trade secrets and confidential information; and a prohibition on inducing other Mavidea employees to leave Mavidea or breach their obligations to Mavidea. *See* Doc. 34-15, at 5.

Defendant also argues the employment agreements may be invalid. Doc. 44, at 17–18. Plaintiff, anticipating this argument, notes that if the employment agreements were deemed invalid, this would further support Plaintiff's breach of fiduciary duty claim, as Warmbir was the one responsible for drafting the faulty employment agreements in the first place. Doc. 32, at 9. By remaining silent upon learning of a defense to the contract, Plaintiff alleges Warmbir

breached his fiduciary duty of loyalty, and he breached his fiduciary duties after leaving by taking advantage of the corporate opportunity to otherwise keep the employees at Mavidea. *Id*. at 10. Moreover, Plaintiff argues the enforceability of the employment agreements is not necessary to find Defendants tortuously interfered with Mavidea's expectancy from the relationship it had with its employees. *Id*.

With respect to the tortious interference claim relating to Mavidea's employees, the Court finds Plaintiff is likely to succeed on this claim. Regardless of the validity of the employment agreements, Mavidea's employees had worked there for multiple years and nothing in the record suggests they were inclined to leave before Warmbir left Mavidea and solicited them to do the same work for his new company. In this respect, Plaintiff's case is similar to *ISC-Bunker* and *Lawson*. And given that Warmbir was the one responsible for drafting and securing signatures on the employment agreements, it is unlikely Defendants will be able to show this interference was anything other than "intentional."

In addition to the tortious interference claim relating to employees, Plaintiff alleges Warmbir interfered with the contracts between Mavidea and its customers. Doc. 32, at 11. In support of this argument, Plaintiff notes that before Warmbir left, Mavidea had a 98% monthly retention rate with its customers. After Warmbir started his own competing business, Mavidea lost 40% of the customers who were receiving IT services from Mavidea from February 14, 2020, to present. Doc. 34, at 5. The customer contracts were at-will contracts. Defendant counters that Plaintiff cannot show purposeful interference because it made no showing Warmbir acted with "fraud deceit, intimidation or deliberate disparagement of his competition with Plaintiff." Doc. 44, at 15–16.

"Until terminated, the relationship created by an at-will contract will presumptively continue in effect so long as the parties are satisfied, and, therefore, such a relationship is sufficient to support an action for tortious interference." *Grund v. Donegan*, 298 Ill. App. 3d 1034, 1038, 700 N.E.2d 157, 160 (1998) (citing *Kemper v. Worcester,* 106 Ill.App.3d 121, 125, 62 Ill.Dec. 29, 435 N.E.2d 827 (1982)). Here, it is undisputed that Mavidea had a reasonable expectation of continuing its relationship with its customers, and this is further supported by Mavidea's 98% customer retention rate. And because Warmbir worked for Mavidea servicing these customers, he knew of Mavidea's expectancy. Thus, the first two elements of a tortious interference claim have been established. Defendant asserts Plaintiff cannot establish the purposeful interference element because it made no showing Warmbir acted with "fraud deceit, intimidation or deliberate disparagement of his competition with Plaintiff." Doc. 44, at 15–16.

In *Smith-Shrader Co. v. Smith*, an Illinois appellate court addressed an argument nearly identical to the one Warmbir advances here:

> Section 768 enumerates the four requirements necessary to establish the aforementioned defense of "privilege": (1) the business relation must concern a matter involved in the competition between the actor and the competitor; (2) the actor must not employ improper means; (3) the actor must not intend to create an illegal restraint of competition; and (4) the actor's purpose must be at least partially to advance his interest in competing with his competitor. (Restatement of Torts § 768 (1939)). Smith claims that because there was no provision in his contract that would prevent him from resigning and forming his own company, he was free to take advantage of his knowledge and experience in the field gained during his association with S–S. We concur with Smith's statement, however, the application of personal knowledge and experience gained while at S–S is not the issue. Rather, the issue is whether Smith employed improper means when he interfered with the business relations established between S–S and its manufacturers and key employees. Our conclusion that Smith breached his fiduciary duty by soliciting key clients and former employees of S–S clearly shows that improper means were used, thus, defeating Smith's claim of "privilege." See *Michigan Avenue National Bank v. State Farm Insurance Companies* (1980), 83 Ill.App.3d 507, 514, 39 Ill.Dec. 42, 404 N.E.2d 426.

*Smith-Shrader Co. v. Smith*, 136 Ill. App. 3d 571, 579–80, 483 N.E.2d 283, 289–90 (1985). Like in *Smith-Shrader*, Defendants in this case cannot rely on the competition privilege because, at least in this stage of the proceedings, Plaintiffs have shown Warmbir purposefully interfered with business relations between Mavidea and its customers by soliciting Mavidea clients, disparaging Mavidea in efforts to covert current Mavidea clients to his new startup, and delaying contract executions with clients during his final weeks at Mavidea. *See Smith-Shrader*, 136 Ill. App. 3d at 580 ("[A]n intentional act is not limited to unabashed third party conduct which induces one party to outrightly repudiate and breach its contract; it also encompasses subtle third party conduct which achieves essentially the same result.") (internal quotations omitted); *See also, e.g.*, Doc. 34-91, at 1 (Exhibit R-23); Doc. 34-92, at 1 (Exhibit R-24); Doc. 34-93, at 1 (Exhibit R-25); Doc. 34-94, at 1 (Exhibit R-26); Doc. 34, at 17; Doc. 34-99, at 1 (Exhibit R-31); Doc. 34-100, at 1 (Exhibit R-32). In light of the above, the Court finds Plaintiff is likely to succeed on its claim that Warmbir tortuously interfered with the contracts between Mavidea and its customers.

### 3. Plaintiff's Trade Secret Claims

Plaintiff brings trade secret claims under the Illinois Trade Secrets Act and the Federal Defend Trade Secrets Act. *See* Doc. 32, at 12–18. Both parties generally agree the analysis of these claims is similar and that they are often discussed together. Plaintiff alleges that its list of actual or potential customers, as well as its contracts and contract terms, are protectable trade secrets. Plaintiff states its customer list was the result of a yearlong effort, including 17,516 phone calls, which resulted in 11 qualified prospective customers. *Id*. at 14. However, although Plaintiff attempts to distinguish its customer lists from those at issue in *Sys. Dev. Servs., Inc. v. Haarmann*, that court found customer lists generated by IT businesses were not protectable trade secrets.

In the present case, the evidence at the trial was insufficient to establish that the identity and contact information of potential customers of computer network services was sufficiently secret to qualify for trade secret status. In today's modern world, computers and computer networks are common business tools, and all businesses are potential customers of computer network services. Locating potential customers is merely a matter of identifying businesses in a particular town, county, or area and looking up their contact information. This information is easily obtained from telephone directories, chamber of commerce directories, the Internet, and a variety of other sources. "[W]here customer information is readily available to competitors through normal competitive means, no protectable interest exists." *Office Mates 5, North Shore, Inc.,* 234 Ill.App.3d at 575–76, 175 Ill.Dec. 58, 599 N.E.2d at 1085. A trade secret must be something kept from the general public and not susceptible to common knowledge.

We note that SDS's customer list is merely a listing of names, addresses, and telephone numbers. The list encompasses a wide range of retail businesses, service businesses, and government offices, including, but not limited to, accountants, lawyers, restaurants, mechanics and other auto service businesses, doctors, insurance agencies, utilities, exterminators, construction companies, schools, health care facilities, retail businesses of all types, banks, real estate agencies, municipalities, county clerks, circuit court clerks, sheriff departments, county treasurer offices, State's Attorneys' offices, manufacturers, county health departments, and pharmacies. Many of these listings were merely potential customers with whom SDS had no prior business relationship. The information on this list is general information and is common knowledge to people in the computer service trade or is otherwise readily available information. Competitors in the computer network industry can quickly identify potential customers in a given area by referring to directories and other sources of publicly available data.

*Sys. Dev. Servs., Inc. v. Haarmann,* 389 Ill. App. 3d 561, 574–75, 907 N.E.2d 63, 75–76 (2009).

For the same reasons articulated in *Sys. Dev. Servs.*, the Court does not believe Plaintiff is likely to succeed on the merits of any of its trade secret claims. Accordingly, the Court declines to issue a TRO against Defendants under these theories.

### 4. Breach of Operating Agreement

Next, Plaintiff seeks a TRO based on Warmbir's breach of Mavidea's Operating Agreement. Doc. 32, at 18. The Operating Agreement prohibited Warmbir from (among other things) "possess[ing] property, or assign rights in specific property, for other than a Company purpose" and required him to "conduct the affairs of the Company in the best interests of the

Company." Doc. 32, at 18–19. Plaintiff largely rehashes the conduct giving rise to the breach of fiduciary duty claim as support for this breach of contract claim. Just like any other contract, the elements of this cause of action are (1) the existence of a valid and enforceable contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) resulting damages. *Gonzalzles v. Am. Exp. Credit Corp.*, 315 Ill. App. 3d 199, 206, 733 N.E.2d 345, 351 (1st Dist. 2000).

Plaintiff is likely to succeed on its breach of Operating Agreement claim, at least with respect to the allegations that Warmbir concealed his intent to leave so as to enable him to take actions to facilitate his own competing startup, failing to protect employee contracts, delaying signing new customers until after his departure, forwarding information on prospective employees to himself for use after he left, and not implementing enhanced software to meet the security needs of Mavidea clients. Doc. 32, at 19–20; *see also* Doc. 34-91, at 1 (Exhibit R-23); Doc. 34-92, at 1 (Exhibit R-24); Doc. 34-93, at 1 (Exhibit R-25); Doc. 34-94, at 1 (Exhibit R-26); Doc. 34, at 17; Doc. 34-99, at 1 (Exhibit R-31); Doc. 34-100, at 1 (Exhibit R-32). Additionally, Plaintiff is likely to succeed on this claim in relation to Warmbir's conversion of the Mavidea-owned phone number, which Warmbir transferred to his own Verizon account by purporting to act as a manager when he contacted Verizon. *See* Doc. 34-108.

## 5. Illinois Cable Piracy Act

Given the novel nature of this claim and that fact that it relates only to Warmbir's conversion of Mavidea's phone number, which is already covered under other theories in this case, the Court does not believe Plaintiff can meet its burden of establishing a likelihood of success on the merits of this claim at this time. Accordingly, the Court declines to issue a TRO with respect to this claim, though Plaintiff may further develop this argument at the preliminary injunction stage.

### 6. Inadequate Remedy at Law and Irreparable Harm

In order to obtain a TRO, Plaintiff must establish no adequate remedy at law exists. *Crue v. Aiken*, 137 F. Supp. 2d 1076, 1082–83 (C.D. Ill. 2001). Plaintiff argues its complete loss of its customer relationships is an injury for which money damages would be inadequate due to the difficulty in calculating those kinds of damages. Doc. 32, at 22. Moreover, Plaintiff claims that it has suffered intangible injuries as well, such as a loss of competitive position and good will. Defendants respond that Plaintiff has an adequate remedy at law because it was able to document and itemize the lost revenues from the clients that have been transferred to Warmbir. Doc. 44, at 20. But even if Defendants were correct, they still fail to address other injuries to Plaintiff, such as a loss of good will and the loss of employees trained to do IT work at Mavidea. Further, Seventh Circuit precedent strongly supports Plaintiff's position on this matter.

> Foodcomm asserts that it has been and will continue to be irreparably injured by Barry and Leacy's actions, the most important injuries of which are its inability to attempt to maintain its relationship with Empire and its complete loss of that relationship. Because it is not practicable to calculate damages to remedy this kind of harm, no remedy at law can adequately compensate Foodcomm for its injury. *Roland Machinery,* 749 F.2d at 386; *see also Cross Wood Products, Inc. v. Suter,* 97 Ill.App.3d 282, 52 Ill.Dec. 744, 422 N.E.2d 953, 957 (1981); *Preferred Meal Systems, Inc. v. Guse,* 199 Ill.App.3d 710, 145 Ill.Dec. 736, 557 N.E.2d 506, 516–17 (1990). Furthermore, Barry and Leacy have no significant assets in the United States and Outback is a start-up business with no assets. *See Roland Machinery,* 749 F.2d at 386. Because Foodcomm's irreparable harm was caused by and is maintained by Barry and Leacy's actions, an injunction is appropriate to prevent this harm from continuing.

*Foodcomm Int'l v. Barry*, 328 F.3d 300, 304–05 (7th Cir. 2003). Like in *Foodcomm*, Mavidea's biggest injury is the loss of its relationship with its customers. Also like *Foodcomm*, Warmbir lacks significant assets with which to pay an adverse judgment. Accordingly, Plaintiff has established it lacks an adequate remedy at law and that it would be irreparably harmed without injunctive relief.

**7. Balancing of Harms**

If a plaintiff establishes the prerequisites for a TRO, the Court must then balance the harm to the movant if the TRO is not issued against the harm to the defendant if it is issued improvidently and consider the interest of the public in whether the injunction is to be granted or denied. *Crue v. Aiken*, 137 F. Supp. 2d 1076, 1082–83 (C.D. Ill. 2001). Here, for reasons already discussed, Plaintiff faces a substantial risk of irreparable harm if Warmbir is not enjoined from poaching clients. In contrast, Warmbir will not be irreparably harmed if a TRO is granted. Rather, Warmbir will be free to compete fairly. He may solicit customers who do not have a relationship with Mavidea, and he can obtain his own phone number. For the same reasons discussed in *Foodcomm*, the balance of the harms favor issuing a TRO.

For the reasons set forth above, the Court finds Plaintiff, Mavidea, will suffer irreparable harm in the absence of a temporary restraining order, the following Order is the only adequate remedy to prevent continued harm to Plaintiff until a preliminary injunction hearing may be held, and the public interest is served by the issuance of this Order. In fashioning this order, the Court has attempted to reduce the risk of harm to Defendants by still allowing them to service the clients they poached from Mavidea, while also insuring that any success Mavidea may ultimately have in this suit will not be a pyrrhic victory. However, it is not the duty of the Court to protect Warmbir and his associates from the consequences of his own actions; consequences which, it appears from the record, Warmbir was fully aware of when he engaged in the conduct giving rise to this lawsuit. Yet given the legal and factual issues regarding the validity and enforceability of the employment agreements, as well as the significant harm to the employees if a restraining order is granted, the Court declines to issue a TRO prohibiting Warmbir from utilizing the services of the former Mavidea employees at this time. Rather, the Court will consider this issue

and balance the harms with the benefit of a more developed record at the preliminary injunction hearing.

Accordingly, it is hereby ordered that:

1. A constructive trust shall be implemented for any funds received for work performed on behalf of 1) any customer who was a customer of Mavidea's IT Department on February 14, 2020 and/or 2) any of the 11 qualified prospective customers Warmbir was actively trying to acquire while at Mavidea in the year previous to his departure on February 14, 2020. Such funds shall be placed in the trust account of the Defendants' attorney until further order of the Court.

2. Defendants shall return any and all intangible property of Plaintiff's to Plaintiff's attorney within seven (7) days of this Order and shall destroy any remaining copies, electronic or otherwise.

3. Defendant shall transfer the phone numbers that he took from Mavidea on February 14, 2020 back to Mavidea by September 4, 2020.

This TRO shall become effective immediately upon its entry, and shall remain in effect until October 20, 2020, or until a hearing may be held on Plaintiff's Motion for Preliminary Injunction, or by further order of the Court, whichever is earlier.

## CONCLUSION

For the reasons set forth above, Plaintiff's Motion (Doc. 31) for Temporary Restraining Order is GRANTED.

Signed on this 3rd day of September, 2020.

s/ James E. Shadid
James E. Shadid
United States District Judge